# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

BRENDA KELLY                                :
                                            :
          Appellant,                        :
                                            :
v.                                          :          CASE NO.: 16-3303
                                            :
UNIVERSITY OF PENNSYLVANIA                  :
HEALTH SYSTEM, d/b/a PENN                   :
MEDICINE                                    :
                                            :
          Appellee.                         :
_____:

## APPENDIX VOLUME 2 OF 5 VOLUMES
## CONTAINING PAGE NUMBERS JA27 TRHOUGH JA221

Appellant, Brenda Kelly ("Appellant"), submits this Brief in support of her

Appeal of the District Court's grant of Summary Judgment in favor of Appellee.

| PAGE | DOCUMENT |
| --- | --- |
| 27-30 | Federal Court Docket Entries |
| 31-102 | Excerpts from Deposition of Plaintiff |
| 103-107 | Excerpts from Deposition of Sophia Douglas |
| 108-110 | Excerpts from Deposition of Tammy Stewart |
| 111-112 | Resume of Plaintiff |
| 113-122 | Leave of Absence Policy |
| 123-124 | 2014 Leave Request Acknowledgement Letter |
| 125-136 | Performance Improvement and Progressive Steps Policy |

| | |
|---|---|
| 137-145 | Plaintiff's Medical Leave History |
| 146-147 | 11/4/14 Email Thread re: Plaintiff's Medical Accommodation Requests |
| 148 | 11/12/14 Email Thread re: Plaintiff's Accommodation Request |
| 149 | 11/14/14 Letter re: Accommodation Request |
| 150-157 | Plaintiff's Disciplinary Warnings Prior to 2014 |
| 158 | First Written Warning dated 4/29/14 |
| 159-160 | Second Written Warning dated 12/5/14 |
| 161 | Final Written Warning dated 2/20/15 |
| 162-201 | Expert Report and Exhibits of Khody R. Detwiler |
| 202-204 | Sick Leave Policy |
| 205 | Email from Sophie Douglas to Plaintiff on 2/10/15 |
| 206 | Email regarding Plaintiff's Unprofessional Conduct on 3/6/15 |
| 207 | Email regarding Plaintiff's Call-Out on 3/16/15 |
| 208 | Personnel Action Form |
| 209-210 | Plaintiff's Employment Pay Rate History |
| 211-212 | Termination Letter dated 6/19/15 |

213-221                          Amended Civil Action Complaint


Julia W. Clark, Esq.
Karpf, Karpf & Cerutti, P.C.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
Phone: (215) 639-0801
Fax: (215) 639-4970
Email: jclark@karpf-law.com
Attorneys for Appellant

Date: February 21, 2017

CLOSED,APPEAL,STANDARD

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:16-cv-00618-MAK

KELLY v. UNIVERSITY OF PENNSYLVANIA HEALTH
SYSTEM
Assigned to: HONORABLE MARK A. KEARNEY
Case in other court:  USCA, 16-03303
Cause: 29:2601 Family Medical Act of 1993

Date Filed: 02/08/2016
Date Terminated: 08/02/2016
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights:
Employment
Jurisdiction: Federal Question

**Plaintiff**

**BRENDA KELLY**                          represented by **JULIA W. CLARK**
                                          KARPF, KARPF & CERUTTI P.C.
                                          3331 STREET ROAD
                                          SUITE 128
                                          TWO GREENWOOD SQUARE
                                          BENSALEM, PA 19020
                                          215-639-0801
                                          Email: jclark@karpf-law.com
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **ARI RISSON KARPF**
                                          KARPF, KARPF & CERUTTI, P.C.
                                          3331 STREET ROAD
                                          TWO GREENWOOD SQUARE, SUITE
                                          128
                                          BENSALEM, PA 19020
                                          215-639-0801
                                          Fax: 215-639-4970
                                          Email: akarpf@karpf-law.com
                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNIVERSITY OF PENNSYLVANIA**            represented by **ERIC C. KIM**
**HEALTH SYSTEM**                         MORGAN LEWIS & BOCKIUS LLP
*doing business as*                       1701 MARKET ST
PENN MEDICINE                             PHILADELPHIA, PA 19103
                                          215-963-5652
                                          Email: eric.kim@morganlewis.com

JA27

*ATTORNEY TO BE NOTICED*

**JEFFREY ALAN STURGEON**
MORGAN, LEWIS & BOCKIUS
1701 MARKET STREET
PHILADELPHIA, PA 19103
215-963-5650
Email: jsturgeon@morganlewis.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/08/2016 | 1 | COMPLAINT against UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM ( Filing fee $ 400 receipt number 0313-11133587.), filed by BRENDA KELLY.(KARPF, ARI) (Entered: 02/08/2016) |
| 02/08/2016 | | Summons Issued as to UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM. Forwarded To: 1 Orig mailed to counsel on 2/8/16 (jmv, ) (Entered: 02/08/2016) |
| 02/08/2016 | | DEMAND for Trial by Jury by BRENDA KELLY. (jmv, ) (Entered: 02/08/2016) |
| 02/09/2016 | 2 | REQUEST FOR WAIVER of Service sent to University of Pennsylvania Health System, d/b/a Penn Medicine on 2/9/2016 by BRENDA KELLY. Waiver of Service due by 3/10/2016. (KARPF, ARI) (Entered: 02/09/2016) |
| 03/07/2016 | 3 | WAIVER OF SERVICE Returned Executed by BRENDA KELLY. UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM waiver sent on 2/9/2016, answer due 4/11/2016. (KARPF, ARI) (Entered: 03/07/2016) |
| 03/10/2016 | 4 | MOTION for Extension of Time to File Answer re 1 Complaint (Attorney) filed by UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM..(STURGEON, JEFFREY) (Entered: 03/10/2016) |
| 03/10/2016 | 5 | NOTICE of Appearance by ERIC C. KIM on behalf of UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM with Certificate of Service (Attachments: # 1 Certificate of Service)(KIM, ERIC) (Entered: 03/10/2016) |
| 03/10/2016 | 6 | ORDER THAT THE PARTIES' STIPULATION EXTENDING THE TIME TO RESPOND TO A ONE (1) COUNT FMLA COMPLAINT (DOC. NO. 4 ), IS DENIED AS THE PARTIES FAILED TO SHOW GOOD CAUSE WHY THIS DEFENDANT REPRESENTED BY A MAJOR LAW FIRM NEEDS AN ADDITIONAL SIX (6) WEEKS FROM TODAY TO RESPOND TO A SINGLE COUNT COMPLAINT WHEN IT ALREADY HAS UNTIL 4/11/2016 TO RESPOND. SIGNED BY HONORABLE MARK A. KEARNEY ON 3/10/2016.3/10/2016 ENTERED AND COPIES E-MAILED.(amas) (Entered: 03/10/2016) |
| 03/10/2016 | 7 | ORDER THAT AN INITIAL PRETRIAL CONFERENCE SHALL BE HELD ON 4/25/2016, AT 9:30 AM, IN COURTROOM 5D, BEFORE HONORABLE MARK A. KEARNEY, ETC. SIGNED BY HONORABLE MARK A. KEARNEY ON 3/10/2016. 3/10/2016 ENTERED AND COPIES E-MAILED.(amas) (Entered: 03/10/2016) |

| | | |
|---|---|---|
| 04/01/2016 | 8 | NOTICE of Appearance by JULIA W. CLARK on behalf of BRENDA KELLY (CLARK, JULIA) (Entered: 04/01/2016) |
| 04/11/2016 | 9 | ANSWER to Complaint together with and Affirmative Defenses by UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM. (Attachments: # 1 Certificate of Service)(KIM, ERIC) (Entered: 04/11/2016) |
| 04/21/2016 | 10 | Discovery Plan by BRENDA KELLY.(CLARK, JULIA) (Entered: 04/21/2016) |
| 04/25/2016 | 11 | ORDER THAT PLAINTIFF ADMITS HER CLAIMS ARISE AFTER 2/8/2015 AND THE COURT ACCORDINGLY STRIKES AFFIRMATIVE DEFENSE NO. 1. ALL FACT AND EXPERT DISCOVERY SHALL BE COMPLETED BY 6/17/2016. THIS MATTER IS REFERRED TO MAGISTRATE JUDGE HEFFLEY FOR ALL SETTLEMENT PURPOSES. ALL MOTIONS FOR SUMMARY JUDGMENT AND DAUBERT MOTIONS ARE DUE BY 6/24/2016. THE PARTIES SHALL FILE THEIR PRETRIAL MEMORANDA NO LATER THAN 8/3/2016. ALL MOTIONS IN LIMINE ARE DUE BY 8/9/2016. A FINAL PRETRIAL CONFERENCE WILL BE HELD ON 8/23/2016, AT 4:00 PM, IN COURTROOM 5-D. COUNSEL IS ATTACHED FOR JURY SELECTION FOLLOWED BY A FOUR-DAY TRIAL ON 8/29/2016, AT 9:00 AM. FURTHER DEADLINES AND INFORMATION OUTLINED HEREIN. SIGNED BY HONORABLE MARK A. KEARNEY ON 4/25/2016. 4/25/2016 ENTERED AND COPIES E-MAILED.(amas) (Entered: 04/25/2016) |
| 04/25/2016 | 12 | Minute Entry for proceedings held before HONORABLE MARK A. KEARNEY Initial Pretrial Conference held on 4/25/2016 (amas) (Entered: 04/25/2016) |
| 04/26/2016 | 13 | ORDER THAT A SETTLEMENT CONFERENCE WILL BE HELD ON 6/21/2016, AT 9:30 AM, IN ROOM 4001, BEFORE MAGISTRATE JUDGE MARILYN HEFFLEY, ETC. SIGNED BY MAGISTRATE JUDGE MARILYN HEFFLEY ON 4/26/2016. 4/26/2016 ENTERED AND COPIES E-MAILED.(amas) (Entered: 04/26/2016) |
| 05/02/2016 | 14 | AMENDED ORDER THAT A SETTLEMENT CONFERENCE WILL BE HELD ON 5/10/2016, AT 9:30 AM, IN CHAMBERS (ROOM 4001), BEFORE MAGISTRATE JUDGE MARILYN HEFFLEY, ETC. SIGNED BY MAGISTRATE JUDGE MARILYN HEFFLEY ON 5/2/2016. 5/2/2016 ENTERED AND COPIES E-MAILED. (amas) (Entered: 05/02/2016) |
| 05/10/2016 | 15 | Minute Entry for proceedings held before MAGISTRATE JUDGE MARILYN HEFFLEY Settlement Conference held on 5/10/16. (jl, ) (Entered: 05/10/2016) |
| 06/15/2016 | 16 | STIPULATION *for Amendment of Complaint* by BRENDA KELLY. (Attachments: # 1 Exhibit A)(CLARK, JULIA) (Entered: 06/15/2016) |
| 06/15/2016 | 17 | ORDER THAT THE STIPULATION (RE: DOC. NO. 16 ), IS APPROVED AND PLAINTIFF SHALL FILE THE AMENDED COMPLAINT ATTACHED TO THE STIPULATION NO LATER THAN 6/17/2016. SIGNED BY HONORABLE MARK A. KEARNEY ON 6/15/2016. 6/15/2016 ENTERED AND COPIES E-MAILED. (amas) (Entered: 06/15/2016) |

| | | |
|---|---|---|
| 06/15/2016 | 18 | AMENDED DOCUMENT by BRENDA KELLY. Amendment to 1 Complaint (Attorney) *Plaintiff's First Amended Complaint*. (CLARK, JULIA) Modified on 6/15/2016 (lvj, ). (FILED IN ERROR BY ATTORNEY; ATTY WILL RE-FILE IN HARD COPY WITH PDF PER CHAMBERS INSTRUCTIONS) (Entered: 06/15/2016) |
| 06/16/2016 | 19 | FIRST AMENDED COMPLAINT against UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, filed by BRENDA KELLY.(amas) (Entered: 06/16/2016) |
| 06/24/2016 | 20 | MOTION for Summary Judgment filed by UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum of Law, # 2 Statement of Undisputed Material Facts, # 3 Appendix 1, # 4 Appendix 2, # 5 Appendix 3, # 6 Text of Proposed Order, # 7 Certificate of Service) (STURGEON, JEFFREY) (Entered: 06/24/2016) |
| 07/05/2016 | 21 | ANSWER to 19 Amended Complaint by UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM. (Attachments: # 1 Certificate of Service)(STURGEON, JEFFREY) (Entered: 07/05/2016) |
| 07/11/2016 | 22 | RESPONSE in Opposition re 20 MOTION for Summary Judgment filed by BRENDA KELLY. (Attachments: # 1 Response to Defendant's Statement of Facts, # 2 Text of Proposed Order)(CLARK, JULIA) (Entered: 07/11/2016) |
| 07/12/2016 | 23 | EXHIBIT *to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment* by BRENDA KELLY.. (Attachments: # 1 Appendix Appendix Part 1 of 2, # 2 Appendix Appendix Part 2 of 2)(CLARK, JULIA) (Attachment 1 replaced on 7/12/2016) (lvj, ). (Attachment 2 replaced on 7/13/2016) (lvj, ). (Entered: 07/12/2016) |
| 07/18/2016 | 24 | RESPONSE in Support re 20 MOTION for Summary Judgment filed by UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM. (Attachments: # 1 Certificate of Service) (STURGEON, JEFFREY) (Entered: 07/18/2016) |
| 08/02/2016 | 25 | MEMORANDUM. SIGNED BY HONORABLE MARK A. KEARNEY ON 8/2/2016. 8/2/2016 ENTERED AND COPIES E-MAILED.(amas) (Entered: 08/02/2016) |
| 08/02/2016 | 26 | MEMORANDUM ORDER THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 20 ), IS GRANTED AND SUMMARY JUDGMENT IS ENTERED IN FAVOR OF THE DEFENDANT. THE CLERK OF COURT SHALL CLOSE THIS CASE. SIGNED BY HONORABLE MARK A. KEARNEY ON 8/2/2016. 8/2/2016 ENTERED AND COPIES E-MAILED.(amas) (Entered: 08/02/2016) |
| 08/03/2016 | 27 | NOTICE OF APPEAL as to 26 Order (Memorandum and/or Opinion), by BRENDA KELLY. No Filing fee paid. Copies to Judge, Clerk USCA, Appeals Clerk and (CLARK, JULIA) Modified on 8/4/2016 (lvj, ). (Entered: 08/03/2016) |
| 08/05/2016 | | USCA Appeal Fees received $ 505 receipt number 144787 re 27 Notice of Appeal filed by BRENDA KELLY (amas) (Entered: 08/08/2016) |
| 08/11/2016 | | NOTICE of Docketing Record on Appeal from USCA re 27 Notice of Appeal filed by BRENDA KELLY. USCA Case Number 16-3303 (dmc, ) (Entered: 08/11/2016) |

```
                                              Page 2
 1           UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                       - - -
 3     BRENDA KELLY,            : CIVIL ACTION
                 Plaintiff      : CASE NO.:
 4                             : 16-0618
       vs.                     :
 5                             :
       UNIVERSITY OF           :
 6     PENNSYLVANIA HEALTH      :
       SYSTEM, d/b/a PENN       :
 7     MEDICINE,               :
                 Defendant      :
 8
                         - - -
 9             Thursday, June 16, 2016
                         - - -
10
11           VIDEOTAPED DEPOSITION of BRENDA KELLY,
12     taken pursuant to notice at the law offices of
13     MORGAN, LEWIS & BOCKIUS, LLP, 1701 Market Street,
14     Philadelphia, Pennsylvania, commencing at
15     approximately 10:00 a.m., before Lynn Parlapiano,
16     Professional Court Reporter and Notary Public in
17     and for the Commonwealth of Pennsylvania.
18                       - - -
19
20
21
22
23             MAGNA LEGAL SERVICES
                 (866) 624-6221
24               www.MagnaLS.com
```



JA31

```
                                                          Page 3
 1   APPEARANCES:
 2          KARPF, KARPF & CERUTTI, P.C.
            BY: JULIE W. CLARK, ESQUIRE
 3              Jclark@karpf-law.com
                3331 Street Road
 4              Two Greenwood Square
                Suite 128
 5              Bensalem, Pennsylvania 19020
                215.639.0801
 6
                    Counsel for Plaintiff
 7
 8          MORGAN, LEWIS & BOCKIUS, LLP
            BY: JEFF STURGEON, ESQUIRE
 9              ERIC KIM, ESQUIRE
                Eric.kim@morganlewis.com
10              1701 Market Street
                Philadelphia, Pennsylvania 19103
11              215.963.5000
12                  Counsel for Defendant
13
14
     Also Present:
15   Chelsea Lynch, The Videographer
16
17
18
19
20
21
22
23
24
```



Case 2:15-cv-00618-MAK Document 81-3 Filed 10/24/16 Page 10 of 198

```
                                                    Page 9
 1   correct?
 2       A.      Yes.  Yes.
 3       Q.      Let me give you one instruction before
 4   we get too far down the line.
 5       A.      Okay.
 6       Q.      And this is very hard and it's
 7   something that everybody does.
 8       A.      Okay.
 9       Q.      You're gonna have to let me get out a
10   question before you answer.  It's because this
11   lovely lady sitting next to me can't take us both
12   at the same time.  Sometimes I speak too slowly.
13   I'm from Pittsburgh.  I'm a borderline
14   midwesterner, so I'm not fast like you northeast
15   folks, so you have to let me get out my often
16   slow questions before you answer.  Does that make
17   sense?
18       A.      Yes, it does.
19       Q.      Thank you.  So you listed three medical
20   conditions for me.  Did you have any medical
21   conditions while you were working at Penn?
22       A.      Yes.
23       Q.      Did you have all three of those medical
24   conditions that you just listed for me, chronic
```



1   osteoarthritis, Hepatitis B and morbid obesity

2   while you were working at Penn?

3       A.      Yes.

4       Q.      Did you have any other medical

5   conditions while you were working at Penn?

6       A.      No.

7       Q.      Are you currently disabled?

8       A.      No.

9       Q.      Were you disabled while you were

10  working at Penn?

11      A.      No.

12      Q.      When did you first develop

13  osteoarthritis?

14      A.      Two-thousand and -- I'm sorry.  Yeah.

15  2009, and I believe it was in March 2009, that I

16  was diagnosed with chronic osteoarthritis through

17  my rheumatologist at Penn Medicine.

18      Q.      How about Hepatitis B, when were you

19  diagnosed with Hepatitis B?

20      A.      1983.

21      Q.      This is a delicate question, but how

22  are you today ma'am?

23      A.      I am 52.

24      Q.      Morbid obesity, when were you diagnosed



```
                                                    Page 11
 1   as being morbidly obese?
 2        A.      I became aware that I was morbidly
 3   obese in two thousand -- I believe it was in
 4   April 2000.
 5        Q.      April 2000?
 6        A.      Yes.
 7        Q.      We're going to get into this in more
 8   detail, but you had a bypass surgery?
 9        A.      Yes.
10        Q.      To address that morbid obesity?
11        A.      Yes.
12        Q.      When was that?
13        A.      Two thousand-- it was actually
14   December 2000.
15        Q.      When did you start working at Penn?
16        A.      February the 2, 1991.
17        Q.      Did you use FMLA leave while you were
18   working at Penn?
19        A.      Yes.
20        Q.      When did you start using FMLA leave
21   while you were working at Penn?
22        A.      In 2009.
23        Q.      Did you ever use all of your FMLA time
24   for a given year while you were working at Penn?
```



Page 16

1    Q.      How much?

2    A.      She didn't say.

3    Q.      Did you talk to anybody else at Penn

4    and say, I need somebody to determine how much

5    additional time under the 12 weeks I have?

6    A.      No.

7    Q.      Did you keep track of when you took

8    these one hours or two hours of FMLA time and

9    your testimony is you were charged for a full

10   day, did you keep track of how much time you

11   actually took?

12   A.      No.

13   Q.      Why not?

14   A.      Because I trusted the department.

15   Q.      Prior to receiving this letter, did you

16   complain to anybody within Penn that they were

17   not keeping track of your FMLA time correctly?

18   A.      I actually had a meeting with the

19   supervisors because as part of some of my

20   responsibilities, I held lead meetings where all

21   the supervisors got together.  We all had FMLA,

22   and we all spoke about how we believed that we

23   were being shortchanged with our hours.  I

24   provided like a -- sort of like a whole layout



Page 18

1    A.       2014.

2    Q.       So it was before you received this

3 letter?

4    A.       Yes.

5    Q.       And what did you say at this meeting?

6    A.       Well, basically it was a group meeting

7 with all the supervisors interacting with it.

8 Actually I did not bring that up.  The other

9 supervisors did and it wasn't just that I was

10 saying that I believe it.  We all stated that we

11 had problems with it.

12    Q.       Okay.  Let me --

13    A.       Because we couldn't calculate it.

14    Q.       Let me try to get to my specific

15 question.

16    A.       Okay.

17    Q.       What did you say at this meeting?

18    A.       At the meeting I said I believe that my

19 hours are not being calculated correctly.

20    Q.       Did you say why you thought your hours

21 are not being calculated correctly?

22    A.       Yes, I did.

23    Q.       What did you say about that?

24    A.       I said that I believe my hours are not



Page 19

1  being calculated correctly because Tammy told me

2  that I need to slow down on the amount of FMLA

3  that I was taking.  And I note that my schedule

4  was just re-advised.  I had just received it.

5      Q.      So you thought your hours were not

6  being calculated correctly because Tammy told you

7  to slow down?

8      A.      Yes.

9      Q.      How does her telling you to slow down

10  on FMLA relate in any way to the calculation of

11  the amount of FMLA time that you were using?

12      A.      Because she managed the FMLA time in

13  the department and I trusted whatever she told me

14  as far as what my hours were, how much time I

15  could use.

16      Q.      So it's not that you think that they're

17  shortchanging you on the number of hours, your

18  problem with Penn at this time is that you think

19  Tammy is telling you not to -- or let me start

20  that again.

21          Your issue is not that they're

22  shortchanging your hours.  Your issue is that

23  Tammy told you that you needed to slow down on

24  taking FMLA time?



Page 20

1          MS. CLARK:  Object to the form.

2          THE WITNESS:  No, that's not

3    correct.  I said I believe that I was being

4    shortchanged with my hours and I trusted that

5    Tammy gave me the correct hours in which I had.

6    BY MR. STURGEON:

7    Q.      Explain to me how you were being

8    shortchanged.

9    A.      Okay.  So it's eight-hour shifts, okay.

10   If I called in and I said that I would like to

11   use a full day of my leave of absence, that would

12   be eight hours; however, there were times that I

13   would call in and ask for one hour, which would

14   leave me seven hours in my bank.  Because I had

15   intermittent LOA, I very rarely took off

16   eight-hour shifts.  In a course of a week, I may

17   have used three hours, one per day using the

18   leave of absence.  So if Tammy was telling me

19   that I needed to slow down and I just received it

20   and I'm not really using the eight hours, that

21   means that in some kind of way this calculation

22   just doesn't seem correct, her statement.

23   Q.      Could she have been telling you to slow

24   down because you were close to using up all of



Page 21

1   your FMLA time and she was looking out for you?

2                   MS. CLARK:  Object to form.

3                   You can answer it.

4                   THE WITNESS:  I stated that I

5   really cannot tell you what Tammy was thinking.

6   I could just tell you that she made this

7   statement.

8   BY MR. STURGEON:

9       Q.      That you should slow down, right?

10      A.      Yes.

11      Q.      And one of the reasons a person would

12  say that is because they're looking out for you

13  and they want you to not use up all your FMLA

14  time, right?

15                  MS. CLARK:  Objection.

16                  You can answer.

17                  THE WITNESS:  No.

18                  MS. CLARK:  Just let me get my

19  objection out fully before you answer, okay?

20                  THE WITNESS:  Okay.  Thank you.

21  I'm sorry.

22                  MS. CLARK:  It's okay.

23  BY MR. STURGEON:

24      Q.      If we look at your FMLA time records,



1   will there be all full days or will there be time

2   records that are partial days?

3       A.      I have no idea.

4       Q.      I thought your testimony was that they

5   were not allowing you to take partial days, that

6   they were charging you only full days?

7       A.      That is true, however I do not trust

8   what she put down on the papers as far as if I

9   was taking one hour, two hours or a full eight

10  hours.

11      Q.      So you think for every time that she

12  took -- that you took one hour or two hours, she

13  put down eight hours?

14      A.      No.  I have no idea what she put down.

15      Q.      So how do you know what she put down

16  was incorrect if you have no idea what she put

17  down?

18      A.      Because of the fact that she would come

19  up later and tell me to resign my paperwork.

20      Q.      Well, you realize when you take FMLA

21  leave it starts and ends at a certain date,

22  correct?

23      A.      No.  No, I don't know that.

24      Q.      So you think that when you take FMLA



Page 29

```
 1      A.       I asked one time if she could provide

 2   access to a handicap stall in our department,

 3   okay.  It was -- the women's bathroom had this

 4   large handicap stall.  After my surgeries,

 5   sometimes I would be required to come back to

 6   work with a walker that was very large, a

 7   wheelchair and some other -- other things, other

 8   tools that I needed just to get around in the

 9   office.  I told her in the stall I just would

10   like if maybe you could put a sign off to ask

11   other operators that are not having issues, not

12   -- I didn't say disabled, but are not having

13   limitations not to use it so that when I can come

14   in, I don't have to stand for long periods of

15   time and not be able to get in and out.  She

16   ignored the request.  She said, I will check in

17   it.  She never came back to me.  She totally

18   ignored me, and it caused a lot of pain to me,

19   because when I would have to get up with my

20   walkers or my canes and I would go into the

21   bathroom, it would be all three stools, you know,

22   being used.  A person would come out, just

23   normal.  They was able to walk.  I wasn't.  Okay.

24   And I will have to stand in the bathroom for very
```



Page 30

1    large periods of time when the only thing I just

2    ask is if she could just put in a note stating if

3    you do not have limitations, could you please use

4    the other stalls.

5        Q.      Any other ways?

6        A.      I believe that she just shut down on

7    me, like she just wouldn't talk to me.  Like she

8    would come into the office and there was at one

9    point that we would communicate with each other a

10   lot through e-mails.  One of her biggest things

11   was, I speak to Brenda through e-mails at least

12   ten to 15 times a day.  She made it known to the

13   whole department.  She just start lessening her

14   conversations with me.  She just stopped

15   basically talking to me, and towards the end when

16   she wrongfully terminated me, she would just come

17   in the office, shut her door and just stay in

18   there.  And I had to do a lot of things on my own

19   as a supervisor.

20       Q.      Any other ways?

21       A.      Not that I can think of.

22       Q.      Okay.  Let's talk about those.  When

23   did this walker or wheelchair stall incident

24   happen?



Page 31

1    A.      It first happened my first surgery,

2    which was in two-thousand and -- it was

3    July 2014.

4    Q.      You said first happened.  Did it happen

5    again after July 2014?

6    A.      Continuously.  Not as far -- yeah, I

7    would say -- I'm gonna use the word continuously

8    because when I first notified her and told her of

9    the accommodations I would like her to make, I

10   was having surgeries throughout the time period

11   that I was there.

12   Q.      Can we try to --

13   A.      Oh, I'm sorry.

14   Q.      That's okay.  I want to let you answer

15   the questions --

16   A.      Okay.  Thank you.

17   Q.      -- but I want to try to --

18   A.      Okay.  I'm sorry.

19   Q.      That's okay.  I'm asking about a

20   specific thing that you mentioned.

21   A.      Okay.  Yes.

22   Q.      So let me get out before you talk,

23   okay?

24   A.      Okay.



JA44

Page 32

1      Q.      This walker, wheelchair, stall

2   incident, you're saying that it happened

3   continuously?

4      A.      Yes.

5      Q.      And then you mentioned other things.  I

6   want to stick to that.

7      A.      Okay.

8      Q.      It first happened in 2014?

9      A.      With my question, yes.

10     Q.      And then it happened continuously how?

11     A.      Because she never addressed the

12   situation.

13     Q.      Did you raise it again after 2014?

14     A.      Absolutely not.

15     Q.      Did you raise it with HR?

16     A.      Absolutely not.

17     Q.      Let's go to the -- you mentioned

18   something about when you came back from leave you

19   were taken away important responsibilities or

20   something to that effect.  Do you remember that

21   testimony?

22     A.      Yes, I do.

23     Q.      Okay.  What was taken away from you?

24     A.      I was interviewing for the department.



Page 55

1    Q.        -- okay?  I'm not talking about

2    specific hours.  I'm talking about that first

3    step when you would apply for FMLA and you would

4    be required to submit a certification, did you

5    feel that Penn ever wrongfully denied your

6    request for FMLA leave?

7    A.        First I would like to say that you're

8    using Penn as a health system; whereas, I believe

9    it was basically my department, okay, and Tammy

10   Stewart, and I can explain why.

11   Q.        Okay.  Let me fix the question --

12   A.        Okay.

13   Q.        -- so you don't have to explain.

14             Did anybody in your department ever

15   deny your request for FMLA leave and you thought

16   it was wrongfully denied?  And I'm separating out

17   I want -- a miscalculation of time, an hour here,

18   an hour there.  What I'm talking about is you go

19   to your employer and you say, I have a medical

20   condition, here are the medical certification and

21   you thought I should have been granted that FMLA

22   leave?

23   A.        Yes.

24   Q.        Okay.  Who?



Page 56

1    A.        That would be Tammy Stewart.

2    Q.        When did that happen?

3    A.        I would say the last -- I can give you,

4    once again, dates, the year, but not the specific

5    days.  So I would say July of 2014,

6    September 2014.  I would say October of 2014.  I

7    will also say -- yeah, those dates.

8    Q.        So what was the reason for the denial

9    in July 2014?

10   A.        The physician's certificate forms that

11   I would give her, she would bring it back and

12   tell me that disability would not accept this

13   because your doctors did not fill out all the

14   required information that was needed.

15   Q.        And you think that a doctor -- strike

16   that.

17             You understand that it's important to

18   have that form filled out correctly, right?

19   A.        Yes.

20   Q.        So it's not Tammy's fault that your

21   doctor didn't fill it out correctly, right?

22   A.        No.

23   Q.        So you expected her to take an

24   incomplete form?



Page 60

1    A.        Absolutely not.

2    Q.        Did you ever use it because you just

3  didn't feel like coming to work that day?

4    A.        Absolutely not.

5    Q.        Did you ever use FMLA time because you

6  were hung over?

7    A.        Absolutely not.

8    Q.        Are you an alcoholic?

9    A.        No, I'm not.

10   Q.        Did you ever suffer from alcoholism?

11   A.        Yes.

12   Q.        For how long?

13   A.        For at least five to six years.

14   Q.        When was this?

15   A.        When it began?

16   Q.        When it began and when it started?

17   A.        Okay.  It started maybe in 2009 because

18  I just recently stopped maybe like a year --

19  during my last surgery.

20   Q.        So from 2009 to roughly 2015?

21   A.        I'd say '14.

22   Q.        And from 2009 to 2014 your testimony is

23  you never used FMLA time because you were hung

24  over or as a result of abusing alcohol?



1    A.      No.

2    Q.      Did you ever use FMLA time because you

3    needed to give a ride to somebody?

4    A.      Me give a ride to someone, no.

5    Q.      Did you ever use FMLA time because

6    somebody was leaving work and you needed to get a

7    ride home with them?

8    A.      Absolutely not.

9    Q.      Never once?

10   A.      Never once.

11   Q.      Did you get rides home from people that

12   you worked with?

13   A.      A lot.

14   Q.      Who?

15   A.      I paid people --

16   Q.      Who?

17   A.      -- to take me home.  The security

18   guard.  His name was Robert.  I paid him $120

19   every two weeks to pick me up and take me home.

20   An operator by the name of Carliece Warring.  I

21   paid her $150 at one point to bring me to work

22   and take me home.  There was also another

23   operator by the name of Greg Richardson that I

24   paid $110 every two weeks to take -- pick me up,



MAGNA
LEGAL SERVICES

                                                    Page 68

1    you to a hostile work environment?

2        A.      Well, once again, I'm not gonna say

3    Penn.  I will use the department in which I

4    worked at, yes.

5        Q.      Who?

6        A.      That would be Tammy Stewart and Sophie

7    Douglas.

8        Q.      How did they subject you to a hostile

9    work environment?

10       A.      It was often told by other operators,

11   and specifically leads, that I was a great

12   operator, very articulate and smart; however, I

13   did not come into work as much as they would like

14   me to come in, and because of that, certain

15   duties that I will have, they would often have to

16   give it to other supervisors and leads.  So when

17   we would these meetings where I was in charge

18   of -- and I would have a whole group of other

19   supervisor and leads around the table -- they

20   would talk about how they would have to take over

21   a certain job or functions that I was doing in

22   the office because I was out and how either

23   Sophie or Tammy said they apologize that they

24   have to ask them to do this or perform a certain



Page 69

1   duty.

2       Q.       Any other ways?

3       A.       I feel basically the fact that I was

4   demoted without -- I'm sorry.  Without even

5   knowing why was hostile and terrible enough,

6   okay.  I just came back to work.  And I was

7   always told that I was a great supervisor, that I

8   did everything that I needed to do and given like

9   these two major projects in this whole other

10  department, just for Sophie to call me in her

11  office and tell me that I was being demoted, and

12  when I asked her why, she just said because I

13  perform better as an operator.  However, the

14  whole time I was at Presbyterian, I was doing

15  data entry for two whole new buildings at the

16  hospital taking over somebody else position that

17  refused to do the job, and Sophie had me do this,

18  putting the whole data entry for a new building,

19  the trauma department at Penn Presbyterian and

20  another new building, which was the 3737 Market

21  building.  I was constantly there working.

22              I was in pain.  I couldn't get up and

23  walk around because I was denied special

24  accommodations, and I would just sit there, put



Page 70

1    in all this information.  She never came to me,

2    never said anything I was doing was wrong, my

3    management skills or my supervisory skills was

4    not up to par.  Just all of a sudden she brings

5    me into the office to tell me I was demoted, and

6    that's very terrible.  It's like -- it was just

7    awful.

8        Q.      Ma'am, do you want to take a break?

9        A.      Yes.

10                THE VIDEOGRAPHER:  We're now off

11    the record.  The time is 11:25 a.m.

12                (Recess.)

13                THE VIDEOGRAPHER:  We're now on the

14    record.  The time is 11:31 a.m.

15    BY MR. STURGEON:

16        Q.      Ma'am, before the break we were talking

17    about your demotion and it was a very long

18    answer, but I believe you testified that you were

19    never told why you were demoted; is that correct?

20        A.      Until the day I sat in the office and

21    actually was demoted, yes.

22        Q.      Okay.  What were you told when you sat

23    in the office and were demoted?

24        A.      I was told that effective this date --



Page 78

1    A.      Okay.  No.  Not that I'm aware of, no.

2               MR. STURGEON:  Mark Defendant's

3    Exhibit 6.  Strike that.  Wrong one.  Take it

4    back.  Mark that.

5               (A document was marked as Exhibit

6    Defendant-6 for identification.)

7    BY MR. STURGEON:

8    Q.      I'm marking as Defendant's Exhibit 6 a

9    final written warning.  Can you take a look at

10   that for me, ma'am?

11   A.      I'm ready.

12   Q.      Is it your testimony that you've never

13   seen this document before today?

14   A.      That is true.

15   Q.      Never once?

16   A.      Never once.  I'm sorry.  Until I went

17   to my unemployment arbitration hearing and saw my

18   file and I spoke to the judge, the lawyer from

19   University of Penn and the head of -- I think she

20   was in management and told her I was never

21   written up for this, ever.  I did not sign

22   anything, and I do not remember -- I never was

23   written up.  I never signed anything and I never

24   ever remember ever being in the final notice my



Case 2:13-cv-00618-MAK    Document 100-3    Filed 08/24/15    Page 602 of 237

Page 79

1   whole time at University of Penn.

2       Q.      Do you see on the bottom it says,

3   "employee refused to sign?"

4       A.      Yes, I do.

5       Q.      So that's not accurate?

6       A.      No.

7       Q.      You never refused to sign this?

8       A.      I don't -- I never saw this write-up

9   before.

10      Q.      Setting aside whether or not you saw

11  this document, I want you to look at the

12  substance of it and why you're given a final

13  written warning.  Do you have any recollection of

14  what happened there?

15      A.      This incident never happened.  I do

16  remember several times throughout my employment

17  at University of Penn texting to use my LOA.  It

18  states here Tenia Davis.  Tenia Davis is a senior

19  operator, okay.  If another supervisor would not

20  be on the floor, I note that Tenia Davis could

21  take over the role of supervisor.

22      Q.      Ma'am, you're not answering my question

23  again.

24      A.      No.



Page 90

1    Q.      How about a supervisor?

2    A.      Supervisor position should have been

3  2010 to 2015.

4    Q.      How about as an operator?  They're

5  referred to as communication specialists, right?

6    A.      That was June 2015 when I was

7  terminated.

8    Q.      So from March 2015 to June 2015, you

9  were an operator and not a supervisor or a lead?

10    A.      Yes.

11    Q.      Three months?

12    A.      Right, no supervisor, no lead.

13    Q.      Did you take any FMLA leave during that

14  time period?

15    A.      Intermittently, yes.

16    Q.      Did you always perform your job well at

17  Penn?

18    A.      According to Sophie, yes, excellent.

19    Q.      How about according to you; do you

20  think that you always performed your job well?

21    A.      I think I -- yes.  I thought I always

22  did a great job.

23    Q.      Did you ever have any performance

24  issues?



Page 91

1    A.       In relation to?

2    Q.       Your performance as -- at Penn?

3    A.       Well, I could say that as a lead

4    operator, there was times when I had to get up

5    and monitor floor, meaning that I would have to

6    walk around, see if people were taking calls, see

7    if they were on the internet or not.  Because of

8    my dis -- my -- well, it wasn't a disability.

9    Because of those surgeries and because of my

10   osteoarthritis, I was just slower.  I believe I

11   was just slower.  I would do it, but I was very

12   slow and maybe I wasn't able to move as fast as

13   maybe my peers were, but the job was being done.

14   I was just slower when it came to just getting up

15   and walking around and monitoring the floor.

16   Q.       How about the substance of your job,

17   meaning when you were calling codes to the

18   hospital or doing anything that would relate to

19   your day-to-day duties, do you think you always

20   did those in an exemplary way?

21   A.       Yes.

22   Q.       Never made mistakes?

23   A.       Not on my own, no.

24   Q.       Were you ever disciplined throughout



JA56

Page 92

1   your career at Penn?

2        A.        Oh, yes.

3        Q.        Ever issued verbal warnings?

4        A.        Yes.

5        Q.        Ever issued written warnings?

6        A.        Yes.

7        Q.        If you make a mistake while you're

8   working as a call center operator, patients'

9   lives can be at risk, right?

10       A.        Yes.

11       Q.        Explain that to us.  Why is that?

12       A.        Okay.  Well, at the time -- well, first

13  of all, of course, any type of emergency

14  procedure is just that it's urgent and it's an

15  emergency, okay, so whatever tools that you need

16  to utilize to set off an emergency procedure

17  should be done accurately.  It should not be

18  anything done intentionally on your part.  You

19  should just do your best and if you need help,

20  you should ask for it.

21       Q.        Part of your job is to call codes?

22       A.        Yes.

23       Q.        What does that mean?

24       A.        So there's several codes.  We have



Page 93

1    something that is actually called a code, which

2    would be like if a patient was coding in the

3    room, heart stopped.  We also have something

4    called a rapid response.

5       Q.      What's that mean?

6       A.      A rapid response just could be a

7    patient falling out of the bed.  It could be a

8    visitor falling on the floor.  It could be

9    different situations.

10      Q.      It could be life-threatening though,

11   right?

12      A.      Some can, yes.

13      Q.      And your job as an operator is when

14   those reports of a rapid response or some other

15   type of code to come in, you need to alert the

16   individuals at the hospital, the doctors, the

17   staff, whoever needs to be alerted, that they

18   need to react to that, right?

19      A.      Yes.

20      Q.      And that's a code or a rapid response

21   or some other message that you're calling over a

22   loud speaker and you're also paging people and

23   doing other things to alert the hospital

24   personnel that that's occurring?



Page 94

1      A.      Yes.

2      Q.      And that's part of -- was part of your

3   duties while you were at Penn?

4      A.      Yes.

5                   MR. STURGEON:  What exhibit are we

6   on?

7                   THE COURT REPORTER:  Eight.

8                   (A document was marked as Exhibit

9   Defendant-8 for identification.)

10  BY MR. STURGEON:

11     Q.      Ma'am, do you recognize Defendant's

12  Exhibit 8?

13     A.      Yes.

14     Q.      What is it?

15     A.      My résumé.

16     Q.      Is it your current résumé?

17     A.      No.

18     Q.      Is it the résumé you used to look for

19  jobs after your employment with Penn ended?

20     A.      No.

21     Q.      Do you have a copy of that résumé?

22     A.      I believe I submitted it.  I don't have

23  it on me now.

24     Q.      Okay.  So your testimony is you believe



Page 95

1    that you gave that to your Counsel?

2       A.      Yes.

3       Q.      What is different between that version

4    and the version I'm looking at now?

5       A.      The phone number has changed.  Let's

6    see what else.  Maybe this is it.

7       Q.      Go to the second page.  Again, I have

8    no idea whether this is a draft or --

9       A.      Okay.

10      Q.      That is something that I don't know.

11   This is a document that you produced to us,

12   meaning your lawyer produced to us, but --

13      A.      Okay.

14      Q.      If you go to the second page, it talks

15   about your position as a lead communication

16   specialist.  Do you see that?

17      A.      Yes.

18      Q.      So this would indicate to you that at

19   least this résumé was generated after your

20   employment with Penn ended, right?

21      A.      Okay.  Yes.

22      Q.      Am I right?

23      A.      Yes.

24      Q.      Okay.  Go down to 1998 to 2000.



Page 96

1    A.        Okay.

2    Q.        Let me ask you a couple things.  So it

3  says, "Position:  As a communication specialist,

4  not only is you responsible for answering a

5  percentage of calls, the job required you to

6  handle emergency medical calls period."

7              Do you see that?

8    A.        Yes.

9    Q.        Do you realize that that is a pretty

10  bad grammatical error, "not only is your

11  responsible?"

12    A.        No.

13    Q.        Do you think it should be "not only are

14  you responsible?"

15    A.        Now that I see it, yes, I will agree

16  with you.

17    Q.        Was this -- is this error -- was this

18  error present when you were applying for jobs

19  after your employment with Penn ended?

20    A.        If this is the same résumé that I used,

21  yes.  I believe -- not to cut you off.

22    Q.        That's okay.

23    A.        I believe I have another résumé, and

24  I'm not sure which one I actually submitted to my



Page 97

1  law office.

2      Q.      Assuming this is the résumé you sent to

3  prospective employers --

4      A.      Okay.

5      Q.      -- do you think that that would hurt

6  your ability to get a new job having this type of

7  grammatical error in your résumé?

8      A.      Possibly.

9      Q.      I want to ask you about the next few

10 sentences.  And you say, "An emergency call is a

11 call that is introduced to a communication

12 specialist as an extreme alert.  An extreme alert

13 would be a (code procedure heart trauma), trauma

14 alert (gun stabbing or severe beating), rapid

15 response (any emergency for an inpatient

16 distress), bomb alert, fire alert and fire alarm,

17 right?

18     A.      Yes.

19     Q.      So this is describing kind of the

20 important things that you would be doing while

21 you're a call center operator?

22     A.      Yes.

23     Q.      And assuming that while you're a call

24 center operator -- strike that.



1          If a call center operator screwed up a

2     rapid response or a trauma alert, that's a pretty

3     big mistake, right?

4          A.     Yes.

5          Q.     It's something that can put patients'

6     lives in danger, right?

7          A.     Yes.

8          Q.     It's something that could delay them in

9     receiving care?

10         A.     Yes.

11         Q.     When you're having a heart attack or

12    you fall down or any other emergency happens in a

13    hospital, seconds can matter in those situations,

14    right?

15         A.     I agree.

16         Q.     I want to take you to the end of your

17    employment.

18         A.     Okay.

19         Q.     Did something happen close to the end

20    of your employment where you made a mistake in

21    calling a code?

22         A.     Yes.

23         Q.     Tell me about that.

24         A.     I didn't set off the overhead



Page 99

1  announcement in the correct hospital.

2      Q.      Which hospital did you send the

3  overhead announcement to?

4      A.      I sent it to my prior employee that I

5  was with for 24 years, University of Penn Health

6  System.

7      Q.      And it should have went to

8  Presbyterian, right?

9      A.      Yes, that I was there for a month with.

10  I mean I'm sorry, two weeks as an operator, yes.

11      Q.      So you sent the rapid response to Penn

12  rather than Presbyterian?

13      A.      Exactly.

14      Q.      You did that because you were on the

15  phone with your husband on a personal call,

16  right?

17      A.      No.

18      Q.      That caused the mistake, didn't it?

19      A.      Absolutely not.

20      Q.      So that had nothing -- strike that.

21  The fact that you were on the phone with your

22  husband when you should have been calling in a

23  code using your computer, that had nothing to do

24  with the situation?



Case 1:16-cv-00618-MAK Document 30 Filed 06/24/16 Page 42 of 132
Case 3:18-cv-00618-MAK Document 30 Filed 06/24/16 Page 42 of 132
Case: 16-3306 Document: 003012548866 Page: 42 Date Filed: 07/03/2017    035A

Page 112

1  the record.  The time is 1:02 p.m.  This starts

2  Disc No. 2.

3  BY MR. STURGEON:

4      Q.      Ma'am, we were talking about the

5  incident with calling the code to the wrong

6  hospital right before our lunch break and I want

7  to get back to that, but I want to cover a few

8  things quickly before we do.  Is that okay?

9      A.      Yes, sir.

10     Q.      You previously testified that in 2014

11 when Penn told you that you used all of the FMLA

12 leave you had for the year, that you thought that

13 was incorrect and that they were not counting

14 your days and/or time correctly, right?

15     A.      Not Penn, but Tammy specifically.

16     Q.      Okay.  So you thought Tammy was not --

17 strike that.

18             You thought Tammy was putting you down

19 for time -- FMLA time when you weren't using it?

20     A.      Yes.

21     Q.      Go ahead.

22     A.      More so the hours.  So say if I asked

23 for one hour, I'm quite sure that she would

24 submit paperwork for an additional seven hours.



Page 113

1  So instead of an hour, she would submit eight

2  hours.

3     Q.      Did you ever suspect that she was, when

4  you would ask for an hour-and-a-half or two

5  hours, putting in more time but not a full day,

6  meaning if you would ask for two hours, she would

7  put in for three or four hours?

8     A.      During the time period of working at

9  University of Penn, I wasn't sure.  It was just

10  something that I felt, but no, I didn't know for

11  sure if she was actually doing this.

12     Q.      So you don't know for sure whether or

13  not she was accounting for your FMLA time

14  correctly; you just felt and had a suspicion that

15  she might not be?

16     A.      Yes, that is true.

17     Q.      No evidence other than your suspicion?

18     A.      Yes, there were other evidence which

19  would happen during our lead meetings with the

20  other supervisors where they were suspecting the

21  same thing.  We would talk about how we would

22  submit an hour or two and they would speak to Ms.

23  Ferguson and she'd say that I see that you might

24  have took like three days, opposed to maybe this



Page 114

1   person just asking for three hours.

2       Q.      Okay.  I want to talk about you

3   specifically though.

4       A.      Oh, me specifically?

5       Q.      Yeah.

6       A.      Okay.

7       Q.      Do you have any evidence as to you,

8   meaning hour logs or e-mails or anything that you

9   can show to us that would confirm or influence or

10  relate to your suspicion that Tammy was not

11  accounting for your FMLA time correctly?

12      A.      No, sir.

13      Q.      And I want to make sure I understand

14  your claims completely.

15      A.      Yes.

16      Q.      If you would have used all of your FMLA

17  time, meaning you use up your 12 weeks --

18      A.      Right.

19      Q.      -- hours completely --

20      A.      Right.

21      Q.      -- you're not claiming that Penn still

22  should have allowed you to take time off from

23  work, right?

24      A.      Well, once again, not Penn.



Page 116

1    being written up.

2        Q.      Okay.  I want to talk about that.

3    Assuming your FMLA time is used up --

4        A.      Yes.

5        Q.      -- and all your other leave time --

6        A.      Yes.

7        Q.      -- why would you be allowed to simply

8    not come to work or leave work early as an

9    accommodation?

10        A.      Okay.  Could you repeat that, please?

11        Q.      Sure.

12        A.      Thank you.

13        Q.      Leaving work early or not coming to

14    work on time --

15        A.      Right.

16        Q.      -- or not coming to work at all --

17        A.      Right.

18        Q.      -- you can have vacation, sick days,

19    FMLA days and other leave under Penn's policies,

20    right?

21        A.      Right.

22        Q.      You wanted them to effectively just

23    continue FMLA, meaning you wanted to be able to

24    leave work early or come to work late or not come



Page 117

1    to work at all because of medical conditions,

2    right?

3        A.        Specifically what I would basically say

4    is although I had leave of absence and FMLA, I

5    also have vacation and personal time.  In that

6    department, it was very hard to get off within

7    maybe an hour or two weeks prior to, you know,

8    just getting off.  So the special accommodations

9    wasn't that I just wanted to be totally the only

10   person at --

11       Q.        Let me try to --

12                 MS. CLARK:  I think she was trying

13   to answer.  Can she please complete her answer?

14                 MR. STURGEON:  Oh, yeah, sure.

15                 THE WITNESS:  It was just that I

16   didn't want it to be just myself being able to

17   take off any time I wanted to.  I wanted to ask

18   for a special accommodation, meaning that I can

19   ask off and be granted my vacation or personal

20   time without waiting for a two-week notice to do

21   so.

22   BY MR. STURGEON:

23       Q.        I want you to assume all your vacation

24   time was used.



Page 118

```
 1    A.       Uh-huh.

 2    Q.       All your sick time.

 3    A.       Uh-huh.

 4    Q.       Any other leave time.

 5    A.       Right.

 6    Q.       All your FMLA time.

 7    A.       Right.

 8    Q.       Are you contending if all that

 9  occurred, you still should have been allowed to

10  leave work when you wanted to, come to work late

11  and not come to work; is that your contention?

12    A.       Absolutely not, no.

13    Q.       Okay.  So if you didn't have any

14  vacation time left or sick time left --

15    A.       Right.

16    Q.       -- or FMLA time left --

17    A.       Right.

18    Q.       -- then you can't leave when you want

19  or come in when you want or take days off, right?

20    A.       Well, no, that's not true, and I'll

21  tell you why.

22    Q.       Sure.

23    A.       In that department we were allowed and

24  there has been operators that totally change
```



time that was able to call into the department and was told that they had to work a Monday, which was the day in which they called eight hours and was able to switch with another person at that time and given that request.

Q. Let me try it this way 'cause I'm defending Penn in this case. Do you understand that?

A. Yes, sir.

Q. Okay. You understand you sued an institution, right?

A. Yes, sir.

Q. So I'm trying to understand your legal claims here.

A. Okay.

Q. Okay. And I just want to understand if this is one of your legal claims, okay? Is one of your legal claims that because you used up your vacation, you used up your sick time, you used up your FMLA time and you used up any time under the other leave program or any other Penn policy and procedure while you were at Penn --

A. Yes.

Q. -- that because they did not allow you



Page 123

1  to come to work when you wanted or leave when you

2  wanted or not come to work at all, that that is

3  illegal?

4          MS. CLARK:  Object to the form.

5          You can answer.

6  BY MR. STURGEON:

7    Q.      I want to understand your legal claim.

8  Is that one of your claims?

9    A.      No.  I never used the word illegal.

10   Q.      Is it wrong?

11   A.      No.

12   Q.      Okay.  Let's go to another document.

13  Again, this is one other thing I want to clean up

14  until we move on to or back to that incident

15  right before you were terminated.

16   A.      Okay.

17   Q.      You testified earlier that you never

18  used FMLA time for issues that don't relate to

19  your medical conditions like getting a ride home

20  with somebody or running personal errands.  Do

21  you remember that testimony?

22   A.      Yes, I do.

23   Q.      Do you stand by that testimony?

24   A.      Exactly.



Page 134

1    your lawyer knows that we produced it as a wav

2    file.  It's just a sound file.  The court

3    reporter may have a hard time transcribing this.

4    I know I would have a hard time transcribing it,

5    so we're going to play it.

6              So for the record, the court reporter

7    is not even going to attempt to transcribe this,

8    so we're going to play it for you and then I'd

9    like to ask you a few questions about it.

10   A.       Sure.

11   Q.       Okay.

12              (Audio recording being played.)

13   BY MR. STURGEON:

14   Q.       Ma'am, were you able to hear that

15   recording as we played it?

16   A.       Yes.

17   Q.       Is the female voice on that recording

18   your voice?

19   A.       Yes.

20   Q.       Whose voice is the male's voice?

21   A.       My husband.

22   Q.       At the beginning of the call, you say,

23   rapid response, rapid response, code three south.

24   What does that mean?



JA73

Page 135

1    A.      Rapid response CUPP three south,

2  meaning that it was a rapid response.  CUPP was

3  the name of the building, the third floor, south

4  side.

5    Q.      So it's CUPP.  What does CUPP stand

6  for?

7    A.      It's just the name of the building,

8  C-U-P-P.

9    Q.      And again, rapid response means what?

10   A.      It's just an emergency procedure where

11 you just act fast, need to arrive for it could be

12 a fall.  It's everything other than a heart stop

13 or an anesthesia issue.

14   Q.      When you were making that call, rapid

15 response, rapid response, code three south,

16 you're not on the same line with your husband,

17 right; I mean he's on a different line and then

18 you jumped to a different line?

19   A.      Totally different.  Yes, totally

20 different.

21   Q.      When you made the call, you put him on

22 hold when you made the call, I assume?

23   A.      I don't remember if -- I don't even

24 think I had to because there's a whole nuther



Page 136

1  phone system, so I could totally talk to him and

2  go to a whole nuther phone and put the code in.

3     Q.     If you wanted to use the console, the

4  computer console, you couldn't do so because you

5  had him on the line, right?

6     A.     That is correct.

7     Q.     What were you and your husband

8  discussing on this private call?

9     A.     I can't really -- I think we were

10 talking about a phone -- someone called in and

11 said I found your husband phone or I think it was

12 something like that.

13    Q.     Whose voice is it at the end who you're

14 talking to -- strike that.  At the end of the

15 recording, it appears that somebody is pointing

16 out to you that you did something wrong?

17    A.     Yes.  Earlier remember I told you my

18 supervisor immediately came to me.  That was

19 Sophie Douglas voice you heard.

20    Q.     Okay.  And then you said I went

21 overhead at HUP?

22    A.     I was saying I went overhead at HUP,

23 yes, it does seem like I said that.

24    Q.     What does that mean?



Page 152

1   remember that, no.

2       Q.      Are you denying that you received it or

3   you just don't recall either way?

4       A.      I'm saying I do not recall.

5       Q.      Did you receive a first written warning

6   for failure to submit in a timely manner

7   completed physician certifications?

8       A.      I do remember that, yes.

9       Q.      You remember receiving a written

10  document warning you of that?

11      A.      Yes.

12      Q.      I want to go back before we get to

13  those --

14      A.      Okay.

15      Q.      -- to the stuff under Presby procedure

16  to process an overhead.

17      A.      Okay.

18      Q.      I want you to look at that.  Do you

19  need help with the right -- I know it gets messy

20  with all the documents.

21      A.      Yes.  Is this it?

22      Q.      It's the June 19, 2015 letter to you.

23      A.      The one we just had?

24      Q.      Yep.



Page 159

1    code to the wrong hospital?

2        A.        Absolutely not.

3        Q.        That was perfectly legitimate, wasn't

4    it?

5        A.        Yes, it was.

6        Q.        And it's grounds for termination, isn't

7    it?

8        A.        No, it's not.

9        Q.        So you think it's wildly improper and

10   wrong for Penn to have terminated your employment

11   for calling an emergency code to the wrong

12   hospital?

13       A.        Terribly wrong, and that --

14       Q.        What do you think a fair discipline

15   should have been?

16       A.        Well, because in my words, it would

17   have been the first time that I was counselled,

18   maybe it should have been a verbal where we just

19   spoke about what happened.

20                 MR. STURGEON:  Take a very short

21   break.

22                 THE WITNESS:  Okay.

23                 THE VIDEOGRAPHER:  We're now off

24   the record.  The time is 1:56 p.m.



JA77

Page 163

```
 1     A.        Okay.

 2     Q.        So Defendant's Exhibit 11, which is

 3   front of you, which is a June 19, 2015 letter to

 4   you from Sophia Douglas, right?

 5     A.        Uh-huh.  Yes.

 6     Q.        So if you go to the second page there

 7   are three things listed, a first written warning,

 8   a second written warning and a final written

 9   warning.  Do you see that?

10     A.        Yes, I do.

11     Q.        Okay.  Now, I want to ask you about

12   this second written warning for unprofessional

13   behavior towards a co-worker --

14     A.        Right.

15     Q.        -- dated December 8, 2014.

16     A.        Uh-huh.

17     Q.        Do you remember receiving a second

18   written warning for unprofessional behavior

19   towards a co-worker on or around that date?

20     A.        I remember being called in her office

21   and us having a conversation about an alleged

22   incident, something that was reported to her

23   about me arguing with an operator.  No, I do not

24   remember seeing paperwork, nor did I sign
```



Page 164

1   anything.  And I did not know about that until I

2   went to my unemployment arbitration hearing.  And

3   another thing --

4       Q.      I'm listening.  I'm just --

5       A.      I'm sorry.  I would never say or even

6   think that this was a second warning because I

7   don't remember a first warning, like somebody

8   coming to the office saying, Brenda, you're on a

9   four-step plan.  This is gonna be your first

10  warning and after this, if you get a second or

11  third or fourth, it's gonna lead up to you being

12  terminated.  There was no conversation like that

13  between me and my manager.  A lot of these things

14  were just conversations between us.

15      Q.      Your testimony is you're a hundred

16  percent sure you were never given a second

17  written warning for this incident in December of

18  2014?

19      A.      No.

20      Q.      Never signed anything?

21      A.      Never signed anything.

22              MR. STURGEON:  Can you mark

23  Defendant's Exhibit 12?

24              (A document was marked as Exhibit



Page 165

1   Defendant-12 for identification.)

2   BY MR. STURGEON:

3       Q.      I'd like you to take your time and look

4   at this, ma'am.

5       A.      Okay.

6       Q.      Let me know when you're --

7       A.      I'm ready.

8       Q.      This document for the record is to

9   Brenda Ford, lead communication specialist, from

10  Sophia Douglas-Morris, contact center manager

11  dated December 5, 2014.  The Bates label's Penn

12  Med 146 to Penn Med 147.  Can you flip to the

13  second page, ma'am?

14      A.      Yes.

15      Q.      Is that your signature?

16      A.      No.

17      Q.      That's not your signature?

18      A.      No.

19      Q.      Does it look like your signature,

20  meaning can you tell by looking at it; is it --

21      A.      Sure.

22      Q.      -- very different than the way you

23  should sign your name?

24      A.      Yes.  I think I even have material and



Page 166

```
 1   my state ID showing my signature.  And another
 2   thing about this signature, it looks like it was
 3   doc'd and it was also like a whiteout and
 4   recopied over again.  I will definitely say that
 5   I did see this write-up before.  When I went to
 6   my unemployment hearing and through arbitration,
 7   the judge allowed me to see this, and when I did,
 8   I was very upset because I realized that my
 9   manager doc'd up a whole write-up with something
10   that we spoke about and formed it in the form of
11   a write-up and a signature was attached to it.
12   And I let the judge know about it.  I let the
13   Penn lawyer know about and the head of the
14   department of Penn Medicine.
15       Q.      So your testimony is this signature on
16   Exhibit 12 is a forgery?
17       A.      Yes, sir.
18       Q.      Have you ever seen this document --
19   strike that.
20               Defendant's Exhibit 12, the second
21   written warning, did you see this prior to your
22   unemployment hearing?
23       A.      No.  There was just a conversation
24   between my supervisor and myself and also --
```



MAGNA
LEGAL SERVICES

Page 168

1  believe, and I told her that it was hearsay, this

2  thing never happened, and I walked out of her

3  office.  And that was just over with.  And I

4  didn't find out until she actually produced this

5  until I went through arbitration.

6      Q.      So the contents of the second written

7  warning for unprofessional communication, you

8  acknowledge that you at least discussed this

9  incident --

10     A.      Yes.  We definitely --

11     Q.      Ma'am.

12     A.      But it wasn't --

13     Q.      Ma'am, ma'am, ma'am.

14     A.      Oh, I'm sorry.

15     Q.      You have to let me ask the question.

16     A.      But sir, sometimes I think like you'll

17 ask a question and I think that you're over with.

18     Q.      Okay.  I understand.  The contents of

19 the second written warning that are in front of

20 you, you agree with me that -- I hope to be a

21 very short answer.  You agree with me that the

22 substance of the document you discussed with

23 Sophie Douglas around this time?

24     A.      I would like to read this again.



Page 171

1 that you did something.

2    A.      No.  No.  No.

3    Q.      What I'm asking you is --

4    A.      I know what you're saying, but the

5 thing of it is -- no.  I was -- the reason why

6 I'm contesting that is because she wasn't saying

7 that in a loud sarcastic manner -- that the

8 allegations was that I was loud and I was

9 sarcastic.  Her allegations was that we erupted

10 into a big fight in the office.  The allegations

11 was that we erupted in a big fight, like it was a

12 verbal loud altercation between Tawanda and I.

13    Q.      And that didn't happen?

14    A.      No, it didn't.

15    Q.      Okay.

16    A.      And of course, I wasn't loud and I

17 wasn't sarcastic.  It was just very short.  It

18 was just everything that happened, the first

19 thing, absolutely did happen.

20    Q.      Okay.  Let me show you -- let's go back

21 to I believe it's Defendant's Exhibit 11.  It's

22 the June 19, 2015, letter.

23    A.      June the 19th, yep.

24    Q.      You see under there, under April 29,



Page 172

1  2014, it says, "First written warning for failure

2  to submit in a timely manner a completed

3  physician's certification to disability

4  management to support your request for a leave of

5  absence."

6          Do you see that it says that?

7     A.    Yes, I do.

8     Q.    Okay.  I'm going to ask you some

9  foundational questions.  I'm not asking for long

10  explanations, okay?

11     A.    Okay.

12     Q.    Do you remember receiving on or around

13  that date a written warning?

14     A.    Yes.

15     Q.    Okay.  So you actually physically

16  received a written warning on or around that

17  date?

18     A.    Okay.  I can't say particularly the

19  date, but I do remember receiving a write-up

20  that, by the way, I didn't sign, and it witnessed

21  by another operator about me not completing my

22  physician's certificate to disability management.

23     Q.    And you didn't sign that written

24  warning?



Page 173

1    A.      No.  I witness was called in because I
2  would not sign it.
3              (A document was marked as Exhibit
4  Defendant-13 for identification.)
5  BY MR. STURGEON:
6    Q.      Do you have that in front of you,
7  ma'am?
8    A.      Yes, sir.
9    Q.      Okay.  Can you look at that for me?
10    A.      That's not my signature.  That's number
11  one.  We did have -- we did talk about this.  We
12  did talk about it.  I did see a write-up.  It
13  just didn't look like it was the same format.
14  She did tell me she was gonna write me up.
15    Q.      Okay.  Let me -- let me --
16    A.      Okay.  Okay.
17    Q.      Let me ask a few questions about it.
18    A.      I'm sorry.
19    Q.      That's okay.  So we're on Defendant's
20  Exhibit 13, which is a document that's titled
21  "Documentation of Progressive Step for
22  Performance Improvement," and it's Bates labeled
23  Penn 152 and it's -- there's a little check next
24  to first written warning.  Do you see that?



Page 174

1      A.      Yes.

2      Q.      Okay.  So this first written warning,

3   this document that you're looking at right now,

4   you've never seen before today?

5      A.      I'm not saying that I never seen this,

6   but I don't believe it was the same format.  And

7   I will also like you to note that when you see

8   the word first, second, third and final warnings

9   at University of Health Penn, they're all

10  separated because you could have a first warning

11  as far as your -- your -- what is -- your

12  tardiness, coming to work, being absent.  That's

13  one performance plan.  Then you can have another

14  one that just relates to your performance, okay.

15           So if you would get a write-up saying

16  your first one, you will have to know which one

17  are we talking about.  Is it for my call-outs, my

18  being lates or not.  So that's one of the issues

19  that I'm having.  And another thing, because I am

20  alleging that a lot of times when I would go in

21  and speak with Sophie, we would have general

22  conversations, just conversations talking about

23  what was going on and other times I would go in

24  and I would be written up.



JA86

Page 175

1    Q.      Ma'am, I don't mean to cut you off,

2    but I asked if -- ma'am.

3    A.      I'm sorry.

4    Q.      My question was simple.  Have you ever

5    seen this document before?

6    A.      No, I don't remember seeing this

7    document.

8    Q.      And your testimony is that's not your

9    signature on there?

10    A.      That is definitely not my signature.

11    Q.      You forged -- strike that.

12            Somebody forged that signature; is that

13    your contention?

14    A.      Well, it's -- yes, it is.

15    Q.      All right.  Let me mark Defendant's

16    Exhibit 13.  I'm sorry.  Defendant's Exhibit 14.

17    I'd like you to put 14, 13 and 12 in front of

18    you.

19    A.      Okay.

20            (A document was marked as Exhibit

21    Defendant-14 for identification.)

22    BY MR. STURGEON:

23    Q.      So ma'am, I'd like you to spread out in

24    front of you Defendant's 12, Defendant's 13 and



Page 178

1  line and then the two Bs coming over connecting.

2  That's one thing's different.

3      Q.      Okay.  Anything else?

4      A.      All right.  Another thing that I think

5  is different -- well, I see it looks like the

6  l-l-y, it looks like somebody really tried to do

7  a good job putting the l-l-y's together because

8  it go K-e-l and is that supposed to be an L or Y?

9  Because on 14, you clearly see two Ls and a Y,

10  but on 12 and 13, it looks like it's K-e-l-y.

11  And the loop on 13 at the bottom is a slightly

12  smaller loop as if someone carefully took their

13  time to copy something, but however, when you

14  write your signature, you're confident with it.

15  You just write your signature.  There is no

16  pause.

17      Q.      What do you think's going on here?  Do

18  you think this is a conspiracy and everybody's

19  out to forge your signature?

20      A.      Not everyone.  Here's what I believe.

21      Q.      Yeah.  Who do you think forged these

22  signatures?  I'd like to know.

23      A.      I believe that they hated the fact that

24  I was taking up so much time using my FMLA



Page 179

1   because in that department, it was Sophie.  And

2   working as a supervisor and a lead, I did so much

3   work in there that it was at the point that in my

4   last leave that a decision was made to get me out

5   of that department.  I do not know if it was

6   Sophie or Tammy or if it was Sophie and Tammy

7   that did that because they worked together.

8              They both had access to certain files

9   in regards to my FMLA, okay, and I believe it's

10  either one or the other or both, but I do know

11  that they harassed me about having my disability,

12  my FMLA, and it caused severe depression and they

13  wanted me out of that department.  So at the last

14  parts of my employment, they start doc'ing up

15  thing, putting a trail of paperwork of write-ups

16  in my folder to get me out of the office.  It had

17  nothing to do with all the years that I worked

18  there having a stellar record there and being

19  promoted and giving different profunctions (sic).

20  Why would they have somebody that they didn't

21  like interviewing potential candidates, holding

22  lead meetings with other supervisors, dealing

23  with the big CCA crap that's investigating

24  things.  And for when I came back to work, all of



MAGNA
LEGAL SERVICES

1    that's taken away from me, and now all of a

2    sudden you're getting write-ups hearsay, I heard

3    this, someone told me this, I heard this, I heard

4    that, or just the fact is something that I really

5    don't understand, the one time where I said that

6    I will refuse to sign and I want somebody to

7    witness me not signing it, where's that at?  I

8    don't even see that write-up.  Just like a couple

9    other things that she's alleging she wrote me up.

10   Where's the write-ups?

11            She didn't want me there because of my

12   FMLA.  She harassed me.  Tammy harassed me, as

13   they did with other people.  They wanted us out

14   of the office.

15       Q.      I'd like to mark some exhibits for you.

16   I'm going to mark them as Defendant's 15, 16, 17

17   and 18, okay?

18       A.      Yes, sir.

19               (Documents were marked as Exhibits

20   Defendant-15, Defendant-16, Defendant-17 and

21   Defendant-18, respectively, for identification.)

22   BY MR. STURGEON:

23       Q.      Ma'am, I'm only going to ask you one

24   question about each document.



Page 183

1    earlier where you were talking about the fact

2    that you believed or I think your word was you

3    had a suspicion that Tammy was putting you in for

4    a full day of FMLA leave when you were only

5    taking partial days or certain hours?

6        A.        Yes.

7        Q.        Do you remember that testimony?

8        A.        Yes, I do.

9        Q.        Okay.  I want you to look -- and you

10   can flip through this document however you'd

11   like, but let's just focus on -- if you go to

12   Bates No. 491, and that's in the bottom

13   right-hand corner.  There's a second of the table

14   called leave group.  Do you see that, where it

15   says leave group on each sort of table?

16       A.        Yes.

17       Q.        Okay.  And then there's one that says

18   leave group, total days approved 22.  Do you see

19   that?

20       A.        The first -- yes.

21       Q.        And then it has a list of dates?

22       A.        Uh-huh.

23       Q.        And it has a certification period, so

24   that reflects the certification period for your



Page 184

1  FMLA.  Do you see that?

2     A.     Uh-huh.

3     Q.     You have to say yes or no.

4     A.     Yes.  I'm sorry.  Yes.

5     Q.     That's okay.  It happens all the time.

6            So you'll see leave begin and end date.

7  So for example, it says July 11, 2014 is the

8  begin date and July 11, 2014 is the end date.  Do

9  you see that?

10    A.     Yes.

11    Q.     It lists a bunch of hours down here.

12 Do you see those hours listed?

13    A.     Yeah.  Like 1.25 hours?

14    Q.     Yeah.

15    A.     Yep.  Yes.

16    Q.     You'd agree with me, at least in this

17 leave group, it looks like the vast majority of

18 these are partial days, meaning they're reflected

19 on the system as partial days and not full days,

20 right?

21    A.     Yes.

22    Q.     They're even doing it by the quarter of

23 the hour where they're not charging you, you

24 know, two full hours for FMLA, they're charging



Page 185

1   you 1.25 hours.  Do you see that?

2       A.      Yes.

3       Q.      Can you explain to me how Penn's

4   records reflect numerous times where partial days

5   are being recorded, yet your contention is Tammy

6   was somehow railroading you by taking your

7   partial FMLA days and docking you and charging

8   you a full day; can you explain that to me?

9       A.      One of the reasons I felt that is

10  because after we had the meeting with the other

11  supervisors, what we were doing is talking about

12  this process where we would earn money, bonuses

13  through the system, okay, you know.  So the bonus

14  was your Q and I, your time on your -- time on

15  the board and your absenteeism, okay, and they

16  would calculate these things that would entitle

17  you to have a bonus.  A bonus could range from

18  150 to $300.  So every month she would bring out

19  this paperwork, right.  So I would try to like

20  kind of calculate when I would take a full day as

21  opposed to hours because if I will take a full

22  day, my time on the board would be increased.  If

23  I would take -- I mean be decreased.  If I took

24  an hour, it would be increased.



Page 186

1        So when I would look through it, I

2   would see, say like in July, I only took -- took

3   like ten hours off, but actually it was ten days

4   and here it is I didn't get a bonus.  I didn't

5   get a bonus because when she would calculate

6   these things, she would put that you was doing

7   full days.

8        This is how it looked.  I couldn't get

9   it because opposed to her just putting ten hours,

10  she would put that I missed like ten days, like

11  ten full eight-hour days or four eight-hour days

12  and increasing my time.

13       And another thing, once she did this,

14  you just never was able to tell how much time you

15  were using with your FMLA until they put the

16  Kronos system in, until it was available for all

17  operators to go into the computer and look at how

18  much time was submitted.  Prior to 2014, we

19  couldn't tell.  We didn't know how much time she

20  was submitting, but after that, once in Kronos.

21  I could go in and see that she just used the hour

22  or 50 minutes, but prior to that, you couldn't

23  tell that kind of stuff.

24     Q.     But 2014's the key year, right, because



Page 187

1   you're saying in 2014 Penn came to you and said,

2   you've used your FMLA time, and what you're

3   saying is that you had a suspicion that that was

4   incorrect, right?

5            MS. CLARK:  Object to the form.

6            THE WITNESS:  Yes.

7   BY MR. STURGEON:

8    Q.     If you look at this document -- and

9   again, I know that you haven't seen this before.

10  This document reflects that you were taking FMLA

11  leave going back at least until 2008.  Do you see

12  that?  If you go back to the back page of the

13  document, which is at Penn 498, you'll see it

14  reflects leave being taken and a lot of it in

15  2008 and 2009?

16   A.     Uh-huh.  Right.

17   Q.     Do you see that?

18   A.     Yes.

19   Q.     2009 actually reflects in one of these

20  leave groups, and that spans from September 23,

21  2008 to December 31, 2009 there was a total of

22  135 days of leave taken.  Do you see that?

23   A.     Starting from 2009, 1/5/2009?

24   Q.     So if you look at Penn 496 at the



Page 188

1    bottom right-hand corner, there's a leave group

2    that says total days 135, and then the leave

3    begin and end dates if you keep flipping, it

4    spans from September 23, 2008, all the way up to

5    December 31, 2009.  Do you see that?

6        A.      Yes.

7        Q.      Okay.  Did you have surgery during that

8    time period?

9        A.      Let's see.  12/20'9.  Will you have

10   allow me to look at a slip that I have showing

11   exact dates that I had surgery?

12       Q.      Sure.

13       A.      Okay.  Thank you.

14       Q.      Yeah.  No problem.

15       A.      Okay.  I had a left hip replacement

16   during that time.

17       Q.      If you keep flipping through the

18   document -- and you can take as much time as you

19   want, but it looks like there are huge blocks of

20   time throughout 2010, 2012, 2013, 2014 where

21   you're taking FMLA time.  Do you see that?

22       A.      Yes.  Yes, sir.

23       Q.      It's because you had a couple hip

24   surgeries; is that right?



Page 189

```
 1     A.      Eight.

 2     Q.      You had eight hip surgeries?

 3     A.      Yes.

 4     Q.      You had eight hip surgeries from 2008

 5  to 2014?

 6     A.      Yes.

 7     Q.      So throughout this entire time period

 8  you're taking FMLA time an you're taking a lot of

 9  it?

10     A.      Yes, sir.

11     Q.      You were never demoted during this time

12  period, right?

13     A.      No.

14     Q.      You were never suspended?

15     A.      No.

16     Q.      You were never fired?

17     A.      No.

18     Q.      Sophie Douglas was your manager during

19  this entire time period?

20     A.      Yes.

21     Q.      How about Tammy when did she come into

22  the picture?

23     A.      I'm not exactly sure but I do remember

24  if you'll allow me to, Sophie and I were both
```



Page 242

1  further surgery that I would have to have.

2            You could just tell that she was

3  just irritated with me.  She just didn't want to

4  hear anything more about it.  And what I feel as

5  though I could back this up with is because what

6  I did ask her for, she did tell me it will have

7  to come through -- I'm sorry -- the personnel

8  department, but it took a long time for her to do

9  it, to submit the information, so it was just a

10  waiting period.

11  BY MS. CLARK:

12    Q.      Did you ever make a request that you be

13  provided with the ability to come into a

14  different entrance?

15    A.      Yes.  So the department had a front

16  entrance and it had a back entrance.  When you

17  came into the front entrance -- if my husband was

18  to drop me off at the front entrance, I had to

19  walk maybe what would be considered almost like a

20  half a block to get into building; however, if he

21  drove to the back of the building, I could go

22  directly into the back of the building and right

23  up the elevators.

24            I asked Sophie if it 's okay --



JA98

Page 243

1    first -- I'm sorry.  First I asked the

2    security -- his name is Robert -- is it okay if

3    my husband drop me off at the back and if I could

4    use that to get upstairs.  He said only if Amy or

5    Sophie would approve it.  So he said that he will

6    ask, and I said I would do the same thing.  I

7    don't know which one of us did it first, but I do

8    know that I did ask her about it, and she said I

9    don't know.  I have to think about it.

10            And later that day when I came down,

11   Robert told me that Sophie came to him and said,

12   do not allow Brenda to use that back entrance.

13   So she talked to him before she even spoke to me,

14   and it was a no.  And when he told me that, I

15   went in the next day and I asked her is it okay

16   -- I just wanted to hear her response to it.  And

17   she said I'm sorry, Brenda.  I won't be able to

18   accommodate you in that manner because there's

19   other people that may have similar problems to

20   yours and if I allow you to do it, I will have to

21   allow those people to do it as well, which wasn't

22   true because she used the back and so did Tammy,

23   like we all knew that because the security guard

24   had a camera there and we had a camera on our



Page 244

1    floor, so we could see people coming in for

2    different entrances.  So I know that that story

3    she gave was a fabrication.

4        Q.      And when did you make this

5    accommodation request?

6                MR. STURGEON:  Objection to the

7    form.

8                THE WITNESS:  I made it several

9    times but more specifically was when my last time

10   coming back from my surgery and I thought well, I

11   knew I needed a little extra help.

12   BY MS. CLARK:

13       Q.      You made reference throughout the

14   course of this deposition to the last time that

15   you came back.  I just want to make sure that

16   we're clear for the record.  When was that, when

17   was your last surgery prior to your termination

18   at Penn?

19       A.      It was 8/2014.

20       Q.      And so after you returned from your

21   surgery in I think August of 2014?

22       A.      Yes.

23       Q.      Is that when things started to change

24   for you there?



Page 266

1    it?  She's the --

2        A.      Why can't you put it in a letter form

3    so then I know that if this happen, everybody's

4    being written up or talked to.

5        Q.      So you disagreed with who you had to

6    call when you called out, you didn't like what

7    they were doing in the protocol they saying?

8        A.      Absolutely not.  I just felt that who I

9    was calling out to was the correct person.

10       Q.      And they disagreed with you?

11       A.      Yes, but -- okay, yes, they --

12       Q.      And they told you that?

13       A.      They disagreed.

14       Q.      Repeatedly they told you that?

15       A.      That time, yes, they did, yes.

16       Q.      Okay.  And Sophie told you that?  I sat

17   here and listened when your lawyer was asking you

18   questions.  Sophie told you repeatedly that you

19   were violating the protocol for calling in and

20   requesting leave, right?

21       A.      Yes, she did.

22       Q.      Okay.  Thank you.  This e-mail we're

23   looking at is mid-March 2015?

24       A.      Uh-huh.



Page 267

1    Q.      And I know that you denied in the early

2  March 2015 saying, "I hate the HUP operators,"

3  right; you deny ever saying that?

4    A.      Sure I do.  I love the operators.

5    Q.      And you deny them ever approaching you

6  -- strike that.  And you deny Sophie ever

7  approaching you and saying that that was what

8  happened?

9    A.      Yes.

10    Q.      Okay.  So that's in early March 2015

11 you deny that occurred.  How about in

12 mid-March 2015, do you deny that anybody

13 approached you on or around the time of the

14 e-mail that I'm looking at here and said you're

15 still continuing not to use the protocol for

16 calling out for leave?

17    A.      I remember speaking with Sophie, but I

18 don't remember exactly when.  I don't remember it

19 being a write-up or anything.  It was just a

20 conversation, but, however, what I did remember

21 is saying can't you come to the lead meetings

22 because can we make this specific because who do

23 I call out to.

24    Q.      In both of these incidents, one of



# Condensed Transcript
# Testimony of:

# SOPHIA DOUGLAS - (Portions Marked Confidential)

## Date: June 17, 2016

## Branda Kelly v. University of Pennsylvania Health System

## No.:  USDC E.D.PA 16-0618

R&K Reporting, Inc.
PO Box 1372
Levittown, Pennsylvania 19058
Phone: 215-946-7009
Fax: 215-949-1867
Email: rkreporting@gmail.com

SOPHIA DOUGLAS - (Portions Marked Confidential)

Pages 1 to 4

---

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3    .
      BRENDA KELLY          :  CIVIL ACTION
 4          Plaintiff,      :
                            :
 5    v.                    :  NO. 16-0618
                            :
 6    UNIVERSITY OF         :
      PENNSYLVANIA HEALTH   :
 7    SYSTEM, d/b/a PENN    :
      MEDICINE              :
 8          Defendant.      :
 9
      PORTIONS OF TRANSCRIPT MARKED CONFIDENTIAL
10
11        Philadelphia, Pennsylvania
12             June 17, 2016
13
14    Pretrial examination of SOPHIA JOANNA DOUGLAS,
15    taken on behalf of the Plaintiff at
16    the Law Offices of Morgan Lewis & Bockius, 1701
17    Market Street, Philadelphia, Pennsylvania, on
18    the above date, commencing at 10:30 a.m.,
19    before Linda A. Ricciardi, Certified Court
20    Reporter.
21
22             R&K REPORTING
            Court Reporting Services
23              PO Box 1372
          Levittown, Pennsylvania  19058-1372
24        Phone: 215-946-7009  Fax: 215-949-1867
```

---

**2**

```
 1    APPEARANCES:
 2    KARPF, KARPF & CERUTTI, P.C.
        BY:  JULIA W. CLARK, ESQUIRE
 3             3331 Street Road
               Two Greenwood Square, Suite 128
 4             Bensalem, Pennsylvania 19020
               215-639-0801
 5             jclark@karpf-law.com
      -- Counsel for Plaintiff
 6
 7
 8    MORGAN LEWIS & BOCKIUS, LLP
        BY:  JEFFREY A. STURGEON, ESQUIRE
 9             1701 Market Street
               Philadelphia, Pennsylvania 19103
10             215-963-5650
               jeffrey.sturgeon@morganlewis.com
11    -- Counsel for Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

**3**

```
 1             I N D E X
 2
 3    WITNESS                                  PAGE
 4    SOPHIA JOANNA DOUGLAS
 5      By Ms. Clark                             4
 6      By Mr. Sturgeon                        194
 7
 8
 9             E X H I B I T S
10    MARKED      DESCRIPTION                  PAGE
11    Douglas-1   Policy manual                 34
12    Douglas-2   Performance evaluation        85
13    Douglas-3   Performance summary           87
14    Douglas-4   ADA request cover sheet       94
15    Douglas-5   Certification of return to   101
                  work
16
      Douglas-6   Email chain                  102
17
      Douglas-7   Email chain                  122
18
      Douglas-8   Email chain                  135
19
      Douglas-9   Personnel action form        143
20
      Douglas-10  Schedule                     148
21
      Douglas-11  Emails                       157
22
      Douglas-12  Documentation of progressive 167
23                step for performance
24                improvement
```

---

**4**

```
 1             E X H I B I T S
 2    MARKED      DESCRIPTION                  PAGE
 3    Douglas-13  Second written warning       172
 4    Douglas-14  Documentation of progressive 174
                  step for performance
 5                improvement
 6    Douglas-15  Email chain                  187
 7    Douglas-16  Email chain                  191
 8    Douglas-17  Qcera LeaveSource            192
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

SOPHIA DOUGLAS - (Portions Marked Confidential)

137

1  using FMLA?
2  A.    I don't keep track of it, frequently.
3  Q.    In 2015 did Tammy Stewart ever bring to
4  your attention that she was having issues with
5  Ms. Kelly utilizing her FMLA leave?
6  A.    What month?
7  Q.    At any time in 2015, did she ever bring
8  any issues to your attention about Ms. Kelly
9  utilizing her FMLA leave?
10  A.    I am not sure.
11  Q.    Do you recall her ever expressing any
12  frustrations regarding Ms. Kelly's use of time
13  off for medical reasons?
14  A.    Not for medical reason, no.
15  Q.    For FMLA purpose, do you recall her
16  expressing any frustration with regards to Ms.
17  Kelly's use of FMLA in 2015?
18  A.    Not specifically FMLA.
19  Q.    Was there any --
20  A.    Not a frustration with using FMLA.
21  Q.    Do you recall any frustrations that
22  Tammy Stewart shared with you concerning Ms.
23  Kelly being out at all in 2015?
24  A.    No.

138

1  Q.    Were you ever made aware by Ms. Kelly
2  that she was going to have subsequent
3  surgeries?
4  A.    Subsequent surgeries, after.
5  Q.    After she came back from her last, I
6  guess I will call it block leave in 2014, at
7  any time after that did she make you aware that
8  she was going to be having additional
9  surgeries?
10       MR. STURGEON:  Objection to the
11       form.
12       THE WITNESS:  I am not sure, I
13       can't recall.
14  BY MS. CLARK:
15  Q.    I want to talk about Ms. Kelly's
16  demotion.  At some point she was demoted; is
17  that correct?
18  A.    Yes.
19  Q.    Tell me why was Ms. Kelly demoted?
20  A.    She was demoted because, let me see,
21  what was the incident?  If I am not mistaken,
22  it was because of a comment she made, I
23  believe.
24  Q.    Who made the decision to demote her?

139

1  A.    Actually HR.
2  Q.    HR made the decision?
3  A.    Uh-huh.  Well, it was a mutual, it was
4  a recommendation, and either demotion or
5  termination and demotion was instituted.
6  Q.    So when I asked you why she was demoted
7  you made reference, and I apologize, I am not
8  recalling your testimony correctly, you made
9  reference to a comment she made; is that
10  correct?
11  A.    Unprofessional conduct, yes.
12  Q.    What was entailed in the unprofessional
13  conduct?
14  A.    I can't recall the situation, but it
15  was for unprofessional conduct.
16  Q.    Have you ever demoted any other
17  employees?
18  A.    Demoted, no.
19  Q.    Can you recall anything about the
20  conduct specifically that caused her to be
21  demoted?
22  A.    I believe that was the one with
23  Carlice, situation with Carlice.
24  Q.    How did you become aware of that

140

1  situation?
2  A.    Tammy was on the floor and heard it and
3  other employees heard it.
4  Q.    Who were the other employees?
5  A.    Ebony Morton is one, she was an
6  attendee, Tammy Stewart, and I know Rhonda was
7  the person that stated not all the employees,
8  because she said, I can't remember the total
9  detail of what she said, but I believe she said
10  that she hated the HUP operators and that is
11  what she get for messing with my girlfriend.
12  She left her station to venture over to the
13  University of Pennsylvania Hospital operators,
14  and to make that statement so everyone can hear
15  it.  I believe that was the reason.
16  Q.    Did you issue Ms. Kelly any kind of
17  discipline in connection with this alleged
18  incident?
19  A.    Actually I wanted to, but Joann
20  recommended, she had to review it with Lisa,
21  our chief generalist, and the consensus was
22  demotion.
23  Q.    Did you want to terminate her as a
24  result of this incident?

SOPHIA DOUGLAS - (Portions Marked Confidential)

153

1  works there?
2  A.   No.  Yeah, it is Brenda's schedule.
3         MR. STURGEON:  Can we go off the
4  record for a second?
5         (Whereupon a discussion was held
6  off the record.)
7  BY MS. CLARK:
8  Q.   So let's work through these so I
9  understand how to read them properly.  Do you
10  see there is a column on the left side of it,
11  these pages that references Brenda Kelly?
12  A.   I see Brenda Kelly, yes.
13  Q.   So if you go right from there, does
14  that refer to Brenda Kelly or how would you
15  read this to see what portion, if any, relates
16  to Brenda Kelly?
17  A.   Okay.  So this one line here is Brenda.
18  Q.   So which page are you looking at right
19  now?
20  A.   So you said this whole block here is
21  Brenda's, right, is what you are saying?
22  Q.   No, I didn't say that and I am sorry if
23  that is how it came across.
24  A.   I am looking at the block here.

154

1  Q.   Which page are you on?
2  A.   I am on 427.  So here, this line right
3  here, all right, now we got it.  We can
4  proceed.
5  Q.   We are actually not on that page, but
6  just so I am clear, if I wanted to find out
7  what Brenda Kelly's schedule was I would first
8  look at her name on the left-hand column,
9  right?
10  A.   Yes.
11  Q.   Then I would look at the columns that
12  directly precede her name from the right going
13  across the page; is that correct?
14         MR. STURGEON:  Proceed?  Objection
15  to form.
16         THE WITNESS:  Yes.
17  BY MS. CLARK:
18  Q.   Follow her name; is that correct?
19  A.   Yes, start from the left and go across
20  the right.
21  Q.   Okay, great.  Can you please turn to
22  Penn 447.  I just want to look at one
23  particular date.  If you look at, and we are
24  looking from February 1st through February

155

1  14th.  Do you see that?
2  A.   Yes.
3  Q.   If you take a look at February 11th, it
4  appears just from looking at the schedule that
5  Ms. Kelly had been scheduled for a shift from
6  7:00 a.m. to 3:30 p.m., do you see that?
7  A.   Yes.
8  Q.   It looks like there is a cross marked
9  through it, slash through it.
10  A.   Uh-huh.
11  Q.   There is something written at the top,
12  what does that say?
13  A.   I cannot tell you what it is.
14  Q.   Does that say leave of absence or LOA?
15  A.   I don't know because I didn't document.
16         MR. STURGEON:  Objection to the
17  form.
18  BY MS. CLARK:
19  Q.   You can put that aside.
20  A.   All right.
21         (Whereupon a short recess was
22  taken.)
23  BY MS. CLARK:
24  Q.   At some point did you issue Ms. Kelly a

156

1  first written warning?
2  A.   Yes, the first written.
3  Q.   And I know we already talked a little
4  bit about this at the very beginning of the
5  deposition.  Tell me why it is that you decided
6  to write Ms. Kelly up?
7  A.   The first written, the first written
8  was for failure to submit leave of absence
9  documentation.
10  Q.   Did anyone instruct you to write Ms.
11  Kelly up?
12  A.   Well, once disability management sent
13  us the denial, that is the key to that, we
14  could issue a counseling.
15  Q.   But just so that I am clear, did anyone
16  actually specifically instruct you to write Ms.
17  Kelly up?
18  A.   Instruct us, I can't recall.  Did
19  someone instruct me?
20  Q.   I know that you testified earlier that
21  you issued these written warnings to other
22  individuals; is that correct?
23  A.   Yes.
24  Q.   On any of those prior occasions or

SOPHIA DOUGLAS - (Portions Marked Confidential)

169

1    Q.    Did she tell you that she disagreed
2    with it?
3    A.    I can't recall.
4    Q.    But she did sign this document?
5    A.    She signed it, yes.
6    Q.    After this at some point you issued her
7    second written warning; is that correct?
8    A.    Yes.
9    Q.    What was the reason for that?
10   A.    The second written warning was for, I
11   believe that was for not following protocol,
12   call out protocol.
13   Q.    Was it about some kind of
14   unprofessional conduct?
15   A.    Let me look at the chain of events. I
16   can't remember.
17   Q.    Well, setting the chain of events aside
18   for a moment, did you ever issue any discipline
19   to Ms. Kelly for unprofessional communication?
20   A.    Yes.
21   Q.    Tell me about that, what happened?
22   A.    Unprofessional communication, which one
23   is that? Is that the one regarding the rapid
24   response, Tawanda had to be the rapid response,

170

1    asked Brenda for the rapid responder name and
2    she in a sarcastic manner stated that she would
3    not notify the rapid responder because she
4    doesn't like putting out stats and she can't
5    remember, something to that.
6    Q.    Yeah, I don't know. You would know
7    much better than I would, so I am just trying
8    to find out what you recall as to why it was
9    that you issued her discipline for
10   unprofessional communication?
11   A.    She is the lead supervisor, and for her
12   to conduct herself in that manner is not
13   acceptable.
14   Q.    So you started, I didn't really follow
15   it very well, you started to talk about exactly
16   what has happened, and there was something with
17   regards to her not providing information at the
18   request of another operator?
19   A.    Right. She had to fill out the log
20   sheet, and Tawanda asked her for the name of
21   the first responder that she notified. Brenda
22   notified the first responder because the first
23   responder is one of the key individuals that is
24   notified, and Brenda refused to give her the

171

1    name or to call the first responder back.
2    Q.    How did you become aware of this
3    incident?
4    A.    I believe the lead is the one that told
5    me about it.
6    Q.    Just by name, who was the lead?
7    A.    I believe that one was Tammy, and Ebony
8    was the acting lead. Ebony was also involved,
9    and she conveyed what occurred.
10   Q.    Did you ever ask Ms. Kelly prior to
11   issuing her the write up for this incident, did
12   you ask her if she actually did what had been
13   alleged?
14   A.    Yes, and she said it didn't occur.
15   Q.    Did you believe her?
16   A.    I don't believe the statement is true
17   because there were others that stated that it
18   did occur.
19   Q.    Did you ever get any kind of written
20   statements from the others who allegedly heard
21   these statements made by Ms. Kelly?
22   A.    It was verbal.
23   Q.    Did you consult with anyone before
24   issuing the discipline to Ms. Kelly?

172

1    A.    I am not sure, I can't recall.
2    Q.    Did you ever sit down with Ms. Kelly to
3    give her the discipline?
4    A.    Yes.
5          (Whereupon second written warning
6    was marked for identification as
7    Douglas-13.)
8    BY MS. CLARK:
9    Q.    I am showing you a document that has
10   been marked for identification purposes as
11   Douglas-12. Just take a minute, look this over
12   and let me know when you had an opportunity to
13   do so.
14         MR. STURGEON: I think we are on
15   13.
16         MS. CLARK: I'm sorry, 13, thank
17   you.
18         MR. STURGEON: You are welcome.
19         THE WITNESS: Okay.
20   BY MS. CLARK:
21   Q.    Is this the second written warning that
22   you issued to Ms. Kelly?
23   A.    Yes.
24   Q.    Can you just put Douglas-12 in front of

# Condensed Transcript
## Testimony of:

# TAMMY STEWART - ROUGH DRAFT

## Date: June 20, 2016

## Brenda Kelly v. University of Pennsylvania Health System

## No.: USDC E.D.PA 16-0618

R&K Reporting Inc.
Court Reporting Services
P.O. Box 1372
Levittown, Pennsylvania 19058
Phone: 215-946-7009
email: rkreporting@gmail.com

# TAMMY STEWART - ROUGH DRAFT

Pages 1 to 4

### Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3                      * * *
 4   BRENDA KELLY            :
                             :
 5        V.                 :
                             :
 6   UNIVERSITY OF PENNSYLVANIA :
     HEALTH SYSTEM d/b/a      :
 7   PENN MEDICINE           :  NO. 16-0618
 8                      * * *
 9                      * * *
10                June 20, 2016
11                      * * *
12
13          Oral deposition of TAMMY STEWART,
14   held in the offices of Morgan, Lewis &
15   Bockius, LLP, 1701 Market Street,
16   Philadelphia, Pennsylvania 19103, commencing
17   at 1:08 p.m., on the above date, before Hope
18   Agosto, a Professional Court Reporter and a
19   Notary Public.
20
                         * * *
21
22                R&K REPORTING
           Court Reporting Services
23              PO Box 1372
        Levittown, Pennsylvania 19058-1372
24    Phone (215) 946-7009   Fax (215) 949-1867
```

### Page 3

```
 1                      * * *
 2                    INDEX
 3                      * * *
 4   WITNESS                         PAGE NO.
 5   TAMMY STEWART
 6      By Ms. Clark
 7
 8
 9                      * * *
10                  EXHIBITS
11                      * * *
12   NO.      DESCRIPTION           PAGE NO.
13   Stewart-1  Schedules
14   Stewart-2  Kelly Time on the Phone Report
15   Stewart-3  Kelly Human Resources/ADA
                Request Cover Sheet
16
         (MARKED DURING PREVIOUS DEPOSITIONS)
17
     Crowley-3  11/4/14 Email Chain re:  Brenda
18              Ford-Kelly
19   Crowley-6  3/16/15 Email Chain re:  Brenda
20
21
22
23
24
```

### Page 2

```
 1   A P P E A R A N C E S:
 2
 3        KARPF, KARPF & CERUTTI, PC
          BY:  JULIA W. CLARK, ESQUIRE
 4        3331 Street Road
          Two Greenwood Square
 5        Suite 128
          Bensalem, Pennsylvania 19020
 6        (215) 639-0801
          JClark@karpf-law.com
 7        -- Counsel for the Plaintiff
 8
 9        MORGAN, LEWIS & BOCKIUS, LLP
          BY:  JEFFREY A. STURGEON, ESQUIRE
10        1701 Market Street
          Philadelphia, Pennsylvania 19103
11        (215) 963-5000
          Jeffrey.Sturgeon@morganlewis.com
12        -- Counsel for the Defendant
13
14
15
16
17
18
19
20
21
22
23
24
```

### Page 4

```
 1                      * * *
 2        (It is hereby stipulated and
 3        agreed by and between counsel for the
 4        respective parties that the sealing,
 5        filing and certification are waived; and
 6        that all objections, except as to the
 7        form of the question, be reserved until
 8        the time of trial.)
 9                      * * *
10        TAMMY STEWART, after having been
11        first duly sworn, was examined and
12        testified as follows:
13                      * * *
14              EXAMINATION
15                      * * *
16   BY MS. CLARK:
17        Q.   Good afternoon, Ms. Stewart.  My name
18   is Julia Clark.  We met off the record but I
19   represent Brenda Kelly in this matter.  Today
20   we're here to take your deposition.  Have you
21   ever been deposed before?
22        A.   Yes.
23        Q.   When was that?
24        A.   I don't recall.  I mean, maybe five
```

R&K REPORTING, INC.

## TAMMY STEWART - ROUGH DRAFT

Pages 89 to 92

Page 89

1        (Whereupon, a brief recess was
2    held at this time.)
3           * * *
4  BY MS. CLARK:
5    **Q.  Before we just took our brief break,**
6  **I was asking you questions about why Ms. Kelly**
7  **was demoted and it's my understanding that you**
8  **know that she was demoted but you don't know;**
9  **is that correct?**
10    A.  Right.
11    **Q.  So you did not have any involvement**
12  **in the decision to demote Ms. Kelly; would that**
13  **be accurate?**
14    A.  Uh-huh, yes.
15    **Q.  And you did not provide any kind of**
16  **recommendation as to whether or not Ms. Kelly**
17  **should be demoted; would that be accurate?**
18    A.  Yes, I don't -- I can't remember why.
19  But I mean, I don't remember exactly what
20  happened that caused them to do that, so I
21  don't know.
22    **Q.  Do you know who did make the decision**
23  **to demote her?**
24    A.  Not officially.

Page 90

1    **Q.  Do you know unofficially who made the**
2  **decision?**
3    A.  I mean, I would imagine it would be,
4  you know, management.  I don't know if it was,
5  you know, a decision by Sophie or Amy or HR.
6  I'm not sure.
7    **Q.  How were you made aware that Ms.**
8  **Kelly was being demoted?**
9    A.  I think I received an email stating
10  that she would no longer be lead.
11    **Q.  Did you ever at any point tell Ms.**
12  **Kelly that she needed to slow down in her use**
13  **of FMLA time?**
14    A.  No.
15    **Q.  Did you ever have any concerns**
16  **whatsoever with Ms. Kelly's use of FMLA time?**
17    A.  I mean, it's a concern.
18    **Q.  What was your concern?**
19    A.  Well, I deal with staffing, so not
20  just her, just the fact of people being there
21  or not.
22    **Q.  Did you ever express those general**
23  **concerns to Ms. Kelly?**
24    A.  No.

Page 91

1    **Q.  Did you ever make those concerns**
2  **known to the operators?**
3    A.  No.
4    **Q.  Ultimately, Ms. Kelly was terminated;**
5  **is that correct?**
6    A.  Yes.
7    **Q.  Why was she terminated, do you know?**
8    A.  I believe it was due to not properly
9  processing a stat, an emergency procedure.
10    **Q.  Did you have any involvement in Ms.**
11  **Kelly's termination?**
12    A.  No.
13    **Q.  How did you become aware that she was**
14  **being terminated?**
15    A.  Well, because of my role, you know,
16  when those kind of things happen, I have to
17  know.  I have to know the staff.  I have to
18  know whether or not we need a law.  So that's
19  the reason I would need the information.
20    **Q.  Did you find out after the fact or**
21  **did you become aware that she was going to be**
22  **terminated prior to the time that it actually**
23  **happened?**
24    A.  I found out afterwards.

Page 92

1    **Q.  Who made you aware of that?**
2    A.  I got another email.
3    **Q.  Safe to say then that you didn't have**
4  **any involvement in the decision to terminate**
5  **Ms. Kelly?**
6    A.  No, no, not at all.
7    **Q.  Did you ever express any concerns**
8  **about the way that Ms. Kelly was calling out to**
9  **use her leave of absence time?**
10    A.  Did I ever --
11    **Q.  Express any concerns?**
12    A.  To who?
13    **Q.  To anyone.**
14    A.  I may have.
15    **Q.  I've just shown you what's been**
16  **marked as Crowley-6.  Take a look and let me**
17  **know when you have had an opportunity to do so.**
18    A.  Okay.
19    **Q.  Have you had an opportunity to look**
20  **at what was marked as Crowley-6?**
21    A.  Yes.
22    **Q.  I just want to direct your attention**
23  **to the email that appears on the bottom portion**
24  **of this document.  Is that an email that you**

BRENDA FORD-KELLY

2121 South Alden Street

Philadelphia, Pennsylvania 19143

Home:  215-727-0862

Philadelphia:  267-283-5665

OBJECTIVE:  My objective is to obtain a customer service position with your organization.

UNIVERSITY of PENNSYLVANIA HEALTH SYSTEM

34TH Spruce Street

Philadelphia, Pennsylvania  19143

1991 - 2015

Position:  Telephone Operator, Lead Communication Specialist, Communications Specialist, C.C.A practice investigator, C.C.A Answering Service Supervisor.

1991 – 1998 Telephone Operators

I would answer calls on a PBX monitor for Penn Presbyterian Hospital. Individually each operator was responsible to take 89 percent of (total) calls per day.

1998 – 2000 Communication Specialists

Position:  As a Communication Specialist not only is you responsible for answering a percentage of calls, the job required you to handle Emergency Medical Calls. An Emergency call is a call that is introduced to a Communication Specialist as an Extreme Alert.  An extreme alert would be a (Code Procedure (Heart Trauma), Trauma Alert (Gun, Stabbing, or Severe Beating), Rapid Response (any emergency for an in patient in distress), Bomb Alert, Fire Alert, and Fire Alarm.

2000 20015 Lead Communication Specialist

Position:  As a Lead Communication Specialist, I was responsible for encouraging 20 operators to start taking calls on time; I managed the perimeter board by making sure there were no more than 3 calls in queue at any given time. The operators had my continual support as far as what type of Health System information to relay to our patients, physicians, and other staff members.  After hours the department would transform into a huge answering service. The Answering Service takes up to 300 calls per night. The reps took calls from patients having medical issues. The operators would take census information, require the reason why the patient is calling and then relay this information to the doctor for a call back.

| University of Pennsylvania Health System<br>POLICY MANUAL | Number: 2-06-07 |
|---|---|
| | Page: 1 of 10 |
| SUBJECT:                    LEAVE OF ABSENCE | Effective: 09/01/14 |

## POLICY

The University of Pennsylvania Health System (UPHS) may authorize and grant Leaves of Absence for specified reasons as outlined below including reasonable accommodations under the Americans with Disabilities Act (see Employees with Disabilities Policy).

## PURPOSE

The purpose of this policy is to define the terms and conditions, as well as the process and procedure, related to the following types of leaves of absence:
1. Family & Medical Leave (FMLA)
2. Other Medical Leave
3. Personal Leave
4. Educational Leave
5. Bone Marrow, Stem Cell or Organ Donation Leave

This policy is not intended to address Military Leave or Leave of Absence for Sexual or Domestic Violence, each of which is addressed in a separate policy.

This policy is intended to be read in conjunction with the Employees with Disabilities policy, as that policy relates to leave as a reasonable accommodation under the Americans with Disabilities Act (ADA) and similar applicable state or local law, including laws governing leave related to pregnancy, childbirth and related medical conditions. Where appropriate, leave as a reasonable accommodation will run concurrently with Other Medical Leave.

## SCOPE

This policy applies to all regular employees (excluding House Staff) who meet the specified eligibility requirements for the various types of leave. House Staff employees should see their Program Director or the Graduate Medical Education Office. Where any part of this policy is inconsistent with the provisions of an applicable collective bargaining agreement, the latter shall prevail.

UPHS complies with all applicable federal, state and local laws pertaining to leave, disability and reinstatement rights and benefits, including those under the Family and Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA) and similar applicable state and local laws, including laws governing leave related to pregnancy, childbirth and related medical conditions. In the event of a conflict between this policy and any of those laws, UPHS will comply with such laws.

## IMPLEMENTATION

Implementation and control of this policy are the responsibilities of the Department Directors/Business Administrators, Entity Senior Leadership, and Human Resources.

## SERVICE REQUIREMENTS

A. FAMILY & MEDICAL LEAVE (FMLA)
   An employee is eligible for Family & Medical leave who has worked 1250 hours in the 12 month period immediately preceding the date the requested leave of absence is to begin and who has completed a combined total of at least one year (365-days) of prior service at any time in the past (including temporary assignments at UPHS). Any periods of approved Military Leave should be counted when calculating these hours of service requirements for FMLA leave.

B. OTHER MEDICAL LEAVE (when the employee has exhausted or is not eligible for FMLA)
   All employees who have completed 180 days of service are eligible to apply for Other Medical Leave.

C. PERSONAL LEAVE
   All employees who have completed 180 days of service are eligible to apply for a Personal Leave.

PENN MED 000198

| University of Pennsylvania Health System POLICY MANUAL | Number: 2-06-07 |
|---|---|
| | Page: 2 of 10 |
| SUBJECT:                    LEAVE OF ABSENCE | Effective: 09/01/14 |

**D.** **EDUCATIONAL LEAVE**
All employees who have completed 180 days of service are eligible to apply for an Educational Leave.

**E.** **BONE MARROW, STEM CELL or ORGAN DONATION LEAVE**
All active regular full-time and regular part-time employees who have completed 90 days of service are eligible to apply for an Organ Donation leave.

**COVERED USES**

**A.** **FAMILY & MEDICAL LEAVE (FMLA)**
An eligible employee may request FMLA leave:
1. For the birth of a child of the employee and in order to care for such child.
2. For the placement of a child with the employee for adoption or foster care.
3. In order to care for the spouse/same sex domestic partner, child or parent of the employee, if such spouse, child or parent has a serious health condition.
4. For a serious health condition that makes the employee unable to perform the functions of the position of such employee.
5. For any qualifying exigency arising out of the fact that the spouse/same sex domestic partner, child or parent of the employee is on covered active duty or call to covered active duty status.
6. For the care required by a covered servicemember with a serious illness or injury if the employee is the spouse/same sex domestic partner, child, parent or next of kin of the covered servicemember.

**B.** **OTHER MEDICAL LEAVE**
An eligible employee may request Other Medical Leave when the employee requires continuous leave for his or her own serious health condition and the employee:
1. is a new employee who has worked for at least 180 days and has worked at least 625 hours during the immediately preceding 180 days but is not eligible for FMLA leave because he or she has not satisfied the length of service requirement for FMLA leave (i.e., has not worked for UPHS for 12 months); or
2. has exhausted his/her FMLA leave entitlement by taking continuous/consecutive FMLA leave but cannot return to work at the end of this leave and requires additional leave due to the same medical condition.
Other Medical Leave must be taken continuously/consecutively, and it may not be taken more than once during a rolling 12 month period.

Employees who are not eligible for Other Medical Leave but who wish to request leave as a reasonable accommodation under the Americans with Disabilities Act, or similar applicable state or local law, should refer to the Employees with Disabilities policy, which includes information regarding the process for requesting an accommodation. Accommodation requests will be received and evaluated pursuant to the procedure described in the Employees with Disabilities policy. Employees who are not eligible for Other Medical Leave or Family & Medical Leave but who wish to request leave as a reasonable accommodation due to pregnancy, childbirth or a related medical condition should following the accommodation request process described in the Employees with Disabilities policy.

**C.** **PERSONAL LEAVE**
An eligible employee may request a Personal Leave for a reason that is not covered under another leave category. For example only, a Personal Leave may be appropriate if (1) an employee requires leave to care for a family member who is not covered under Family & Medical Leave (FMLA) (e.g., a grandparent), or (2) requires additional time beyond an approved FMLA leave to care for a family member. Personal Leave is not intended to be used for situations where an employee seeks leave for his or her own medical condition. The Department Director or Business Administrator and the Senior VP will determine the approval of the leave based on the operational needs of the department. Personal Leave will not be approved if there is another type of leave that is more appropriate.

**D.** **EDUCATIONAL LEAVE**
An eligible employee may request an Educational Leave to continue his or her own education. The Department Director or Business Administrator and the entity Senior Leadership will determine the approval of the leave based on the operational needs of the department.

PENN MED 000199

| University of Pennsylvania Health System<br>POLICY MANUAL | Number: 2-06-07 |
| --- | --- |
| | Page: 3 of 10 |
| SUBJECT:              LEAVE OF ABSENCE | Effective: 09/01/14 |

E. **BONE MARROW, STEM CELL or ORGAN DONATION LEAVE**
An eligible employee may request a Bone Marrow/Stem Cell/Organ Donation leave when the employee intends to donate bone marrow, stem cells or a major organ to another person. The employee must be the donor and must need time off to recover following the donation of bone marrow, stem cells or a major organ (lung, liver or kidney) to another person.

**DEFINITIONS (APPLICABLE TO FMLA LEAVE AND OTHER MEDICAL LEAVE ONLY)**

A. ARMED FORCES includes the United States Army, Navy, Air Force, Marine Corps, and Coast Guard, including the National Guard and Reserves.

B. A CHILD is defined as a biological, adopted or foster child; stepchild; legal ward; or child for whom an employee acted as a parent) who is under 18 years of age or, if older than 18 years of age, is incapable of self-care because of a mental or physical disability. Please note that this age restriction does not apply when FMLA leave is taken for a qualifying exigency or to care for a covered servicemember.

C. COVERED ACTIVE DUTY OR CALL TO COVERED ACTIVE DUTY STATUS – This term includes the following:
   1. In the case of a member of the regular Armed Forces, duty during the deployment of the member with the Armed Forces to a foreign country; or
   2. In the case of a member of the Reserve component of the Armed Forces, duty during the deployment of the member with the Armed Forces to a foreign country under a Federal call or order to active duty in support of a contingency operation pursuant to Section 101(a)(13)B) of Title 10, United States Code.

D. COVERED SERVICEMEMBER - The term "covered service member" means:
   1. A current member of the Armed Forces, including a member of the National Guard or Reserves, who is undergoing medical treatment recuperation, or therapy, is otherwise in outpatient status, or is otherwise on the temporary disability retired list, for a serious illness or injury; or
   2. A covered veteran who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness. For purposes of this definition, a covered veteran means an individual who was a member of the Armed Forces (including a member of the National Guard or Reserves), and was discharged or released under conditions other than dishonorable at any time during the five-year period prior to the first date the eligible employee takes FMLA leave to care for the covered veteran. Note, however, that the period between October 28, 2009 and March 9, 2013 shall not count towards the determination of the five-year period for covered veteran status.

E. NEXT OF KIN means the nearest blood relative of the employee.

F. QUALIFYING EXIGENCY means the following events, which are further defined by applicable FMLA regulations: (1) short-notice deployment; (2) military events and related activities; (3) childcare and school activities; (4) financial and legal arrangements; (5) counseling; (6) rest and recuperation (i.e., to spend time – up to 15 calendar days – with the military member who is on short-term temporary Rest and Recuperation leave during the period of deployment); (7) post-deployment activities; (8) parental care (i.e., where the military member's parent is incapable of self-care); and (9) additional activities not encompassed in the other categories, but agreed to by UPHS and the employee.

G. SERIOUS HEALTH CONDITION
An illness, injury, impairment, or physical or mental condition that involves one or more of the following:
   a. Hospital Care - Inpatient care (i.e., an overnight stay) in a hospital, hospice, or residential medical care facility, including any period of incapacity or subsequent treatment in connection with or consequent to such inpatient care.
   b. Absence Plus Treatment - A period of incapacity of more than three consecutive calendar days (including any subsequent treatment or period of incapacity relating to the same condition), that also involves:
      (1) Treatment[1] two or more times within 30-days of the first day of incapacity, unless extenuating circumstances exist,

---
[1] Treatment includes examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations.

PENN MED 000200

| University of Pennsylvania Health System<br>POLICY MANUAL | Number: 2-06-07 |
|---|---|
| | Page: 4 of 10 |
| SUBJECT:          LEAVE OF ABSENCE | Effective: 09/01/14 |

       by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

    (2)  Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment[2] under the supervision of the health care provider.

  c.  Pregnancy.  Any period of incapacity due to pregnancy, or for prenatal care.

  d.  Chronic Conditions Requiring Treatments.  A chronic condition that:

    a.  Requires periodic visits for treatment by a health care provider, or by a nurse or physician's assistant under direct supervision of a health care provider;

    b.  Continues over an extended period of time (including recurring episodes of a single underlying condition); and

    c.  May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

  e.  Permanent/Long-term Conditions Requiring Supervision.  A period of incapacity, which is permanent or long-term, due to a condition for which treatment may not be effective.  The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider.  Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

  f.  Multiple Treatments (Non-Chronic Conditions).  Any period of absence to receive multiple treatments (including any period or recovery there from) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis).

H.  SERIOUS INJURY OR ILLNESS – This term includes the following:

  a.  For a current member of the Armed Forces, including a member of the National Guard or Reserves, an injury or illness incurred by the covered servicemember in the line of active military duty in the Armed Forces or that existed before the beginning of the member's active duty and was aggravated by service in the line of duty on active duty in the Armed Forces, and that may render the member medically unfit to perform the duties of the member's office, grade, rank, or rating.

  b.  For a covered veteran, an injury or illness that was incurred by the member in the line of duty on active duty in the Armed Forces (or existed before the beginning of the member's active duty and was aggravated by service in the line of duty on active duty in the Armed Forces) and manifested itself before or after the member became a veteran and provided one of the additional criteria as described in 29 C.F.R. § 825.127(c)(2)(i)-(iv) is satisfied.

**DURATION**

A.  FAMILY & MEDICAL LEAVE (FMLA)

An eligible employee may receive up to 12 weeks of FMLA leave per rolling 12-month period.  The rolling 12-month period is measured backward from the date the leave commenced or will commence.  The 12 weeks of FMLA leave may be taken consecutively/continuously or on an intermittent or reduced schedule basis, except as indicated below.  Approved FMLA taken intermittently or on reduced schedule shall be calculated based on an employee's scheduled or regularly budgeted hours.

An eligible employee who is the spouse/same sex domestic partner, son, daughter, parent, or next of kin of a covered service member shall be entitled to a total of 26 workweeks of FMLA leave during a 12-month period to care for the service member.  The 26 workweeks for this type of leave is measured forward from the date an employee first begins leave for this purpose.

FMLA leave for the birth, placement for adoption or foster care of a child must be taken and conclude within the first year

---

[2] A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition.  A regimen of treatment does not include the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider.

PENN MED 000201

| University of Pennsylvania Health System POLICY MANUAL | Number: 2-06-07 |
|---|---|
| | Page: 5 of 10 |
| SUBJECT:          LEAVE OF ABSENCE | Effective: 09/01/14 |

of the birth or the placement for adoption or foster care. Requested time *must* be taken in one continuous period of up to a maximum of 12-weeks. Unless medically necessary, intermittent leave *will not be granted* for the birth, placement for adoption or placement for foster care of a child. However, leave for the placement for adoption or foster care of a child may be taken intermittently before the child has been placed if absence from work is required for the adoption or foster care process to proceed.

If both parents are employed by UPHS and are eligible for FMLA under this policy for the birth of a child or the placement of a child with them for adoption or foster care, or to care for a parent with a serious health condition, total leave for both, for any one of these reasons, may be limited to 12 work weeks during any 12-month period. Any period of incapacity either before or after the birth of a child may be considered FMLA, where the employee meets the eligibility requirement, and would not be subject to the combined limit. The Department Director and/or Business Administrators may choose to make exceptions to this limitation.

B. OTHER MEDICAL LEAVE
An eligible employee may request up to a maximum of 12 weeks of Other Medical Leave per rolling 12 month period.

Employees who wish to request additional leave as a reasonable accommodation for their own medical condition under the Americans with Disabilities Act, or similar applicable state or local law, should refer to the Employees with Disabilities policy, which includes information regarding requesting an accommodation. Accommodation requests will be received and evaluated pursuant to the procedures described in the Employees with Disabilities policy. Employees who wish to request additional leave as a reasonable accommodation due to pregnancy, childbirth or a related medical condition should follow the accommodation request process described in the Employees with Disabilities policy.

C. PERSONAL
An eligible employee may request up to a maximum of 12 weeks of Personal Leave per rolling 12 month period.

D. EDUCATIONAL
An eligible employee may request up to a maximum of 12 weeks of Educational Leave per rolling 12 month period.

E. BONE MARROW, STEM CELL or ORGAN DONATION LEAVE
An eligible employee may request the following time off, depending on the type of donation:
- Bone Marrow – maximum of five (5) calendar days
- Stem Cell – time off equal to number of collections
- Kidney – maximum of thirty (30) calendar days
- Liver – maximum of forty-five (45) calendar days

F. COMBINED TOTAL LEAVE
Employees generally will not be granted more than 24 total weeks of leave in a rolling 12-month period when combining all available leave types, except where additional leave is required by law. For example only, additional leave may be required for an employee to care for a covered servicemember with a serious illness or injury or additional leave may be required as a reasonable accommodation under the ADA or similar applicable state or local law.

## REQUESTING LEAVE

A. ALL LEAVE
All employees requesting a leave of absence for any reason (FMLA, Other Medical Leave, Personal Leave, Educational Leave, Bone Marrow/Stem Cell/Organ Donation Leave) must submit a Leave of Absence Request.

B. FMLA AND OTHER MEDICAL LEAVE
For FMLA Leave and Other Medical Leave, the employee must submit a leave request through e-STAR or by calling Disability Management at 215-615-2360. For planned absences, this request must be made no later than 30 days prior to the date the requested leave of absence is to begin. For unplanned absences, the employee must notify Disability Management at 215-615-2360 or his/her supervisor or as soon as possible after the employee determines that s/he needs to

PENN MED 000202

| University of Pennsylvania Health System **POLICY MANUAL** | Number: 2-06-07 |
| --- | --- |
| | Page: 6 of 10 |
| SUBJECT:                **LEAVE OF ABSENCE** | Effective: 09/01/14 |

request leave. Regardless of how this notice is provided, the employee is still required to comply with his/her department's call-out procedures. (Note: Advance notice is not required for leave due to a qualifying exigency, as described above.)

## CERTIFICATION FORM REQUIREMENTS FOR FMLA AND OTHER MEDICAL LEAVE

A. INITIAL CERTIFICATION

In order to qualify for FMLA and/or Other Medical Leave, an employee must ensure that UPHS receives an accurate, complete and sufficient Certification supporting the employee's FMLA or Other Medical Leave request **within 15 days** from the date the employee receives the Certification form. There are several different types of Certification forms. The type of Certification form that must be completed and who must complete it depends on the purpose for which the leave is requested. For example only, if an employee requests FMLA or Other Medical Leave for his or her own serious health condition, the employee must have his or her own health care provider complete the form. If the employee requests leave to care for a child, parent or spouse/domestic partner, then the family member's health care provider must complete the form. In the event the leave is being requested because of birth, adoption, or foster care placement, no Certification form is necessary; however, other appropriate proof may be required.

Employees will be advised in writing by Disability Management of the need to provide a completed Certification, and they will be provided a copy of the Certification form that must be completed. The completed Certification form must be returned to the Department of Disability Management **within 15 days** from the date the employee receives the form. FMLA leaves of absence and Other Medical Leave will not be approved until a completed Certification form is provided supporting the need for leave.

Employees who fail to return the Certification form within 15 days, absent extenuating circumstances, may have their leave delayed or denied, and any related absences will be considered an occurrence or occurrences, as appropriate, under the Performance Improvement and Progressive Steps policy. Employees who are unable to timely return the Certification are required to notify Disability Management prior to the due date, with an explanation of the extenuating circumstances causing the delay and a date by which the Certification form will be received. Disability Management will be responsible for reviewing extension requests and extenuating circumstances and determining if an extension is appropriate. An employee may be subject to disciplinary action for failure to timely return the Certification form, unless there are extenuating circumstances and/or the employee requested and was granted an extension of time from Disability Management in advance of the Certification's due date.

For Certification forms that must be completed by a health care provider, it is the employee's responsibility to coordinate with the health care provider's office to ensure that the completed Certification of Health Care Provider form is returned to the Department of Disability Management within 15 days from the date the employee receives the form.

B. SECOND AND THIRD OPINIONS

The employee, upon UPHS's request, may be required to undergo an examination by a health care provider designated by UPHS at the expense of the employee's home department. If the second opinion differs from the first, UPHS may require a third opinion at the expense of the employee's home department, by a health care provider jointly approved by UPHS and the employee, whose opinion shall be final and binding. Failure to attend any medical examinations requested under this policy may result in the delay or denial of the leave, as well as disciplinary action up to and including termination of employment.

C. RECERTIFICATION

UPHS may require that the employee obtain subsequent re-certification of a serious health condition at reasonable intervals during the leave. Certification for a serious health condition will be required for each subsequent request for a leave of absence due to an employee's own serious health condition or the serious health condition of a family member.

## USING FMLA LEAVE ON AN INTERMITTENT BASIS

A. FREQUENCY AND DURATION OF ABSENCES

It is important to note that for any approved Intermittent leaves, an employee will only be approved for the frequency and duration that the health care provider indicated on the Certification of Health Care Provider Form. Any leave dates outside

PENN MED 000203

JA118

| University of Pennsylvania Health System POLICY MANUAL | Number: 2-06-07 |
|---|---|
| | Page: 7 of 10 |
| SUBJECT:        LEAVE OF ABSENCE | Effective: 09/01/14 |

the parameters of the approved frequency and/or duration may require an updated Certification of Health Care Provider Form in order to be protected under the FMLA. Should an employee's pattern of absences become inconsistent with what the health care provider has authorized, the employee will be required to provide Disability Management an updated Certification of Health Care Provider Form. An employee may be subject to disciplinary action for failure to timely return the Certification form, unless there are extenuating circumstances and/or the employee requested and was granted an extension from Disability Management in advance of the Certification's due date.

B. CALL OUT PROCEDURES
When an employee who has been approved for intermittent FMLA leave seeks to use that leave on a particular day, the employee must follow the regular call-out procedures for his/her department and make clear that the time off is for the approved FMLA reason.

C. SCHEDULING APPOINTMENTS
Employees taking intermittent FMLA must make a reasonable effort to schedule any appointments for treatment outside regular work hours.

D. INCREMENTS OF FMLA USE
Intermittent FMLA may be taken in fifteen (15) minute increments.

**USING FMLA LEAVE ON A CONTINUOUS/CONSECUTIVE BASIS**

A. EMPLOYEE UPDATES DURING LEAVE
The employee must keep his/her supervisor informed and up-to-date on his/her status throughout the leave periodically as agreed upon by the employee and the supervisor. In the event it is necessary for an employee to take more leave than originally anticipated or the employee discovers after beginning leave that the circumstances have changed and the amount of leave originally anticipated is no longer necessary, the employee must provide his/her supervisor with no less than two business days' notice of the changed circumstances, where foreseeable.

B. REQUESTING ADDITIONAL LEAVE
If an employee is unable to return to work at the conclusion of his or her consecutive/continuous FMLA leave, the employee must notify his or her supervisor and Disability Management of the need to request an extension. If the employee has not exhausted his or her FMLA leave entitlement, he or she may request additional FMLA leave. If his or her FMLA leave entitlement has been exhausted, the employee may request Other Medical Leave. The extension request will be treated as a new request for either FMLA leave or Other Medical Leave, as applicable, and the same Certification and other requirements will apply.

**NOTICE OF INTENT TO RETURN TO WORK**

Employees should notify their supervisor of their intent to return from an approved leave of absence at least two weeks in advance of the expected date of return. If the return to work date is unforeseeable, an employee must give at least two full business days' notice of intent to return to work. If the employee fails to notify the supervisor and does not return by the agreed date, the employee may be subjected to disciplinary action, up to and including termination.

**FITNESS FOR DUTY CERTIFICATION REQUIREMENT FOR RETURN FROM FMLA AND/OR OTHER MEDICAL LEAVE**

A. AT THE CONCLUSION OF CONSECUTIVE/CONTINUOUS FMLA LEAVE AND/OR OTHER MEDICAL LEAVE
If an employee is returning to work following consecutive/continuous FMLA Leave for his or her own medical condition or following Other Medical Leave, the employee must present documentation from his or her health care provider indicating his/her ability to resume work at the conclusion of his/her leave. Failure to timely provide this return-to-work release will result in a delay in the employee's return to work.

PENN MED 000204

| University of Pennsylvania Health System POLICY MANUAL | Number: 2-06-07 |
|---|---|
| | Page: 8 of 10 |
| SUBJECT:                    LEAVE OF ABSENCE | Effective: 09/01/14 |

B. DURING INTERMITTENT FMLA LEAVE
A fitness-for-duty certification may be required for an employee on intermittent FMLA Leave if reasonable safety concerns exist regarding the employee's ability to perform his or her duties based on the medical condition for which the employee is taking intermittent leave.

**OTHER EMPLOYMENT DURING LEAVE**

An employee may not engage in outside employment while on FMLA Leave, Other Medical Leave, Personal Leave, Educational Leave or Bone Marrow/Stem Cell/Organ Donation Leave, without the express, prior written permission of his or her Department Director. This restriction also applies to employment within UPHS and the University of Pennsylvania.

**PAY DURING LEAVE**

A. FMLA and OTHER MEDICAL LEAVE
FMLA and Other Medical Leave are unpaid, except that employees are required to exhaust their accrued, applicable paid time off.

Employees must first exhaust all available sick time, if applicable, in instances where they have requested and been approved for a leave of absence for their own medical condition. *Accrued sick time can only be used during leaves of absence when taken for the employee's own medical condition.* Available vacation and personal hours, if applicable, can only be used after the exhaustion of the employee's available sick balance when leave is taken for an employee's own medical condition. An employee may reserve a maximum of 40 hours vacation and/or personal hours (or PTO, if applicable) while on an approved leave of absence. Otherwise, employees are required to exhaust all applicable, accrued sick, vacation and personal time (or PTO, if applicable) when taking FMLA.

An employee's usage and payment of any accrued paid time off benefits will be done in increments equal to the amount of time off.

No vacation, sick or holiday accruals are earned while on an unpaid leave of absence. Employees on an approved unpaid leave of absence will not be paid for any legal holidays that occur during their approved leave period.

If the reason for a Leave of Absence is for the birth of a child, sick time may be used for post-partum recovery and any other documented time off for medical reasons related to the pregnancy (i.e., complications before or after delivery).

B. PERSONAL LEAVE AND EDUCATIONAL LEAVE
Personal Leave and Educational Leave are unpaid, except that employees are required to exhaust their accrued, applicable paid time off. An employee may reserve a maximum of 40 hours vacation and/or personal hours while on an approved leave of absence.

An employee's usage and payment of any accrued paid time off benefits will be done in increments equal to the amount of time off.

No vacation, sick or holiday accruals are earned while on an unpaid leave of absence. Employees on an approved unpaid leave of absence will not be paid for any legal holidays that occur during their approved leave period.

C. BONE MARROW, STEM CELL or ORGAN DONATION LEAVE
In order to encourage donation and to ensure that the employee is not penalized and does not suffer any financial hardship to provide this "Gift of Life", the employee will be paid regular time. No vacation, personal or sick time (or PTO, if applicable) will be utilized. Time off will not be counted towards an employee's other leave entitlements.

| **University of Pennsylvania Health System** **POLICY MANUAL** | Number: 2-06-07 |
|---|---|
| | Page: 9 of 10 |
| SUBJECT:         LEAVE OF ABSENCE | Effective: 09/01/14 |

## HEALTH INSURANCE BENEFITS

### A. FAMILY & MEDICAL LEAVE (FMLA)

While on an approved FMLA leave of absence an employee's health benefits will be maintained during any period of paid or unpaid FMLA under the same conditions as if the employee continued to work. If the employee normally pays a portion of the premiums for his/her health insurance, these payments will continue to be made by the employee during any period of FMLA leave for which they use paid time off benefits. If no paid-time off benefits are used during the FMLA leave, the leave will be considered unpaid time off and benefit premiums normally made by the employee will be made on the employee's behalf by the University of Pennsylvania Health System. Premium contributions will resume the first pay date following the employee's return to work. Any employee contributions for premiums made on behalf of the employee by UPHS while on an approved unpaid FMLA leave of absence will be collected from the employee's first regular paycheck upon their return from leave of absence to regular benefit eligible active status, unless the employee makes arrangements with the Corporate Benefits Office for a different repayment schedule. If the employee does not return to work following an approved FMLA for any reason other than (1) the continuation, recurrence, or onset of a serious health condition which entitled the employee to FMLA or (2) other circumstances beyond the control of the employee, the employee may be required to reimburse the University of Pennsylvania Health System for their share of the premiums paid on their behalf during FMLA leave.

In the event of the birth of a child or the placement of a child for adoption or foster care the employee must notify the Corporate Benefits Office within 30-days to have the child added to any applicable benefit.

### B. OTHER MEDICAL, PERSONAL AND/OR EDUCATIONAL LEAVE

In instances of an approved Other Medical, Personal or Educational leave of absence, health insurance benefits may terminate at the end of the month following the exhaustion of the employee's paid time off benefits, unless the employee chooses to pay for the costs of insurance continuation under COBRA provisions, if eligible.

If benefits terminate while an employee is on an unpaid Other Medical, Personal or Educational leave of absence, benefits will not be reactivated until the employee returns to a paid, benefit-eligible status. However, this is not an automatic process. The employee should contact the Corporate Benefits Office to make any eligible changes. In the event of the birth of a child or the placement of a child for adoption or foster care the employee must notify the Corporate Benefits Office within 30-days to have the child added to any applicable benefit.

If an employee does not return to work after an approved Other Medical, Personal or Educational leave and UPHS continued the employee's benefits on the employee's behalf during the leave, the employee may be required to reimburse UPHS for the costs it incurred in providing benefits for the employee and/or their family during the leave.

### C. BONE MARROW, STEM CELL or ORGAN DONATION LEAVE

While on Bone Marrow, Stem Cell or Organ Donation Leave, an employee's health benefits will be maintained under the same conditions as if the employee continued to work. If the employee normally pays a portion of the premiums for his/her health insurance, these payments will continue to be made by the employee.

## TUITION ASSISTANCE

See Tuition Assistance Benefit for UPHS Employees Policy for information regarding the impact of leaves of absence on tuition assistance.

## JOB RESTORATION

### A. FAMILY & MEDICAL LEAVE (FMLA)

Following any approved FMLA leave of absence, an employee generally will be entitled to return to the same position of employment or to an equivalent position with equivalent benefits, pay and other terms and conditions of employment. The employee returning from an approved FMLA leave of absence will not suffer any loss of employment benefits accrued prior to the date on which the leave commenced. Reinstatement may be denied in certain situations, consistent with applicable law.

PENN MED 000206

| University of Pennsylvania Health System POLICY MANUAL | Number: 2-06-07 |
| --- | --- |
| | Page: 10 of 10 |
| SUBJECT: LEAVE OF ABSENCE | Effective: 09/01/14 |

B. OTHER MEDICAL LEAVE

An employee who is granted Other Medical Leave is not automatically entitled to return to his or her former position upon the conclusion of the Other Medical Leave. If UPHS determines that it is not able to hold the employee's position, the employee will be notified of this and provided information regarding the date through which the position will be held and the process for requesting a reasonable accommodation under the Employees with Disabilities policy if the employee wishes to explore returning to work by this date with or without a reasonable accommodation. If the employee's former position is filled before the employee is able to return to work, the employee shall remain on a leave status for the duration of his/her approved Other Medical Leave. If the employee has not obtained another position within this period, his/her employment with UPHS may be terminated at the end of the Other Medical Leave.

C. PERSONAL OR EDUCATIONAL LEAVE

UPHS cannot guarantee that the employee's former position will be available upon the conclusion of an approved Personal or Educational Leave of Absence. If the employee's former position is filled, the employee shall remain on a leave status, for the duration of his/her approved Personal or Educational leave. If the employee has not obtained another position within this period, his/her employment with UPHS may be terminated.

D. BONE MARROW, STEM CELL or ORGAN DONATION LEAVE

An employee on leave for Bone Marrow, Stem Cell or Organ Donation will be returned to the same position of employment following the leave.

**WORKERS COMPENSATION**

In instances where an employee is taking FMLA or Other Medical leave due to an injury sustained while in the course and scope of his/her employment and has applied for Worker's Compensation benefits, an approved FMLA or Other Medical leave will run concurrently with any approved Workers' Compensation benefit(s). Please see Worker's Compensation Policy.

**EMPLOYEE PERFORMANCE ASSESSMENT**

While an employee is in an approved consecutive leave of absence status, the time that the employee is away will be removed from the calculation for Performance Appraisal Compliance. The due date for the employee's Performance Appraisal will be adjusted by the amount of time the employee was on a leave of absence.

Any questions regarding this policy may be referred to Human Resources, Disability Management Office.

| SUPERSEDES: 07/01/03, 03/01/09, 12/01/12 | ISSUED BY: _Patricia J. Wren_ Patricia J. Wren, Vice President, Human Resources |
| --- | --- |



# Penn Medicine
University *of* Pennsylvania Health System

The Department of Disability Management

3001 Market Street, Suite 320 | Philadelphia, PA 19104

Brenda Kelly                                                    April 15, 2014
2121 Alden Street
Philadelphia, PA 19143

Dear Brenda:

Penn Medicine has been notified of your need to take a leave of absence as defined below:

Reason:            **Serious Health Condition**
Relationship:      **Self**
Requested Leave    **(leave dates unknown at this time)**
Dates:

Please be advised that the Certification of Healthcare Provider form received by Penn Medicine's Department of Disability Management is incomplete due to: **The certification is missing required information.** The completed Certification form should be forwarded directly to the Disability Management Department by **04/30/2014**. The Disability Management Department is located at 3001 Market Street, Suite 320, Philadelphia, PA 19104. Failure to submit the requested Certification form or failure to attend any medical examinations requested in accordance with the Leave of Absence policy, may result in the delay or denial of the leave.

Except as noted below, you have the right under the Family and Medical Leave Act (FMLA) to take up to twelve (12) weeks of leave in a 12-month period for certain qualifying medical conditions or family events; or up to twenty-six (26) weeks of leave in a 12-month period, to run concurrent with other FMLA leave entitlement, in order for you to care for a family member who is a member of the Armed Forces, including a member of the National Guard or Reserves who has certain qualifying medical conditions. Penn Medicine is *provisionally* designating your time away from the workplace as 'Family Medical Leave' (FMLA)'.

If you are approved for FMLA, upon your return you will be entitled to return to the same position of employment or to an equivalent position with equivalent benefits, pay, shift, and other terms and conditions of employment.

Your health benefits (with the exception of a Dependent Care Flexible Spending Account and the Transportation Reimbursement Incentive Program – T.R.I.P.) will be maintained during any period of paid or unpaid 'FMLA Leave' under the same conditions as if you continued to work. If you are currently enrolled in either the TRIP or Dependent Care Flexible Spending Account programs you must contact Penn Medicine's Corporate Benefits Office at (215) 615-2277 upon your return to learn about your re-enrollment options.

P1

If this leave request is for your own serious health condition and you have elected Short Term Disability benefits (STD) please contact UNUM Provident at (888) 748-2950 to telephonically file a claim for STD Benefits.

If you normally pay a portion of the premiums for your health insurance, these payments will continue to be made by you during any period of your 'FMLA Leave' (with the exception of a Dependent Care Flexible Spending Account and T.R.I.P. program) for which you are paid accrued sick, vacation or personal time. If you are on an unpaid 'FMLA Leave', Penn Medicine will make on your behalf benefit premiums normally made by you. Upon your return to work, Penn Medicine will deduct the amount paid on your behalf by Penn Medicine from your first paycheck. If you do not return to work following an approved 'FMLA Leave' for any reason other than: (1) the continuation, recurrence, or onset of a serious health condition which entitled you to 'FMLA Leave'; or (2) other circumstances beyond your control, you may be required to reimburse Penn Medicine for your share of the premiums paid on your behalf during your 'FMLA Leave'. Subsequently, should your benefits be terminated, you may be eligible for such benefits under COBRA.

If this leave request is for your own serious health condition or the serious health condition of a family member, you **may** be required to submit medical re-certification every 30 days. In the event that you do not submit appropriate medical certification when requested, this provisional designation will be withdrawn and your leave will not be protected under the FMLA.

If your request is for intermittent leave, and you have some control over the timing of your leave, you are expected to make an effort to schedule appointments at times that will cause the least disruption to the functionality of your department. You are expected to provide your manager with as much notice as possible when you need to be away from work. If you are not able to provide reasonable notice to your manager, you may be required to provide documentation to verify the urgency of the situation (i.e. why more notice could not be given).

If your leave of absence is due to your own serious health condition, you will need to provide your immediate supervisor with a Certification of Return to Work form at least two weeks prior to your scheduled return to work date. If such certification is not received, your return to work may be delayed or denied. If the circumstances of your leave change and you are able to return to work *earlier* than the date indicated, you will need to notify your immediate supervisor accordingly.

You may not engage in employment for any other employer during any period of time that you are on leave from Penn Medicine without the express, prior written permission of your supervisor. This restriction applies to employment within Penn Medicine and The University of Pennsylvania.

You are required to substitute available paid leave for unpaid leave. This means that you will be required to exhaust all available sick, vacation and/or personal time at the beginning of your leave. Should you exhaust your accrued paid time off benefits, the remainder of your leave, if any, will be unpaid. However, you may reserve a maximum of 40 hours of accrued vacation and/or personal time.

Please contact the Disability Management Department at (215) 615-2360 if you have any questions or if you are unable to supply the requested information.

Sincerely,
Disability Management

P4

JA124

| University of Pennsylvania Health System | Number: 2-05-25 |
|---|---|
| Policy Manual | Page 1 of 12 |
| **Subject: Performance Improvement and Progressive Steps** | Effective: 05/13/2015 |

**POLICY**

The University of Pennsylvania Health System (UPHS) is committed to being the healthcare "Employer of Choice" in the Philadelphia region, by fostering an environment in which each employee can perform to the best of his or her ability. In support of this strategic goal, UPHS has established a comprehensive employee relations program to promote an organizational culture that:

- Demonstrates openness and fairness with respect to its employees;
- Values continuous learning;
- Ensures accountability for behavioral choices; and
- Is unequivocally committed to quality care, patient safety and academic excellence.

UPHS believes in a voluntary commitment to a pro-active employee relations program that encourages application of human resources policies and procedures through measured and thoughtful management practices. The organization's human resources policies and procedures provide a framework, which coupled with the exercise of thoughtful and fair managerial judgment, establishes an environment of positive, consistent and constructive relations with employees.

**PURPOSE**

The purpose of this policy is to set forth fair, reasonable and equitable processes to address concerns relating to individual employee performance, violations of UPHS rules, policies, safety practices, and standards of professional conduct, and employee attendance and timeliness.

**OBJECTIVES**

- Maintain a set of standards for performance and behavior that are reasonable, fair and apply equally.
- Communicate standards for employee behavior that support the UPHS mission, vision, values and strategies.
- Prescribe corrective action when employee performance or behavior is not in keeping with organizational expectations.
- Provides affirmative feedback when performance or behavior changes to meet expectations.

**SCOPE**

This policy applies to all regularly budgeted full and part time employees of the Hospital of the University of Pennsylvania (HUP), those parts of the Clinical Practices of the University of Pennsylvania (CPUP) which practice at or in conjunction with HUP operating under its license, and UPHS Corporate departments. This policy also applies to those practices and sites that are off campus facilities or departments of HUP and operating under its license, e.g. HUP's inpatient rehabilitation facility. For purposes of this policy, the above facilities, practices, and sites are collectively referred to as "entity".

This policy does not apply to physicians and House Staff, the oversight of whom is the responsibility of departments and/or entity medical staffs. The provisions of this policy do not apply in taking corrective action or terminating a per diem/PRN employee or an employee in their Introductory Period.

PENN MED 000208

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
|---|---|
|  | Page 2 of 12 |
| Subject: Performance Improvement and Progressive Steps | Effective: 05/13/2015 |

**IMPLEMENTATION**

Implementation and compliance of this policy are the responsibility of the Senior Leadership, Department Directors/Business Administrators, Managers, and Supervisors.

**PROCEDURE**

1. **Job Performance Deficiencies**
   A "Job Performance Deficiency" is the failure of the employee to carry out the role or responsibility of the position, typically as a result of a skill or competency deficit. In the event that the manager determines that an employee's job performance is deficient, i.e., that it does not meet expectations for the position, the manager must first identify and consider all relevant facts pertaining to the potential performance problem. This fact-finding process should include the opportunity for the affected employee to present his or her perspective on the matter. During this process, the manager should consider whether (a) clear expectations have been communicated to the employee; (b) the necessary processes, procedures, training systems, and work environment that effect employee performance are in place and accessible to the employee; and (c) performance monitoring and feedback has been provided. If under these circumstances, the potential exists to correct the performance problem by providing such resources or interventions, the manager should make every effort to address the matter in that manner before proceeding to the "Progressive Steps for Performance Improvement" set forth below. In such instances the manager should also document the employee's progress in response to the application of available resources and interventions.

   If upon completion of the fact-finding process the manager determines that (a) a job performance deficiency exists that cannot be corrected through the provision of such resources or interventions as set forth above, or (b) such efforts have already been made and have been unsuccessful, then the Progressive Steps for Performance Improvement set forth below, will be followed.

2. **Violations of Rules, Policies and Professional Standards**
   In the event that the manager determines that an employee may have violated an organizational rule or policy, safety practice, or a standard of professional conduct, then the manager ought to investigate the facts pertaining to the alleged violation. This fact-finding process should include the opportunity for the affected employee to present his or her perspective on the matter. If after review the manager determines that a violation has occurred, then depending on the nature of the violation, the manager will proceed to the appropriate level of the Progressive Steps for Performance Improvement.

   For entities of UPHS that utilize an automated time recording system, it is the responsibility of the employee to record his or her time of arrival at work ("swipe in") and departure from work ("swipe out"). Employees must swipe in and out in order to ensure the accurate calculation of payroll, effective management of staff, and for a variety of other purposes. Accordingly, failure to swipe in and out constitutes a work rule violation that will result in the application of the Progressive Steps as set forth in the schedule below. A manager may invoke a Progressive Step if an employee demonstrates a pattern or practice of failing to swipe in or out that may not precisely satisfy the criteria set forth in the schedule below but, nevertheless, in the manager's judgment, constitutes a swiping in/swiping out violation.

PENN MED 000209

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
|---|---|
| | Page 3 of 12 |
| Subject: **Performance Improvement and Progressive Steps** | Effective: 05/13/2015 |

A manager, in his or her discretion, may determine that a violation of an organizational rule or policy, safety practice, or a standard of professional conduct should be disregarded if, in the manager's judgment, extraordinary circumstances provide the appropriate justification.

3. **Attendance (Absence and Lateness) Infractions**

In the event that the manager determines that the employee has been excessively absent or late, the employee will be subject to the Progressive Steps for Performance Improvement in accordance with the schedule set forth below. An absence or lateness will be deemed to be an attendance violation if it is not scheduled and approved by the employee's manager in advance, except that beginning May 13, 2015, employees with accrued PTO, Sick, Personal and/or Vacation time may use a certain amount of that time each calendar year for unscheduled absences without incurring an attendance violation ("protected time"), provided it is used for one or more of the following purposes:
- For an employee's own illness, injury or health condition;
- To care for a family member* with an illness, injury or health condition;
- For medical appointments (an employee's own or a family member's*); and/or
- For absences necessary due to domestic abuse, sexual assault or stalking where the employee or the employee's family member* requires time off for the reasons described in the Leave of Absence Policy for Domestic or Sexual Violence.

When using "protected time", employees are encouraged to report absences according to department guidelines, however, "protected time" may be requested before the start of the employee's scheduled work hours, or as soon as practicable if the need arises immediately before or after the employee has reported to work.

When using 'protected time' employees may not be required to search for or find a replacement to cover the hours during which the employee is using protected time.

*For purposes of this section of the PIPS policy, family members include an employee's spouse/domestic partner, parent (including a biological, adoptive, stepparent or foster parent or legal guardian of an employee or the employee's spouse, or a person who stood in loco parentis when the employee was a minor child), child (including a biological, adopted or foster child, a stepchild or legal ward or a child to whom the employee stands in loco parentis), grandparent/grandparent's spouse, grandchild , sibling/sibling's spouse, and/or Life Partner (per applicable law).

**It is important to understand that not all accrued PTO, Sick, Vacation and/or Personal time is considered "protected time."** The amount of "protected" PTO, Sick, Personal and/or Vacation time an employee may accrue and use each calendar year is equal to 1 hour of protected time for every 40 hours worked, up to a maximum of 40 hours for the calendar year. Full-time employees (1.0 FTEs) accrue 40 hours of "protected time" each calendar year. For part-time employees, the following examples are illustrative.
- 0.5 FTE employee accrues 26 hours of "protected time"
  (assumes employee works 20 hours per week with no time off)
  Calculation: 2080 hours * .5 = 1040; 1040/40 = 26 hours protected hours

- 0.6 FTE employee accrues 31.20 hours of "protected time"
  (assumes employee works 24 hours per week and with no time off)
  Calculation: 2080 hours * .6 = 1248; 1248/40 = 31.20 hours protected hours

PENN MED 000210

JA127

| University of Pennsylvania Health System Policy Manual | Number: 2-05-25 |
|---|---|
| | Page 4 of 12 |
| Subject: Performance Improvement and Progressive Steps | Effective: 05/13/2015 |

- 0.6 FTE employee accrues 31.20 hours of "protected time"
  (assumes employee works 24 hours per week and with no time off)
  Calculation: 2080 hours * .6 = 1248; 1248/40 = 31.20 hours protected hours

Note: Accrual of hours and use of "protected time" off will be pro-rated and capped based on hours worked for the period May 13, 2015 through December 31, 2015. For full-time employees (1.0 FTEs) the maximum amount of "protected time" for the duration of 2015 will be 33 hours.

A manager, in his or her discretion, may determine that an absence or lateness violation should be disregarded if, in the manager's judgment, extraordinary circumstances provide the appropriate justification. Similarly, a manager may invoke a Progressive Step if an employee demonstrates a pattern or practice of absenteeism or lateness that may not precisely satisfy the criteria set forth in the schedule below but, nevertheless, in the manager's judgment, constitutes an attendance infraction. Upon issuance of the progressive step, the manager will notify the employee that any additional occurrence of absence/lateness in the next 365 days will advance him/her in the process.

For purposes of the following chart, an "occurrence" of an absence is defined as time off from work separated by time worked. If an employee has sufficient <u>protected</u> PTO, Sick, Personal and/or Vacation time accrued to cover the absence or lateness, then the absence will not count as an "occurrence". However, if an employee does not have sufficient <u>protected</u> PTO, Sick, Personal and/or Vacation time to cover his/her entire absence or lateness, then the unprotected time will cause the absence to count as an "occurrence", even if the employee has unprotected PTO, Sick, Personal and/or Vacation time available.

| ATTENDANCE AND SWIPING IN/OUT VIOLATIONS AND OCCURRENCE MANAGEMENT | | | | | |
|---|---|---|---|---|---|
| Prompt to Initiate Corrective Action | Coaching | First Written Warning | Second Written Warning | Final Warning | Termination |
| Number of unscheduled occurrences of absences in rolling 12 month period | 5 | ↓ | ↓ | ↓ | ↓ |
| Number of unscheduled occurrences of lateness in rolling 12 month period | 5 | 6 | 7 | 8 | 9 |
| Number of failures to swipe in or out in rolling 12 month period* | 5 | ↑ | ↑ | ↑ | ↑ |

PENN MED 000211

JA128

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
|---|---|
| | Page 5 of 12 |
| Subject:  Performance Improvement and Progressive Steps | Effective:  05/13/2015 |

4.  **Combined Performance and Violation Occurrences.**
In some cases, the occurrence may have some characteristics of a Job Performance Deficiency (Section 1 above), and some characteristics of a Violation (Section 2 above).  In those instances, the manager will consult with Human Resources to determine the most appropriate classification. In determining this classification, the manager will consider whether the occurrence is primarily a result of the employee's lack of skills or competencies to perform the job duty, or primarily because of the employee's unwillingness to do so.  Once the appropriate determination is made, the manager will follow the Progressive Steps in accordance with that classification.

5.  **Documentation.**
It is the responsibility of the manager to fully document the procedures followed in connection with the alleged performance deficiency or violation, including the fact-finding, analysis, discussions with the employee and other necessary parties, and any follow-up action.  Attachment A provides a suggested format for documentation of Coaching, and Attachment B provides a suggested format for documentation of all other Progressive Steps.

**PROGRESSIVE STEPS FOR PERFORMANCE IMPROVEMENT**

The progressive steps are intended to provide the employee with notification of a deficiency in performance or violation of a rule, policy or professional standard of conduct, and to convey expectations for improvement, and are invoked by the manager upon the occurrence of such an event.  The Progressive Steps for Performance Improvement are as follows:

1.  **Coaching**

Coaching is an ongoing, informal process through which the manager articulates, models and reinforces expected performance, and addresses (a) performance deficiencies, (b) violations of rules, policies, safety practices and standards of professional conduct, and (c) attendance and lateness infractions.  The coaching process is intended to focus on the employee's development through an informal process that reflects a mutual commitment to the success of the employee, and should occur sufficiently close in time to the relevant events so as to provide the appropriate and effective guidance to the employee.

Documentation of the coaching process is the responsibility of the manager, and will be maintained in the manager's department file.  Coaching documentation will be forwarded to the employee's Human Resources file in the event that the employee is subject to a subsequent Progressive Step (typically, but not necessarily, a First Written Warning) within a twelve month period immediately following Coaching.

PENN MED 000212

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
|---|---|
| | Page 6 of 12 |
| Subject:   Performance Improvement and Progressive Steps | Effective:  05/13/2015 |

Examples of violations whose single occurrence would typically result in Coaching may include the following:

- Presence in unauthorized areas
- Unauthorized use of UPHS mail, phones, equipment, computers or supplies for personal business
- Personal use of cell phones or other personal communications devices while on duty
- Failure to wear proper UPHS ID badge
- Disregard of UPHS standards regarding one's appearance, uniform, dress or personal hygiene
- Selling or advertising sale of merchandise, tickets or services without authorization
- Unauthorized solicitation for a charity or cause

This list of examples is intended only for illustrative purposes and is not exhaustive; in addition, serious or inexcusable occurrences may warrant more stringent discipline.

2. **First Written Warning**

This step is initiated by the manager in the event of ongoing performance problems, more serious violations, recurrence of prior violations, or persistence of attendance or lateness infractions.  A First Written Warning also is appropriate for an occurrence that would ordinarily result in Coaching, if it occurs within twelve months of a prior Coaching.  At the First Written Warning phase, the employee is advised, with a heightened sense of urgency, of the seriousness of the matter.  Absent extenuating circumstances, communication of the step should be delivered to the employee in writing within five business days of the subject event, except that the manager should notify the employee of a First Written Warning due to an attendance or swiping in/out violation no later than the day on which the employee is paid for the pay period during which the absence or lateness occurred.

The First Written Warning also communicates the corrective action required and the applicable time frame.  It is the responsibility of the manager to fully document this step in the performance improvement process, which should then be reviewed by Human Resources prior to presentation to and discussion with the employee.  This documentation becomes a part of the employee file.

Examples of violations that would typically result in a First Written Warning in the event of a single occurrence include the following:

- Failure to report to work after request for time off has been denied
- Failure to submit completed leave of absence paperwork within required time frame
- Unauthorized absence from workplace during work hours
- Failure to notify or properly notify manager of absence
- Failure to follow safety procedures
- Offensive language or behavior
- Acceptance of a gratuity
- Failure to report an on-the-job injury

PENN MED 000213

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
|---|---|
| | Page 7 of 12 |
| Subject:  Performance Improvement and Progressive Steps | Effective:  05/13/2015 |

This list of examples is intended only for illustrative purposes and is not exhaustive; in addition, serious or inexcusable occurrences may warrant more stringent discipline.

3. **Second Written Warning**

This step is invoked by the manager in the event of persistent performance problems following a First Written Warning during the preceding twelve month period, even if under other circumstances the occurrence would only typically result in a Coaching or First Written Warning. At the Second Written Warning phase, the employee is notified that the next progressive step will be nothing less than a Final Warning that any further performance deficiency or violation of any kind or magnitude will result in termination of employment.  Absent extenuating circumstances, the Second Written Warning should be delivered to the employee in writing within five business days

of the subject event, except that the manager should notify the employee of a Second Written Warning due to an attendance or swiping in/out violation no later than the day on which the employee is paid for the pay period during which the absence or lateness occurred.

This Second Written Warning also communicates the corrective action required, and the applicable time frame.  It is the responsibility of the manager to fully document this step in the performance improvement process, which should then be reviewed by Human Resources prior to presentation to and discussion with the employee.  This documentation becomes a part of the employee file.

4. **Final Warning**

This step is taken in the event that, after thorough investigation, the manager determines that performance deficiencies, violations of rules, policies, safety practices or standards of professional conduct, or attendance or lateness infractions, have not been rectified, or that the employee has committed a very serious violation.  At the Final Warning stage, the employee is advised that his or her employment is in jeopardy and that immediate and sustained improvement of performance or elimination of all violations or infractions is required.  The employee is further advised that any further performance deficiency or violation, of any kind or magnitude, during the next twelve month period will result in immediate termination of employment.  Absent extenuating circumstances, the Final Warning should be delivered to the employee in writing within five business days of the subject event, except that the manager should notify the employee of a Final Warning due to an attendance or swiping in/out violation no later than the day on which the employee is paid for the pay period during which the absence or lateness occurred.

An employee in the Final Warning stage is not eligible to receive any pay increase until after the deactivation of the Final Warning in accordance with the Documentation Deactivation Schedule., and any such adjustment will only apply to the time period after the deactivation occurs and will not be retroactive.

The Final Warning must include the time frame for any applicable corrective action.  It is the responsibility of the manager to fully document this step in the performance improvement process,

PENN MED 000214

| University of Pennsylvania Health System Policy Manual | Number: 2-05-25 |
|---|---|
|  | Page 8 of 12 |
| Subject: Performance Improvement and Progressive Steps | Effective: 05/13/2015 |

which should then be reviewed by Human Resources prior to presentation to and discussion with the employee. This documentation becomes a part of the employee file.

Examples of violations that would typically result in a final warning in the event of a single occurrence include the following:

- Unreported absence for two consecutive work shifts
- Smoking in unauthorized areas on hospital grounds or patient care facilities
- Failure to carry out an appropriate directive from an authorized manager
- Intentionally accessing confidential information
- Inappropriate disclosure or usage of confidential information

This list of examples is intended only for illustrative purposes and is not exhaustive.

5. **Termination of Employment**

In the event that (a) an employee engages in an egregious violation or reckless behavior with respect to *a work rule, policy or professional standard of conduct, or (b) notwithstanding improvement efforts,* (i) the employee's performance remains deficient, (ii) serious violations or infractions by the employee continue to occur or (iii) absence or lateness infractions persist, then termination of employment is the appropriate step in this process. The decision to terminate the employee must be based on a thorough review of the facts and circumstances and must be consistent with all applicable UPHS policies and procedures.

It is the responsibility of the manager to fully document this decision, which should then be reviewed by Human Resources. In consultation with Human Resources, the manager will provide the employee with written confirmation of the termination decision.

Examples of violations that would typically result in termination of employment in the event of a single occurrence include the following:

- Unreported absence from work for three consecutive work shifts (job abandonment)
- Failure to report to work after expiration of authorized leave of absence
- Smoking inside hospital buildings
- Intentional misrepresentation or falsification of clinical or other information or UPHS record
- Fighting or disorderly conduct
- Possession of a weapon, firearm or explosive on UPHS property, including parking lot or other exterior UPHS property
- Unauthorized possession of property belonging to UPHS, or another employee, patient or visitor
- Sleeping on the job
- Unprofessional verbal or physical conduct potentially jeopardizing patient safety or disrupting patient care
- Harassment, bullying, discrimination or unlawful retaliation of any kind
- Any act intended to deceive an employee, patient or visitor

PENN MED 000215

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
|---|---|
| | Page 9 of 12 |
| Subject:  Performance Improvement and Progressive Steps | Effective:  05/13/2015 |

- Inappropriate access, release and/or disclosure of personal health information (PHI). This includes but is not limited to lost or stolen PHI information from laptop or PDA; faxing personal health information without first confirming security of receive site; sharing of PHI with co-workers, friends who are not authorized to receive the information
- Intentional disclosure of confidential information to unauthorized individuals
- Unauthorized use or possession of a drug or alcohol on UPHS property
- Failure to be fit for duty or to perform job duties due to drug or alcohol consumption*
- Refusal to submit to reasonable medical examination prescribed by a medical provider
- Action or inaction that may create a life-threatening situation or that threatens the safety or well-being of a patient, employee or visitor
- Gross misconduct

The above list of examples is intended for illustrative purposes only and is not exhaustive.

*The Chief Human Resources Officer at the entity level may attempt to resolve the "fit for duty" violation by way of accommodation (if appropriate, in the case of disability) or refer case for Independent Review as per the guidelines in the Professionalism and Standards of Conduct policy.

6. **Administrative Leave**

   In the event that an investigation is warranted in connection with an allegation of a performance deficiency, a violation of a UPHS rule, policy, safety practice or standard of professional conduct, or attendance or lateness infraction, the employee may be suspended or put on Administrative Leave, with or without pay, pending that investigation.  As a part of the investigation, the manager should consider whether (a) clear expectations have been communicated to the employee; (b) necessary processes, procedures, training systems, and work environment that effect employee performance or behavior are in place and accessible to the employee; (c) performance monitoring and feedback has been provided; and (d) whether the allegation could result in termination. Managers considering suspension or Administrative Leave pending investigation should consult with Human Resources.  If a performance deficiency, violation or infraction is determined to have occurred, the employee will not receive back pay for the suspension or leave.  Conversely, if none has occurred, then the employee will receive pay for the time off pending investigation. Administrative Leave may occur at any time during the Progressive Steps for Performance Improvement.

**DOCUMENTATION DEACTIVATION SCHEDULE**

1. If an employee is subject to only one Progressive Step during a 365 day period, documentation of that Progressive step is deactivated, i.e. no longer eligible for consideration, 365 days after that Progressive Step has been issued.

2. If an employee received a subsequent Progressive Step within 365 days of a prior Progressive Step, the period required for deactivation of the second Progressive Step will also apply to the first Progressive Step.  Both the prior and subsequent Progressive Step will be deactivated only when the employee completes a 365 day period without an additional Progressive Step.

PENN MED 000216

| University of Pennsylvania Health System | Number: 2-05-25 |
| Policy Manual | Page 10 of 12 |
| Subject: Performance Improvement and Progressive Steps | Effective: 05/13/2015 |

3.  Documentation of a Progressive Steps becomes part of the employee's Human Resources file and is available for consideration in connection with subsequent Progressive Steps until deactivated. Upon deactivation, the document is retained as part of the employee's Human Resources file.   In the event of extraordinary circumstances, although deactivated, the Progressive Steps action can be considered for a subsequent step. Such extraordinary circumstances may include for example, concerns regarding the safety of a patient or employee.

**RETALIATION**

UPHS does not permit nor will it condone intimidating or retaliatory acts against employees who report perceived or actual work rule or other regulatory violations. Corrective action up to and including termination may be warranted based on the outcome of a UPHS investigation.

**AT WILL EMPLOYMENT NOT AFFECTED**

Notwithstanding anything to the contrary stated in this policy, nothing herein is intended to alter the at-will status of any employee.  UPHS at all times retains the right to terminate any employee or impose progressive discipline at any step at any time for any lawful reason, or for no reason at all.

| SUPERSEDES:<br>Absence Control Policy<br>Constructive Discipline Policy<br>Lateness Control Policy<br>Managing Unacceptable Performance Policy<br><br>SUPERSEDES:  01/01/2008, 0/01/2012 | ISSUED BY:<br><br>Patricia J. Wren, Vice President<br>Human Resources<br><br>Garry Scheib, Executive Director,<br>Hospital of the University of Pennsylvania |

PENN MED 000217

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
|---|---|
| | Page 11 of 12 |
| Subject: Performance Improvement and Progressive Steps | Effective: 05/13/2015 |

**Attachment A**

**COACHING RECORD**

Documentation of the coaching process is the responsibility of the manager, and will be maintained in the manager's department file. A copy will be provided to the employee upon request. Coaching documentation will be forwarded to the employee's Human Resources file in the event that the employee is subject to a subsequent Progressive Step within a three hundred sixty five (365) day period immediately following Coaching, or will be deactivated in accordance with the UPHS "Progressive Steps for Performance Improvement – Documentation Deactivation."

Employee Name _____ Title _____

UPHS Entity _____ Department _____

Immediate Manager _____ Manager's Title _____

Subject of Coaching:

_____

_____

_____

_____

Performance Improvement/Corrective Action Plan:

_____

_____

_____

_____

Follow Up Date: _____ By Whom: _____

Follow Up Date: _____ By Whom: _____

Employee's Signature _____ Date _____

Manager's Signature _____ Date _____

PENN MED 000218

| University of Pennsylvania Health System<br>Policy Manual | Number: 2-05-25 |
| --- | --- |
| | Page 12 of 12 |
| Subject: Performance Improvement and Progressive Steps | Effective: 05/13/2015 |

**Attachment B**

**DOCUMENTATION OF PROGRESSIVE STEP**
**FOR PERFORMANCE IMPROVEMENT**

Employee Name _____ Title _____

UPHS Entity _____ Department _____

Immediate Manager _____ Manager's Title _____

Progressive Step: First Written Warning _____ Second Written Warning _____ Final Warning _____

Basis for Progressive Step: (specify performance deficiency or violation, dates, times, other individuals involved, etc., and attach relevant documentation):

_____
_____
_____
_____

Corrective Action Required, including applicable time frame(s):

_____
_____
_____
_____

I acknowledge that this Progressive Step has been discussed with me by my manager. I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.

I further acknowledge that nothing in this Documentation of Progressive Step for Performance Improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee's Signature _____ Date _____

_____
_____

I have attached additional comments I wish to make regarding this action.

Manager's Signature _____ Date _____

Next Level Manager's Signature _____ Date _____

PENN MED 000219

JA136



**Kelly, Brenda**
**University of Pennsylvania Health System**                          Print Date: **06/10/2016 10:53 AM ET**

| | | | | | | |
|---|---|---|---|---|---|---|
| Employee ID: | **000500427** | Address: | **2121 Alden Street** | | Work State: | **Pennsylvania** |
| Date of Birth: | **03/05/1965** | | **Philadelphia, PA 19143** | | Hire Date: | **02/04/1991** |
| | | Phone: | **(267) 283-5665** | | Hours Worked: | **1359** |
| Supervisor: | Stewart, Tammy - Tammy.Stewart@uphs.upenn.edu | | | | Emp Status: | **Terminated** |
| HR Contact: | Crowley, Joann - Joann.Crowley@uphs.upenn.edu | | | | FT/PT: | |
| Other Contact: | Stewart, Tammy - tammy.stewart@uphs.upenn.edu | | | | Division: | |
| Work Email: | Brenda.Ford@uphs.upenn.edu | | | | Department: | **R1002** |
| Personal Email: | | | | | Location: | **CORP** |
| | | Job Functions: | Create New | | MyLeave Account: | **(Not registered)** |

**Account Balance**

| Accounts | Counting Period | Max | ▉ Approved | ☐ Pending | ▉ Available |
|---|---|---|---|---|---|
| FML - Fed | 06/11/2015 to 06/10/2016 | 12.00 wks | | 12.00 wks | |
| OtherMedical | 06/11/2015 to 06/10/2016 | 12.00 wks | | 12.00 wks | |

**Leave History**

| | Leave Group | Total Days Apv: 16 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | **0867060** |
|---|---|---|---|---|---|---|

| | Self - Serious Health Condition | | | | Closed | 0940528 |
|---|---|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status | |
|---|---|---|---|---|---|---|---|
| #1: | 06/07/2015  06/07/2015 | 0.38 | Approved | I | #1: 02/10/2015 to 08/09/2015 | Complete | I |
| #1: | 06/07/2015  06/07/2015 | 2.17 | Approved | I | | | |
| #1: | 06/07/2015  06/07/2015 | 5.45 | Approved | I | | | |
| #1: | 06/06/2015  06/06/2015 | 2.45 | Approved | I | | | |
| #1: | 06/06/2015  06/06/2015 | 5.55 | Approved | I | | | |
| #1: | 05/28/2015  05/28/2015 | 0.20 | Approved | I | | | |
| #1: | 05/28/2015  05/28/2015 | 7.80 | Approved | I | | | |
| #1: | 05/27/2015  05/27/2015 | 0.25 | Approved | I | | | |
| #1: | 05/26/2015  05/26/2015 | 1.00 | Approved | I | | | |
| #1: | 05/21/2015  05/21/2015 | 1.13 | Approved | I | | | |
| #1: | 05/21/2015  05/21/2015 | 6.87 | Approved | I | | | |
| #1: | 05/18/2015  05/18/2015 | 3.70 | Approved | I | | | |
| #1: | 05/18/2015  05/18/2015 | 4.30 | Approved | I | | | |
| #1: | 05/06/2015  05/06/2015 | 1.37 | Approved | I | | | |
| #1: | 05/06/2015  05/06/2015 | 6.63 | Approved | I | | | |
| #1: | 04/27/2015  04/27/2015 | 8.00 | Approved | I | | | |

| | Leave Group | Total Days Apv: 0 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | **0829749** |
|---|---|---|---|---|---|---|

| | Self - Serious Health Condition | | | | Closed | 0896085 |
|---|---|---|---|---|---|---|

Leave dates unknown

| | | Certification Period | Status | |
|---|---|---|---|---|
| | #1: | (No Dates) | Denied | I |

| | Leave Group | Total Days Apv: 71 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | **0802223** |
|---|---|---|---|---|---|---|

| | Other Medical Leave 1 | | | | Closed | 0862932 |
|---|---|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 08/05/2014  10/14/2014 | 408.00 | Approved | | #1: 08/05/2014 to 10/14/2014 | Complete |

| | Leave Group | Total Days Apv: 22 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | **0802221** |
|---|---|---|---|---|---|---|

| | Self - Serious Health Condition | | | | Closed | 0862930 |
|---|---|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 07/14/2014  08/04/2014 | 128.00 | Approved | | #1: 07/14/2014 to 07/29/2014 | Complete |

| | Leave Group | Total Days Apv: 0 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | **0790984** |
|---|---|---|---|---|---|---|

| | Other Medical Leave 1 | | | | Closed | 0849198 |
|---|---|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 07/29/2014  10/07/2014 | 408.00 | Canceled | | #1: (No Dates) | Canceled |

| | Leave Group | Total Days Apv: 0 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | **0790982** |
|---|---|---|---|---|---|---|

PENN MED 000490



| Self - Serious Health Condition | | | | | | Closed | 0849196 |
|---|---|---|---|---|---|---|---|
| **Leave Begin & End Dates** | | **Hours** | **Status** | | **Certification Period** | **Status** | |
| #1: 07/08/2014 | 07/28/2014 | 120.00 | Canceled | | #1: 07/08/2014 to 07/28/2014 | Canceled | |

| Leave Group | Total Days Apv: 14 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | | | **0788793** |
|---|---|---|---|---|---|---|---|
| Self - Serious Health Condition | | | | | | Closed | 0846493 |
| **Leave Begin & End Dates** | | **Hours** | **Status** | | **Certification Period** | **Status** | |
| #1: 06/02/2014 | 06/15/2014 | 80.00 | Approved | | #1: 06/02/2014 to 06/15/2014 | Complete | |

| Leave Group | Total Days Apv: 22 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | | | **0758629** |
|---|---|---|---|---|---|---|---|
| Self - Serious Health Condition | | | | | | Closed | 0811083 |
| **Leave Begin & End Dates** | | **Hours** | **Status** | | **Certification Period** | **Status** | |
| #1: 07/11/2014 | 07/11/2014 | 1.25 | Approved | I | #1: 03/25/2014 to 08/25/2014 | Complete | I |
| #1: 07/10/2014 | 07/10/2014 | 1.00 | Approved | I | | | |
| #1: 07/09/2014 | 07/09/2014 | 1.00 | Approved | I | | | |
| #1: 07/08/2014 | 07/08/2014 | 8.00 | Approved | I | | | |
| #1: 07/07/2014 | 07/07/2014 | 0.50 | Approved | I | | | |
| #1: 07/06/2014 | 07/06/2014 | 1.00 | Approved | I | | | |
| #1: 07/03/2014 | 07/03/2014 | 0.25 | Approved | I | | | |
| #1: 07/01/2014 | 07/01/2014 | 0.25 | Approved | I | | | |
| #1: 06/20/2014 | 06/20/2014 | 8.00 | Approved | I | | | |
| #1: 06/20/2014 | 06/20/2014 | 0.53 | Approved | I | | | |
| #1: 06/20/2014 | 06/20/2014 | 1.30 | Approved | I | | | |
| #1: 06/20/2014 | 06/20/2014 | 1.93 | Approved | I | | | |
| #1: 05/28/2014 | 05/28/2014 | 1.25 | Approved | I | | | |
| #1: 05/25/2014 | 05/25/2014 | 1.50 | Approved | I | | | |
| #1: 05/23/2014 | 05/23/2014 | 1.50 | Approved | I | | | |
| #1: 05/12/2014 | 05/12/2014 | 0.50 | Approved | I | | | |
| #1: 05/09/2014 | 05/09/2014 | 8.00 | Approved | I | | | |
| #1: 05/05/2014 | 05/05/2014 | 1.00 | Approved | I | | | |
| #1: 05/04/2014 | 05/04/2014 | 8.00 | Approved | I | | | |
| #1: 05/02/2014 | 05/02/2014 | 2.75 | Approved | I | | | |
| #1: 04/30/2014 | 04/30/2014 | 1.00 | Approved | I | | | |
| #1: 04/29/2014 | 04/29/2014 | 1.00 | Approved | I | | | |

| Leave Group | Total Days Apv: 0 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | | | **0746240** |
|---|---|---|---|---|---|---|---|
| Self - Serious Health Condition | | | | | | Closed | 0797070 |
| **Leave dates unknown** | | | | | **Certification Period** | **Status** | |
| | | | | | #1: (No Dates) | Denied | I |

| Leave Group | Total Days Apv: 50 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | | | **0702203** |
|---|---|---|---|---|---|---|---|
| Self - Serious Health Condition | | | | | | Closed | 0746480 |
| **Leave Begin & End Dates** | | **Hours** | **Status** | | **Certification Period** | **Status** | |
| #1: 03/23/2014 | 03/23/2014 | 8.00 | Approved | I | #1: 10/25/2013 to 03/25/2014 | Complete | I |
| #1: 03/22/2014 | 03/22/2014 | 8.00 | Approved | I | | | |
| #1: 03/17/2014 | 03/17/2014 | 8.00 | Approved | I | | | |
| #1: 03/14/2014 | 03/14/2014 | 8.00 | Approved | I | | | |
| #1: 03/13/2014 | 03/13/2014 | 1.00 | Approved | I | | | |
| #1: 03/12/2014 | 03/12/2014 | 1.00 | Approved | I | | | |
| #1: 03/11/2014 | 03/11/2014 | 8.00 | Approved | I | | | |
| #1: 03/07/2014 | 03/07/2014 | 0.25 | Approved | I | | | |
| #1: 03/06/2014 | 03/06/2014 | 1.25 | Approved | I | | | |
| #1: 03/05/2014 | 03/05/2014 | 1.00 | Approved | I | | | |
| #1: 03/03/2014 | 03/03/2014 | 8.00 | Approved | I | | | |
| #1: 03/02/2014 | 03/02/2014 | 8.00 | Approved | I | | | |
| #1: 02/26/2014 | 02/26/2014 | 2.25 | Approved | I | | | |
| #1: 02/24/2014 | 02/24/2014 | 8.00 | Approved | I | | | |
| #1: 02/21/2014 | 02/21/2014 | 1.00 | Approved | I | | | |
| #1: 02/20/2014 | 02/20/2014 | 0.50 | Approved | I | | | |
| #1: 02/19/2014 | 02/19/2014 | 1.00 | Approved | I | | | |

| | | | | | |
|---|---|---|---|---|---|
| #1: | 02/18/2014 | 02/18/2014 | 8.00 | Approved | I |
| #1: | 02/17/2014 | 02/17/2014 | 8.00 | Approved | I |
| #1: | 02/12/2014 | 02/12/2014 | 0.50 | Approved | I |
| #1: | 02/10/2014 | 02/10/2014 | 8.00 | Approved | I |
| #1: | 02/09/2014 | 02/09/2014 | 8.00 | Approved | I |
| #1: | 02/07/2014 | 02/07/2014 | 1.00 | Approved | I |
| #1: | 01/30/2014 | 01/30/2014 | 1.00 | Approved | I |
| #1: | 01/28/2014 | 01/28/2014 | 8.25 | Approved | I |
| #1: | 01/27/2014 | 01/27/2014 | 0.25 | Approved | I |
| #1: | 01/24/2014 | 01/24/2014 | 8.00 | Approved | I |
| #1: | 01/23/2014 | 01/23/2014 | 8.00 | Approved | I |
| #1: | 01/22/2014 | 01/22/2014 | 8.00 | Approved | I |
| #1: | 01/20/2014 | 01/20/2014 | 8.00 | Approved | I |
| #1: | 01/19/2014 | 01/19/2014 | 1.00 | Approved | I |
| #1: | 01/15/2014 | 01/15/2014 | 0.50 | Approved | I |
| #1: | 01/13/2014 | 01/13/2014 | 8.00 | Approved | I |
| #1: | 01/10/2014 | 01/10/2014 | 1.00 | Approved | I |
| #1: | 01/09/2014 | 01/09/2014 | 1.00 | Approved | I |
| #1: | 01/08/2014 | 01/08/2014 | 0.50 | Approved | I |
| #1: | 01/01/2014 | 01/01/2014 | 1.00 | Approved | I |
| #1: | 12/20/2013 | 12/20/2013 | 8.00 | Approved | I |
| #1: | 12/17/2013 | 12/17/2013 | 0.75 | Approved | I |
| #1: | 12/13/2013 | 12/13/2013 | 0.75 | Approved | I |
| #1: | 12/09/2013 | 12/09/2013 | 8.00 | Approved | I |
| #1: | 12/08/2013 | 12/08/2013 | 8.00 | Approved | I |
| #1: | 12/02/2013 | 12/02/2013 | 1.50 | Approved | I |
| #1: | 11/27/2013 | 11/27/2013 | 3.25 | Approved | I |
| #1: | 11/25/2013 | 11/25/2013 | 2.25 | Approved | I |
| #1: | 11/22/2013 | 11/22/2013 | 1.50 | Approved | I |
| #1: | 11/17/2013 | 11/17/2013 | 8.00 | Approved | I |
| #1: | 11/13/2013 | 11/13/2013 | 8.00 | Approved | I |
| #1: | 11/12/2013 | 11/12/2013 | 8.00 | Approved | I |
| #1: | 11/11/2013 | 11/11/2013 | 8.00 | Approved | I |

| Leave Group | Total Days Apv: 0 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | 0683187 |
|---|---|---|---|---|

| Self - Serious Health Condition | | | | Closed | 0723632 |
|---|---|---|---|---|---|

**Leave dates unknown**

| | | Certification Period | Status | |
|---|---|---|---|---|
| #1: | (No Dates) | Denied | I |

| Leave Group | Total Days Apv: 140 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | 0543980 |
|---|---|---|---|---|

| Self - Serious Health Condition | | | | Closed | 0564349 |
|---|---|---|---|---|---|

| | Leave Begin & End Dates | | Hours | Status | | | Certification Period | Status | |
|---|---|---|---|---|---|---|---|---|---|
| #3: | 08/02/2013 | 08/02/2013 | 1.25 | Approved | I | #1: | 02/01/2012 to 08/01/2012 | Complete | I |
| #3: | 07/31/2013 | 07/31/2013 | 1.50 | Approved | I | #2: | 08/02/2012 to 02/02/2013 | Complete | I |
| #3: | 07/30/2013 | 07/30/2013 | 1.50 | Approved | I | #3: | 02/03/2013 to 08/03/2013 | Complete | I |
| #3: | 07/29/2013 | 07/29/2013 | 8.00 | Approved | I | | | | |
| #3: | 07/23/2013 | 07/23/2013 | 0.25 | Approved | I | | | | |
| #3: | 07/18/2013 | 07/18/2013 | 0.25 | Approved | I | | | | |
| #3: | 07/17/2013 | 07/17/2013 | 1.00 | Approved | I | | | | |
| #3: | 07/15/2013 | 07/15/2013 | 8.00 | Approved | I | | | | |
| #3: | 07/14/2013 | 07/14/2013 | 8.00 | Approved | I | | | | |
| #3: | 07/13/2013 | 07/13/2013 | 8.00 | Approved | I | | | | |
| #3: | 07/12/2013 | 07/12/2013 | 1.00 | Approved | I | | | | |
| #3: | 07/10/2013 | 07/10/2013 | 0.25 | Approved | I | | | | |
| #3: | 07/09/2013 | 07/09/2013 | 8.00 | Approved | I | | | | |
| #3: | 07/03/2013 | 07/03/2013 | 0.25 | Approved | I | | | | |
| #3: | 07/02/2013 | 07/02/2013 | 1.00 | Approved | I | | | | |
| #3: | 06/27/2013 | 06/27/2013 | 1.00 | Approved | I | | | | |
| #3: | 06/23/2013 | 06/23/2013 | 8.00 | Approved | I | | | | |
| #3: | 06/22/2013 | 06/22/2013 | 8.00 | Approved | I | | | | |
| #3: | 06/21/2013 | 06/21/2013 | 8.00 | Approved | I | | | | |
| #3: | 06/17/2013 | 06/17/2013 | 8.00 | Approved | I | | | | |

PENN MED 000492

| | | | | | |
|---|---|---|---|---|---|
| #3: | 06/13/2013 | 06/13/2013 | 8.00 | Approved | I |
| #3: | 06/10/2013 | 06/10/2013 | 0.25 | Approved | I |
| #3: | 06/06/2013 | 06/06/2013 | 8.00 | Approved | I |
| #3: | 06/05/2013 | 06/05/2013 | 0.25 | Approved | I |
| #3: | 06/02/2013 | 06/02/2013 | 8.00 | Approved | I |
| #3: | 06/01/2013 | 06/01/2013 | 0.25 | Approved | I |
| #3: | 05/29/2013 | 05/29/2013 | 8.00 | Approved | I |
| #3: | 05/27/2013 | 05/27/2013 | 1.50 | Approved | I |
| #3: | 05/21/2013 | 05/21/2013 | 1.00 | Approved | I |
| #3: | 05/20/2013 | 05/20/2013 | 1.00 | Approved | I |
| #3: | 05/12/2013 | 05/12/2013 | 8.00 | Approved | I |
| #3: | 05/08/2013 | 05/08/2013 | 0.25 | Approved | I |
| #3: | 05/07/2013 | 05/07/2013 | 8.00 | Approved | I |
| #3: | 05/06/2013 | 05/06/2013 | 8.00 | Approved | I |
| #3: | 05/03/2013 | 05/03/2013 | 2.00 | Approved | I |
| #3: | 05/01/2013 | 05/01/2013 | 1.00 | Approved | I |
| #3: | 04/30/2013 | 04/30/2013 | 1.00 | Approved | I |
| #3: | 04/24/2013 | 04/24/2013 | 8.00 | Approved | I |
| #3: | 04/22/2013 | 04/22/2013 | 0.50 | Approved | I |
| #3: | 04/21/2013 | 04/21/2013 | 8.00 | Approved | I |
| #3: | 04/16/2013 | 04/16/2013 | 8.00 | Approved | I |
| #3: | 04/10/2013 | 04/10/2013 | 0.25 | Approved | I |
| #3: | 04/05/2013 | 04/05/2013 | 0.50 | Approved | I |
| #3: | 03/31/2013 | 03/31/2013 | 8.00 | Approved | I |
| #3: | 03/30/2013 | 03/30/2013 | 8.00 | Approved | I |
| #3: | 03/29/2013 | 03/29/2013 | 3.75 | Approved | I |
| #3: | 03/27/2013 | 03/27/2013 | 0.25 | Approved | I |
| #3: | 03/22/2013 | 03/22/2013 | 0.50 | Approved | I |
| #3: | 03/14/2013 | 03/14/2013 | 0.25 | Approved | I |
| #3: | 03/13/2013 | 03/13/2013 | 8.00 | Approved | I |
| #3: | 03/11/2013 | 03/11/2013 | 8.00 | Approved | I |
| #3: | 03/10/2013 | 03/10/2013 | 0.75 | Approved | I |
| #3: | 03/09/2013 | 03/09/2013 | 0.50 | Approved | I |
| #3: | 03/08/2013 | 03/08/2013 | 8.00 | Approved | I |
| #3: | 03/06/2013 | 03/06/2013 | 3.40 | Approved | I |
| #3: | 03/01/2013 | 03/01/2013 | 1.00 | Approved | I |
| #3: | 02/26/2013 | 02/26/2013 | 1.50 | Approved | I |
| #3: | 02/22/2013 | 02/22/2013 | 8.00 | Approved | I |
| #3: | 02/21/2013 | 02/21/2013 | 3.00 | Approved | I |
| #3: | 02/17/2013 | 02/17/2013 | 8.00 | Approved | I |
| #2: | 02/01/2013 | 02/01/2013 | 0.25 | Approved | I |
| #2: | 01/31/2013 | 01/31/2013 | 0.50 | Approved | I |
| #2: | 01/30/2013 | 01/30/2013 | 8.00 | Approved | I |
| #2: | 01/28/2013 | 01/28/2013 | 0.50 | Approved | I |
| #2: | 01/27/2013 | 01/27/2013 | 8.00 | Approved | I |
| #2: | 01/26/2013 | 01/26/2013 | 1.00 | Approved | I |
| #2: | 01/25/2013 | 01/25/2013 | 2.00 | Approved | I |
| #2: | 01/22/2013 | 01/22/2013 | 8.00 | Approved | I |
| #2: | 01/21/2013 | 01/21/2013 | 0.50 | Approved | I |
| #2: | 01/18/2013 | 01/18/2013 | 0.50 | Approved | I |
| #2: | 01/15/2013 | 01/15/2013 | 0.50 | Approved | I |
| #2: | 01/14/2013 | 01/14/2013 | 7.90 | Approved | I |
| #2: | 01/05/2013 | 01/05/2013 | 0.25 | Approved | I |
| #2: | 12/31/2012 | 12/31/2012 | 8.00 | Approved | I |
| #2: | 12/26/2012 | 12/26/2012 | 8.00 | Approved | I |
| #2: | 12/17/2012 | 12/17/2012 | 8.00 | Approved | I |
| #2: | 12/15/2012 | 12/15/2012 | 0.50 | Approved | I |
| #2: | 12/14/2012 | 12/14/2012 | 7.00 | Approved | I |
| #2: | 12/07/2012 | 12/07/2012 | 1.75 | Approved | I |
| #2: | 12/04/2012 | 12/04/2012 | 1.00 | Approved | I |
| #2: | 11/26/2012 | 11/26/2012 | 0.10 | Approved | I |
| #2: | 11/25/2012 | 11/25/2012 | 8.00 | Approved | I |
| #2: | 11/23/2012 | 11/23/2012 | 8.00 | Approved | I |

PENN MED 000493

Qcera LeaveSource                                                    Page 5 of 10

| | | | | | |
|---|---|---|---|---|---|
| #2: | 11/16/2012 | 11/16/2012 | 8.00 | Approved | I |
| #2: | 11/14/2012 | 11/14/2012 | 8.00 | Approved | I |
| #2: | 11/07/2012 | 11/07/2012 | 8.00 | Approved | I |
| #2: | 11/05/2012 | 11/05/2012 | 1.50 | Approved | I |
| #2: | 11/04/2012 | 11/04/2012 | 8.00 | Approved | I |
| #2: | 10/26/2012 | 10/26/2012 | 8.00 | Approved | I |
| #2: | 10/17/2012 | 10/17/2012 | 8.00 | Approved | I |
| #2: | 10/09/2012 | 10/09/2012 | 8.00 | Approved | I |
| #2: | 10/08/2012 | 10/08/2012 | 8.00 | Approved | I |
| #2: | 09/27/2012 | 09/27/2012 | 8.00 | Approved | I |
| #2: | 09/26/2012 | 09/26/2012 | 8.00 | Approved | I |
| #2: | 09/21/2012 | 09/21/2012 | 0.50 | Approved | I |
| #2: | 09/19/2012 | 09/19/2012 | 8.00 | Approved | I |
| #2: | 09/18/2012 | 09/18/2012 | 1.00 | Approved | I |
| #2: | 09/10/2012 | 09/10/2012 | 8.00 | Approved | I |
| #2: | 09/07/2012 | 09/07/2012 | 1.00 | Approved | I |
| #1: | 07/30/2012 | 07/30/2012 | 0.50 | Approved | I |
| #1: | 07/22/2012 | 07/22/2012 | 8.00 | Approved | I |
| #1: | 07/21/2012 | 07/21/2012 | 8.00 | Approved | I |
| #1: | 07/20/2012 | 07/20/2012 | 8.00 | Approved | I |
| #1: | 07/18/2012 | 07/18/2012 | 8.00 | Approved | I |
| #1: | 07/17/2012 | 07/17/2012 | 8.00 | Approved | I |
| #1: | 07/12/2012 | 07/12/2012 | 0.25 | Approved | I |
| #1: | 07/05/2012 | 07/05/2012 | 6.75 | Approved | I |
| #1: | 07/03/2012 | 07/03/2012 | 5.00 | Approved | I |
| #1: | 06/27/2012 | 06/27/2012 | 8.00 | Approved | I |
| #1: | 06/26/2012 | 06/26/2012 | 8.00 | Approved | I |
| #1: | 06/22/2012 | 06/22/2012 | 8.00 | Approved | I |
| #1: | 06/21/2012 | 06/21/2012 | 8.00 | Approved | I |
| #1: | 06/18/2012 | 06/18/2012 | 8.00 | Approved | I |
| #1: | 06/11/2012 | 06/11/2012 | 8.00 | Approved | I |
| #1: | 05/25/2012 | 05/25/2012 | 8.00 | Approved | I |
| #1: | 05/23/2012 | 05/23/2012 | 8.00 | Approved | I |
| #1: | 05/20/2012 | 05/20/2012 | 0.25 | Approved | I |
| #1: | 05/18/2012 | 05/18/2012 | 0.50 | Approved | I |
| #1: | 05/16/2012 | 05/16/2012 | 1.00 | Approved | I |
| #1: | 05/15/2012 | 05/15/2012 | 0.50 | Approved | I |
| #1: | 05/14/2012 | 05/14/2012 | 1.00 | Approved | I |
| #1: | 05/09/2012 | 05/09/2012 | 1.00 | Approved | I |
| #1: | 05/08/2012 | 05/08/2012 | 8.00 | Approved | I |
| #1: | 05/04/2012 | 05/04/2012 | 1.25 | Approved | I |
| #1: | 04/30/2012 | 04/30/2012 | 8.00 | Approved | I |
| #1: | 04/29/2012 | 04/29/2012 | 0.75 | Approved | I |
| #1: | 04/27/2012 | 04/27/2012 | 0.75 | Approved | I |
| #1: | 04/23/2012 | 04/23/2012 | 0.50 | Approved | ! |
| #1: | 04/19/2012 | 04/19/2012 | 2.50 | Approved | I |
| #1: | 04/18/2012 | 04/18/2012 | 8.00 | Approved | I |
| #1: | 04/13/2012 | 04/13/2012 | 0.25 | Approved | I |
| #1: | 04/12/2012 | 04/12/2012 | 0.50 | Approved | I |
| #1: | 04/06/2012 | 04/06/2012 | 8.00 | Approved | I |
| #1: | 04/03/2012 | 04/03/2012 | 8.00 | Approved | I |
| #1: | 03/29/2012 | 03/29/2012 | 8.00 | Approved | I |
| #1: | 03/28/2012 | 03/28/2012 | 2.50 | Approved | I |
| #1: | 03/19/2012 | 03/19/2012 | 8.30 | Approved | I |
| #1: | 03/09/2012 | 03/09/2012 | 0.50 | Approved | I |
| #1: | 03/08/2012 | 03/08/2012 | 3.00 | Approved | I |
| #1: | 03/06/2012 | 03/06/2012 | 8.00 | Approved | I |

| | | | |
|---|---|---|---|
| Leave Group | Total Days Apv: 0 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | 0529146 |
| Self - Serious Health Condition | | Closed | 0547755 |

**Leave dates unknown**

| | Certification Period | Status | |
|---|---|---|---|
| #1: | 11/01/2011 to 02/01/2012 | Denied | R |

PENN MED 000494

JA141



| Leave Group | Total Days Apv: 0 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | 0434845 |
|---|---|---|---|---|

| Self - Serious Health Condition | | | Closed | 0449736 |
|---|---|---|---|---|

Leave dates unknown

| | | | Certification Period | Status |
|---|---|---|---|---|
| | | #1: | 06/28/2011 to 09/28/2011 | Denied | I |

| Leave Group | Total Days Apv: 120 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | 0399129 |
|---|---|---|---|---|

| Other Medical Leave 1 | | | Closed | 0409601 |
|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 03/02/2011  05/13/2011 | 424.00 | Approved | #1: | *(No Dates)* | Complete |

| Self - Serious Health Condition | | | Closed | 0409600 |
|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 03/22/2011  03/22/2011 | 8.00 | Canceled | #1: | 01/14/2011 to 05/13/2011 | Complete |
| #1: | 01/29/2011  03/01/2011 | 176.00 | Canceled | | | |
| #1: | 01/21/2011  01/21/2011 | 8.00 | Canceled | | | |
| #1: | 01/14/2011  03/21/2011 | 376.00 | Canceled | | | |
| #1: | 01/14/2011  03/01/2011 | 264.00 | Approved | | | |

| Leave Group | Total Days Apv: 7 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | 0395174 |
|---|---|---|---|---|

| Self - Serious Health Condition | | | Closed | 0405119 |
|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 12/27/2010  01/02/2011 | 40.00 | Approved | #1: | 12/27/2010 to 01/02/2011 | Complete |

| Leave Group | Total Days Apv: 54 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | 0348670 |
|---|---|---|---|---|

| Self - Serious Health Condition | | | Closed | 0354083 |
|---|---|---|---|---|

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #3: | 01/13/2011  01/13/2011 | 1.00 | Approved | I | #1: | 05/26/2010 to 08/25/2010 | Complete |
| #3: | 01/11/2011  01/11/2011 | 8.00 | Approved | I | #2: | 08/28/2010 to 11/28/2010 | Complete | I |
| #3: | 01/10/2011  01/10/2011 | 8.00 | Approved | I | #3: | 11/28/2010 to 02/28/2011 | Complete | I |
| #3: | 01/07/2011  01/07/2011 | 1.00 | Approved | I | | | |
| #3: | 01/06/2011  01/06/2011 | 1.00 | Approved | I | | | |
| #3: | 01/05/2011  01/05/2011 | 1.00 | Approved | I | | | |
| #3: | 12/21/2010  12/21/2010 | 0.50 | Approved | I | | | |
| #3: | 12/20/2010  12/20/2010 | 0.25 | Approved | I | | | |
| #3: | 12/17/2010  12/17/2010 | 8.00 | Approved | I | | | |
| #3: | 12/16/2010  12/16/2010 | 8.00 | Approved | I | | | |
| #3: | 12/15/2010  12/15/2010 | 8.00 | Approved | I | | | |
| #3: | 12/13/2010  12/13/2010 | 8.00 | Approved | I | | | |
| #3: | 12/11/2010  12/11/2010 | 0.50 | Approved | I | | | |
| #3: | 12/10/2010  12/10/2010 | 8.00 | Approved | I | | | |
| #3: | 12/08/2010  12/08/2010 | 1.00 | Approved | I | | | |
| #3: | 12/07/2010  12/07/2010 | 0.50 | Approved | I | | | |
| #3: | 12/02/2010  12/02/2010 | 8.00 | Approved | I | | | |
| #2: | 11/29/2010  11/29/2010 | 8.00 | Canceled | I | | | |
| #2: | 11/25/2010  11/25/2010 | 1.00 | Approved | I | | | |
| #2: | 11/21/2010  11/21/2010 | 1.00 | Approved | I | | | |
| #2: | 11/20/2010  11/20/2010 | 0.50 | Approved | I | | | |
| #2: | 11/16/2010  11/16/2010 | 8.00 | Approved | I | | | |
| #2: | 11/15/2010  11/15/2010 | 0.50 | Approved | I | | | |
| #2: | 11/11/2010  11/11/2010 | 1.50 | Approved | I | | | |
| #2: | 11/10/2010  11/10/2010 | 0.50 | Approved | I | | | |
| #2: | 11/05/2010  11/05/2010 | 8.00 | Approved | I | | | |
| #2: | 11/04/2010  11/04/2010 | 8.00 | Approved | I | | | |
| #2: | 11/03/2010  11/03/2010 | 8.00 | Approved | I | | | |
| #2: | 11/01/2010  11/01/2010 | 8.00 | Approved | I | | | |
| #2: | 10/29/2010  10/29/2010 | 8.00 | Approved | I | | | |
| #2: | 10/27/2010  10/27/2010 | 0.25 | Approved | I | | | |
| #2: | 10/26/2010  10/26/2010 | 0.50 | Approved | I | | | |
| #2: | 10/22/2010  10/22/2010 | 1.00 | Approved | I | | | |
| #2: | 10/18/2010  10/18/2010 | 8.00 | Approved | I | | | |



| | Leave Begin & End Dates | Hours | Status | | |
|---|---|---|---|---|---|
| #2: | 10/15/2010  10/15/2010 | 1.00 | Approved | I | |
| #2: | 10/13/2010  10/13/2010 | 1.00 | Approved | I | |
| #2: | 10/04/2010  10/04/2010 | 1.00 | Approved | I | |
| #2: | 10/01/2010  10/01/2010 | 2.25 | Approved | I | |
| #2: | 09/19/2010  09/19/2010 | 8.00 | Approved | I | |
| #2: | 09/18/2010  09/18/2010 | 8.00 | Approved | I | |
| #2: | 09/13/2010  09/13/2010 | 1.25 | Approved | I | |
| #2: | 09/07/2010  09/07/2010 | 0.75 | Approved | I | |
| #2: | 08/28/2010  08/28/2010 | 0.75 | Approved | I | |
| #2: | 08/25/2010  08/25/2010 | 0.50 | Approved | I | |
| #2: | 08/23/2010  08/23/2010 | 0.50 | Approved | I | |
| #1: | 08/16/2010  08/16/2010 | 1.50 | Approved | I | |
| #1: | 07/24/2010  07/24/2010 | 6.00 | Approved | I | |
| #1: | 07/21/2010  07/21/2010 | 8.00 | Approved | I | |
| #1: | 07/19/2010  07/19/2010 | 8.00 | Approved | I | |
| #1: | 07/12/2010  07/12/2010 | 8.00 | Approved | I | |
| #1: | 07/07/2010  07/07/2010 | 1.00 | Approved | I | |
| #1: | 06/27/2010  06/27/2010 | 8.00 | Approved | I | |
| #1: | 06/23/2010  06/23/2010 | 8.00 | Approved | I | |
| #1: | 06/22/2010  06/22/2010 | 8.00 | Approved | I | |
| #1: | 06/21/2010  06/21/2010 | 1.25 | Approved | I | |

**Leave Group**   Total Days Apv: 42  /  Pend: 0   |   Disability Days Apv: 0  /  Pend: 0                     **0327860**

**Other Medical Leave 1**                                                                         Closed   0332306

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 03/06/2010  04/07/2010 | 240.00 | Approved | #1: | (No Dates) | Complete |

**Leave Group**   Total Days Apv: 36  /  Pend: 0   |   Disability Days Apv: 0  /  Pend: 0                     **0321574**

**Self - Serious Health Condition**                                                               Closed   0325706

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 01/29/2010  03/05/2010 | 208.00 | Approved | #1: | 01/29/2010 to 03/05/2010 | Complete |

**Leave Group**   Total Days Apv: 0  /  Pend: 0   |   Disability Days Apv: 0  /  Pend: 0                     **0317342**

**Self - Serious Health Condition**                                                               Closed   0321228

| | Leave Begin & End Dates | Hours | Status | | Certification Period | Status |
|---|---|---|---|---|---|---|
| #1: | 01/04/2010  01/10/2010 | 40.00 | Denied | #1: | (No Dates) | Denied |

**Leave Group**   Total Days Apv: 135  /  Pend: 0   |   Disability Days Apv: 0  /  Pend: 0                     **0232257**

**Self - Serious Health Condition**                                                               Closed   0233130

| | Leave Begin & End Dates | Hours | Status | | | Certification Period | Status | |
|---|---|---|---|---|---|---|---|---|
| #3: | 12/31/2009  12/31/2009 | 2.00 | Approved | I | #1: | 09/16/2008 to 03/16/2009 | Complete | I |
| #3: | 12/24/2009  12/24/2009 | 2.75 | Approved | I | #2: | 03/17/2009 to 09/16/2009 | Complete | I |
| #3: | 12/20/2009  12/20/2009 | 8.00 | Approved | I | #3: | 09/17/2009 to 03/16/2010 | Complete | I |
| #3: | 12/19/2009  12/19/2009 | 1.75 | Approved | I | | | | |
| #3: | 12/16/2009  12/16/2009 | 0.50 | Approved | I | | | | |
| #3: | 12/11/2009  12/11/2009 | 0.50 | Approved | I | | | | |
| #3: | 12/09/2009  12/09/2009 | 8.00 | Approved | I | | | | |
| #3: | 12/08/2009  12/08/2009 | 8.00 | Approved | I | | | | |
| #3: | 12/07/2009  12/07/2009 | 8.00 | Approved | I | | | | |
| #3: | 12/03/2009  12/03/2009 | 2.00 | Approved | I | | | | |
| #3: | 12/02/2009  12/02/2009 | 3.25 | Approved | I | | | | |
| #3: | 11/28/2009  11/28/2009 | 0.25 | Approved | I | | | | |
| #3: | 11/27/2009  11/27/2009 | 8.00 | Approved | I | | | | |
| #3: | 11/26/2009  11/26/2009 | 8.00 | Approved | I | | | | |
| #3: | 11/25/2009  11/25/2009 | 8.00 | Approved | I | | | | |
| #3: | 11/23/2009  11/23/2009 | 0.25 | Approved | I | | | | |
| #3: | 11/18/2009  11/18/2009 | 0.25 | Approved | I | | | | |
| #3: | 11/17/2009  11/17/2009 | 1.25 | Approved | I | | | | |
| #3: | 11/16/2009  11/16/2009 | 1.25 | Approved | I | | | | |
| #3: | 11/13/2009  11/13/2009 | 8.00 | Approved | I | | | | |

PENN MED 000496

Qcera LeaveSource

Page 8 of 10

| | | | | | |
|---|---|---|---|---|---|
| #3: | 11/12/2009 | 11/12/2009 | 0.75 | Approved | I |
| #3: | 11/09/2009 | 11/09/2009 | 8.00 | Approved | I |
| #3: | 11/06/2009 | 11/06/2009 | 1.25 | Approved | I |
| #3: | 11/04/2009 | 11/04/2009 | 8.00 | Approved | I |
| #3: | 11/02/2009 | 11/02/2009 | 1.00 | Approved | I |
| #3: | 10/30/2009 | 10/30/2009 | 0.50 | Approved | I |
| #3: | 10/29/2009 | 10/29/2009 | 0.50 | Approved | I |
| #3: | 10/28/2009 | 10/28/2009 | 1.50 | Approved | I |
| #3: | 10/26/2009 | 10/26/2009 | 8.00 | Approved | I |
| #3: | 10/18/2009 | 10/18/2009 | 8.00 | Approved | I |
| #3: | 10/17/2009 | 10/17/2009 | 1.00 | Approved | I |
| #3: | 10/16/2009 | 10/16/2009 | 1.00 | Approved | I |
| #3: | 10/13/2009 | 10/13/2009 | 0.50 | Approved | I |
| #3: | 10/08/2009 | 10/08/2009 | 1.50 | Approved | I |
| #2: | 09/14/2009 | 09/14/2009 | 8.00 | Approved | I |
| #2: | 09/10/2009 | 09/10/2009 | 8.00 | Approved | I |
| #2: | 09/06/2009 | 09/06/2009 | 0.75 | Approved | I |
| #2: | 09/05/2009 | 09/05/2009 | 0.50 | Approved | I |
| #2: | 08/14/2009 | 08/14/2009 | 1.00 | Approved | I |
| #2: | 08/12/2009 | 08/12/2009 | 0.50 | Approved | I |
| #2: | 08/11/2009 | 08/11/2009 | 0.50 | Approved | I |
| #2: | 08/10/2009 | 08/10/2009 | 0.50 | Approved | I |
| #2: | 08/07/2009 | 08/07/2009 | 0.50 | Approved | I |
| #2: | 08/06/2009 | 08/06/2009 | 8.00 | Approved | I |
| #2: | 08/05/2009 | 08/05/2009 | 0.50 | Approved | I |
| #2: | 08/04/2009 | 08/04/2009 | 1.00 | Approved | I |
| #2: | 08/03/2009 | 08/03/2009 | 8.00 | Approved | I |
| #2: | 07/31/2009 | 07/31/2009 | 8.00 | Approved | I |
| #2: | 07/30/2009 | 07/30/2009 | 8.00 | Approved | I |
| #2: | 07/29/2009 | 07/29/2009 | 0.50 | Approved | I |
| #2: | 07/27/2009 | 07/27/2009 | 0.50 | Approved | I |
| #2: | 07/26/2009 | 07/26/2009 | 8.00 | Approved | I |
| #2: | 07/25/2009 | 07/25/2009 | 8.00 | Approved | I |
| #2: | 07/20/2009 | 07/20/2009 | 8.00 | Approved | I |
| #2: | 07/17/2009 | 07/17/2009 | 2.00 | Approved | I |
| #2: | 07/16/2009 | 07/16/2009 | 0.50 | Approved | I |
| #2: | 07/15/2009 | 07/15/2009 | 0.25 | Approved | I |
| #2: | 07/14/2009 | 07/14/2009 | 0.50 | Approved | I |
| #2: | 07/13/2009 | 07/13/2009 | 0.75 | Approved | I |
| #2: | 07/09/2009 | 07/09/2009 | 2.00 | Approved | I |
| #2: | 07/08/2009 | 07/08/2009 | 2.00 | Approved | I |
| #2: | 07/06/2009 | 07/06/2009 | 0.50 | Approved | I |
| #2: | 07/05/2009 | 07/05/2009 | 0.50 | Approved | I |
| #2: | 07/03/2009 | 07/03/2009 | 2.50 | Approved | I |
| #2: | 06/29/2009 | 06/29/2009 | 8.00 | Approved | I |
| #2: | 06/12/2009 | 06/12/2009 | 2.00 | Approved | I |
| #2: | 06/08/2009 | 06/08/2009 | 1.00 | Approved | I |
| #2: | 06/05/2009 | 06/05/2009 | 1.00 | Approved | I |
| #2: | 06/04/2009 | 06/04/2009 | 1.00 | Approved | I |
| #2: | 06/02/2009 | 06/02/2009 | 8.00 | Approved | I |
| #2: | 05/25/2009 | 05/25/2009 | 1.50 | Approved | I |
| #2: | 05/20/2009 | 05/20/2009 | 8.00 | Approved | I |
| #2: | 05/13/2009 | 05/13/2009 | 8.00 | Approved | I |
| #2: | 05/12/2009 | 05/12/2009 | 8.00 | Approved | I |
| #2: | 05/07/2009 | 05/07/2009 | 1.00 | Approved | I |
| #2: | 04/28/2009 | 04/28/2009 | 8.00 | Approved | I |
| #2: | 04/24/2009 | 04/24/2009 | 0.50 | Approved | I |
| #2: | 04/20/2009 | 04/20/2009 | 8.00 | Approved | I |
| #2: | 04/13/2009 | 04/13/2009 | 0.50 | Approved | I |
| #2: | 04/12/2009 | 04/12/2009 | 8.00 | Approved | I |
| #2: | 04/03/2009 | 04/03/2009 | 0.50 | Approved | I |
| #2: | 03/27/2009 | 03/27/2009 | 4.20 | Approved | I |
| #2: | 03/26/2009 | 03/26/2009 | 8.00 | Approved | I |

PENN MED 000497

| | | | | |
|---|---|---|---|---|
| #2: 03/25/2009 | 03/25/2009 | 5.00 | Approved | I |
| #2: 03/21/2009 | 03/21/2009 | 0.50 | Approved | I |
| #2: 03/20/2009 | 03/20/2009 | 0.50 | Approved | I |
| #1: 03/10/2009 | 03/10/2009 | 1.00 | Approved | I |
| #1: 03/09/2009 | 03/09/2009 | 8.00 | Approved | I |
| #1: 03/04/2009 | 03/04/2009 | 8.00 | Approved | I |
| #1: 03/02/2009 | 03/02/2009 | 8.00 | Approved | I |
| #1: 03/01/2009 | 03/01/2009 | 8.00 | Approved | I |
| #1: 02/28/2009 | 02/28/2009 | 8.00 | Approved | I |
| #1: 02/27/2009 | 02/27/2009 | 1.00 | Approved | I |
| #1: 02/25/2009 | 02/25/2009 | 0.50 | Approved | I |
| #1: 02/23/2009 | 02/23/2009 | 8.00 | Approved | I |
| #1: 02/19/2009 | 02/19/2009 | 1.00 | Approved | I |
| #1: 02/18/2009 | 02/18/2009 | 1.00 | Approved | I |
| #1: 02/17/2009 | 02/17/2009 | 1.25 | Approved | I |
| #1: 02/11/2009 | 02/11/2009 | 1.00 | Approved | I |
| #1: 02/08/2009 | 02/08/2009 | 0.50 | Approved | I |
| #1: 02/03/2009 | 02/03/2009 | 0.50 | Approved | I |
| #1: 01/30/2009 | 01/30/2009 | 2.00 | Approved | I |
| #1: 01/28/2009 | 01/28/2009 | 1.50 | Approved | I |
| #1: 01/26/2009 | 01/26/2009 | 0.75 | Approved | I |
| #1: 01/18/2009 | 01/18/2009 | 8.00 | Approved | I |
| #1: 01/17/2009 | 01/17/2009 | 0.25 | Approved | I |
| #1: 01/08/2009 | 01/08/2009 | 0.50 | Approved | I |
| #1: 01/05/2009 | 01/05/2009 | 5.70 | Approved | I |
| #1: 12/28/2008 | 12/28/2008 | 0.00 | Approved | I |
| #1: 12/28/2008 | 12/28/2008 | 5.00 | Approved | I |
| #1: 12/27/2008 | 12/27/2008 | 0.00 | Denied | I |
| #1: 12/26/2008 | 12/26/2008 | 0.50 | Approved | I |
| #1: 12/19/2008 | 12/19/2008 | 1.50 | Approved | I |
| #1: 12/18/2008 | 12/18/2008 | 0.50 | Approved | I |
| #1: 12/16/2008 | 12/16/2008 | 1.50 | Approved | I |
| #1: 12/12/2008 | 12/12/2008 | 0.50 | Approved | I |
| #1: 12/07/2008 | 12/07/2008 | 3.80 | Approved | I |
| #1: 12/05/2008 | 12/05/2008 | 0.75 | Approved | I |
| #1: 12/03/2008 | 12/03/2008 | 8.00 | Approved | I |
| #1: 12/02/2008 | 12/02/2008 | 8.00 | Approved | I |
| #1: 12/01/2008 | 12/01/2008 | 8.00 | Approved | I |
| #1: 11/26/2008 | 11/26/2008 | 2.25 | Approved | I |
| #1: 11/24/2008 | 11/24/2008 | 2.00 | Approved | I |
| #1: 10/26/2008 | 10/26/2008 | 1.00 | Approved | I |
| #1: 10/21/2008 | 10/21/2008 | 1.50 | Approved | I |
| #1: 10/15/2008 | 10/15/2008 | 1.00 | Approved | I |
| #1: 10/10/2008 | 10/10/2008 | 0.50 | Approved | I |
| #1: 10/09/2008 | 10/09/2008 | 2.50 | Approved | I |
| #1: 10/05/2008 | 10/05/2008 | 1.00 | Approved | I |
| #1: 10/04/2008 | 10/04/2008 | 1.00 | Approved | I |
| #1: 10/03/2008 | 10/03/2008 | 1.00 | Approved | I |
| #1: 09/29/2008 | 09/29/2008 | 8.00 | Approved | I |
| #1: 09/26/2008 | 09/26/2008 | 0.50 | Approved | I |
| #1: 09/25/2008 | 09/25/2008 | 1.50 | Approved | I |
| #1: 09/24/2008 | 09/24/2008 | 5.75 | Approved | I |
| #1: 09/23/2008 | 09/23/2008 | 1.00 | Approved | I |

| Leave Group | Total Days Apv: 8 / Pend: 0 | Disability Days Apv: 0 / Pend: 0 | | | | | 0204453 |
|---|---|---|---|---|---|---|---|
| Self - Serious Health Condition | | | | | | Closed | 0205300 |
| **Leave Begin & End Dates** | | **Hours** | **Status** | | | **Certification Period** | **Status** |
| #1: 09/18/2008 | 09/18/2008 | 1.00 | Approved | I | #1: | 06/19/2008 to 09/19/2008 | Complete | I |
| #1: 09/14/2008 | 09/14/2008 | 8.00 | Approved | I | | | |
| #1: 09/13/2008 | 09/13/2008 | 8.00 | Approved | I | | | |
| #1: 09/10/2008 | 09/10/2008 | 1.00 | Approved | I | | | |
| #1: 09/09/2008 | 09/09/2008 | 0.50 | Approved | I | | | |

PENN MED 000498

**Douglas, Sophie**

| | |
|---|---|
| From: | Douglas, Sophie |
| Sent: | Tuesday, November 04, 2014 5:11 PM |
| To: | Crowley, Joann |
| Cc: | Douglas, Sophie |
| Subject: | Brenda Ford-Kelly |

Hi Joann,

I spoke to Brenda and then she sent me this memo. I will respond to her tomorrow. She is a Lead and her Time on the Phone is less than the operators. We take in to consideration that the Leads perform Lead duties, so we allow flexibility. She is able to get up and stretch and mobilize her joints because we understand. As far as leaving early and coming in late, she does not have any more FMLA. Brenda, needs to be monitored carefully because she is the individual that left(FMLA) early on several occasions because she needed a ride from a co-worker. She said she had doctor's appointments but it was because she does not have a car. Also, the leads are due to rotate so she will be a Presby Lead and that group operation is not as intense as HUP. If she is not fully recovered, she may need to go out on long term disability.

Also, if feasible, Tammy will try and work with her if she need to take vacation time.

Have a great evening.

Sophie

-----Original Message-----
From: Ford, Brenda
Sent: Tuesday, November 04, 2014 2:38 PM
To: Douglas, Sophie
Subject:

I talked to Joann. I didn't receive my letter. However, the special accomendations that I would like would be: enabling me to leave early when I am in too much pain to work - I would do so after 2:30 before the second shift begins - be able to walk around without considering the number of calls I have to take or time on the board so that I dont suffer from stiffness, and pain that Osteo-athritis causes. Also, during a episode which practioners do not know why (we) have them or (when) they will strike - I will continue to come in but sometimes I need extra time coming in. Ms, Crowley told me to wait for the letter.

Brenda Ford-Kelly
University of Pennsylvania
Corporate Contact Center

1

PENN MED 000368

Supervisor
215-349-5628

PENN MED 000369

**Douglas, Sophie**

| | |
|---|---|
| **From:** | Douglas, Sophie |
| **Sent:** | Wednesday, November 12, 2014 12:34 PM |
| **To:** | Crowley, Joann |
| **Cc:** | Douglas, Sophie |
| **Subject:** | RE: Brenda Kelly |

Hi Joann,

I spoke to Brenda and we reviewed the request that is stipulated by her physician. It stated limited activities that led to knee or hip pain. I mentioned to her that she exhausted her FMLA ,so she will be unable to utilize leave before or end shift. Tammy will try her n best to honor a vacation request if it is operational feasible. However, this is what we provided her.

1. A chair that will support her hips.
2. She has a foot stool
3. She is able to walk around if joints are stiff
4. She will supervise the Presby operators which is not as labor intense.

Thank you,

Sophie

---

**From:** Crowley, Joann
**Sent:** Monday, November 10, 2014 12:12 PM
**To:** Douglas, Sophie
**Subject:** Brenda Kelly

Sophie, we will need to formally respond to Brenda in writing about her accommodation request.

Please let me know what, if anything, you would be willing to do to accommodate her.

Thank you,
Joann

**Joann Crowley, SPHR**
**Human Resources Manager, Corporate Services**
3001 Market Street, Suite 320
Philadelphia PA 19104
Tel: 215-615-2662
Cell: 215-519-9459
Fax: 215-615-2448
Email: joann.crowley@uphs.upenn.edu
Penn Medicine

1

PENN MED 000361

JA148



**Penn Medicine**

November 14, 2014

**Human Resources**

Corporate Services

Ms. Brenda Kelly
2121 Alden Street
Philadelphia PA 19143

Dear Brenda:

On October 30, 2014, you were sent a letter from Disability Management advising that your request for Family and Medical Leave was denied because your request was beyond the maximum number of weeks provided by the federal and/or state family/medical leave regulations. You were informed that you could request an accommodation under our Employees with Disabilities policy.

Subsequently, you spoke with your manager, Sophie Douglas, and requested the following to assist you in performing the functions of your position:

1. The ability to leave early from work during episodic periods of pain
2. The ability to arrive late to work during episodic periods of pain
3. The ability to stand up from your work area to walk around to relieve stiffness and pain
4. A chair that provides better support for your back and hips.

Since you have exhausted your FMLA, we cannot grant you time off to leave early or arrive to work later in the day. We will provide you with an office chair with lumbar support for your work area, and you may stand up and stretch, as needed. Please keep in mind that these accommodations do not relieve you of any of your duties as Lead Communications Specialist, and you will continue to be held to the same productivity metrics that have been established for your position.

If there are any changes in your medical condition that impact this accommodation, you must contact your manager in a timely manner.

Please let me know if you have any questions or concerns. I can be reached at (215) 615-2662.

Sincerely,

Joann L. Crowley
Human Resources Manager, Corporate Services

Cc: Sophie Douglas, Manager, Contact Center

PENN MED 000505

JA149

**University of Pennsylvania Health System
Contact Center**

---

**Constructive Discipline**

Brenda Kelly
02/16/05

**Official Written Warning (Attachment)**


You will recall on **02/12/05**, at 3:30pm you assisted Terria Cunningham with a **Code Call** from The Hospital of the University of Pennsylvania cafeteria stating that a person had fallen. There was some confusion in how the call was called in. You did eventually follow through and start the Code Call. You made your public address announcement, but did not verify if pagers were activated or if the call list was notified. You did not process this call correctly. You are required to verify with the staff that the entire procedure has been completed.

Brenda, I applaud you for helping an inexperience co-worker with a problem call.

PENN MED 000084

**C O N F I D E N T I A L**

UNIVERSITY OF PENNSYLVANIA MEDICAL CENTER

**PLAN FOR IMPROVEMENT FORM**

Employee: *Brenda Ford-Kelly*   Department: *Contact Center*

Job Title: *Communication Specialist*   Date of Hire: *7/21/00*

**Class of Discipline:**
☐ AA   ☐ A   ☐ B   ☒ C   Date of incident: *2/12/05*

Infraction: *Processed Code Call incorrectly on 02/12/05 at 3:30pm*

Specifics of incident (as needed): *On 2/12/05 at approximately 3:30pm you assisted Terria Cunningham with a code call. You made your public address announcement, but you failed to alert the code pagers. (see attachment)*

**Discipline level:**
☒ official written warning   ☐ suspension _____ days   ☐ termination

Change needed in employee behavior: *Brenda must follow the code procedure and make a public address announcement and alert code pagers for all code calls*

Result of no change: *Suspension / Termination*

Date: *4/16/05*   Supervisor: *Deborah Sherman*
Date: *2/25/05*   Department Head: *A. Tylels*

**Employee Section:**

Comments

RECEIVED

I understand that signing indicates only receipt of the Plan for Improvement not agreement with the document or waiver of any rights as a University of Pennsylvania Medical Center employee including but not limited to the right to have this incident reviewed.

Employee signature *Brenda Kelly*   Date *4-16-05*

If the employee refuses to sign the form, the witness present at time of issuance is to sign and complete the following:

"On (date) _____, I personally observed (supervisor's name) _____ serve and read a copy of this Plan For Improvement Form to (employee's name) _____ and that he/she refused to sign for and acknowledge the same."

Witness signature _____   Date _____

011809   ORIGINAL (Personnel)   YELLOW (Department)   PINK (Employee)   AEL 9/2001

PENN MED 000085

JA151

5 00 427

## UNIVERSITY OF PENNSYLVANIA MEDICAL CENTER
## PLAN FOR IMPROVEMENT FORM

Employee: _Brenda Ford_    Department: _Contact Center_

Job Title: _Communication Specialist_    Date of Hire: _____

**Class of Discipline:**
☐ AA    ☐ A    ☐ B    ☑ C    Date of incident: _August 16, 2007_

Infraction: _Inappropriate behavior_ _____

_____

Specifics of incident (as needed): _on aug. 14, 2007, Brenda made a comment to a fellow employee, that "us sistas have to stick together against these white girls"_

**Discipline level:**
☑ official written warning    ☐ suspension _____ days    ☐ termination

Change needed in employee behavior: _while in the Contact Center, you are expected to conduct yourself in a professional manner at all times._

Result of no change: _Suspension/Termination_

_____

Date: _9/4/07_    Supervisor: _Kyle O'Donnell_
Date: _9/7/07_    Department Head: _A. Zglinitia_

**Employee Section:**

Comments _____    · · · 1 0 2007

I understand that signing indicates only receipt of the Plan for Improvement not agreement with the document or waiver of any rights as a University of Pennsylvania Medical Center employee including but not limited to the right to have this incident reviewed.

Employee signature _Brenda Kelly_ _____    Date _9/6/2007_

If the employee refuses to sign the form, the witness present at time of issuance is to sign and complete the following:

"On (date) _____, I personally observed (supervisor's name) _____ serve and read a copy of this Plan For Improvement Form to (employee's name) _____ and that he/she refused to sign for and acknowledge the same."

Witness signature _____    Date _____

011809

ORIGINAL (Personnel)    YELLOW (Department)    PINK (Employee)    AEL 9/2001

PENN MED 000038

| University of Pennsylvania Health System **Policy Manual** | Number: 2-05-25 |
|---|---|
| | Page 10 of 10 |
| Subject:    Performance Improvement and Progressive Steps | Effective: 1/01/08 |

Attachment B

## DOCUMENTATION OF PROGRESSIVE STEP
## FOR PERFORMANCE IMPROVEMENT

Employee Name _Brenda Kelly_ Title _Lead Communications Specialist_

UPHS Entity _Corporate_ Department _Contact Center_

Immediate Manager _Stephen Douglas_ Manager's Title _____

Progressive Step: First Written Warning _✓_    Second Written Warning ____    Final Warning ____

**Basis for Progressive Step:** (specify performance deficiency or violation, dates, times, other individuals involved, etc., and attach relevant documentation):

_Failure to follow Contact Center protocol regarding a work schedule switch._

**Corrective Action Required, including applicable time frame(s):**

_This level of discipline will remain active for a minimum of 12 months. Please advise that the next level of discipline for performance deficiency will advance you to a Second written warning._

I acknowledge that this Progressive Step has been discussed with me by my manager. I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.

I further acknowledge that nothing in this Documentation of Progressive Step for Performance Improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee's Signature _Brenda Kelly_    Date _7-14-2011_

_____

I have attached additional comments I wish to make regarding this action.

Manager's Signature _Stephen Douglas_    Date _7/20/11_

Next Level Manager's Signature _A 7 Winter_    Date _7/20/11_

PENN MED 000355

**Penn Medicine**
**Contact Center**
**Corporate Operator Services**

**To:** Brenda Ford
      Lead Communications Specialist

**Fr:** Sophia Douglas-Morris
      Contact Center Manager

**Date: July 14, 2011**

**Re:** 1st **Written Warning (Failure to follow protocol)**

Brenda, on June 20, 2011 you switch your shift with Greg without authorization from Tammy (Information Service Coordinator.) Brenda, as a Lead you are aware that any schedule modification must be approved by Tammy.

According to the Contact Center guideline, it is imperative that all employees fill out a slip for any schedule changes. However, in the event that an employee has a last minute switch, the employee must notify Tammy via cell phone.

On this particular day, you and Tammy converse regarding another issue and you did not make any reference that you were going to switch your shift.

In the future, please fill out a slip if you desire to switch your shift. If it is a last minute switch, it is imperative that you contact Tammy for her approval.

Brenda, you are receiving a 1st written warning under the Performance Improvement and Progressive policy #2-05-25. This level of discipline will remain active for a minimum of 12 months.

If the above described behavior continues or any other infraction or performance deficiency occurs you will advance to a 2nd Written Warning.

Brenda, I am confident that you can make the necessary changes in order for you to excel in your role. Please discuss with me, any situations that may develop where you require help, advice, and assistance.

PENN MED 000356

_Brandon Kelley_
Employee

_7-14-2011_
Date

_Stephen Duffy_
Contact Center Manager

_Webb 7/20/11_
Date

PENN MED 000357

500427

| University of Pennsylvania Health System **Policy Manual** | Number: 2-05-25 |
|---|---|
| | Page 10 of 10 |
| Subject:   Performance Improvement and Progressive Steps | Effective: 1/01/08 |

Attachment B

### DOCUMENTATION OF PROGRESSIVE STEP
### FOR PERFORMANCE IMPROVEMENT

Employee Name _Brenda Kelly_     Title _Communication Specialist_

UPHS Entity _CORP_     Department _Contact Center_

Immediate Manager _Sophia Douglas_   Manager's Title _____

Progressive Step: First Written Warning ___   Second Written Warning ___   Final Warning ✓

Basis for Progressive Step: (specify performance deficiency or violation, dates, times, other individuals involved, etc., and attach relevant documentation):
_Brenda received a First Written Warning on 2/14/11 for failure to " " Contact Center protocol. Since she has advanced to the next level for absence from the work-place on 11/2/11 & 11/1/11. (See attached memo for list of absences)_

Corrective Action Required, including applicable time frame(s):
_This level of discipline will remain active a minimum of 12 months. Please be aware that the next level of discipline +/or performance deficiency will advance you to a Final Warning._

I acknowledge that this Progressive Step has been discussed with me by my manager.  I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.

I further acknowledge that nothing in this Documentation of Progressive Step for Performance improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee's Signature _Brenda Kelly_     Date _11/8/2011_

_____

I have attached additional comments I wish to make regarding this action.

Manager's Signature _Sophia Douglas_     Date _11/8/11_

Next Level Manager's Signature _A. Tyutu_     Date _11/9/11_
NOV 9 2011

PENN MED 000156

UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM
CONTACT CENTER
CORPORATE OPERATOR SERVICES

MEMORANDUM

To:      Brenda Kelly
         Communication Specialist

From:    Sophia Douglas
         Contact Center Manager

Date:    November 3, 2011

Memo:    **Second Written Warning for Absence**

Brenda, I would like to talk to you about your absence from work on the following dates:

**11/1/11, 11/2/11**
**10/17/11**
**9/14/11, 9/15/11**
**8/29/11, 9/2/11**
**8/19/11, 8/20/11, 8/21/11, 8/22/11**
**7/4/11, 7/5/11, 7/6/11, 7/11/11**

## RESULT OF UNSATISFACTORY PERFORMANCE

Brenda, I know that you will strive to report to work on your scheduled shift.  According to current policy, you are now receiving a **Second Written Warning** for absence from the work place.  Unfortunately, failure to meet this expectation any time in the next twelve months will result in further disciplinary action.  The next step in the disciplinary process is a **Final Warning** under the Performance and Improvement and Progressive Steps policy.

We will review your progress on an ongoing daily basis.  I, along with the Leadership Team, am always available to answer any questions you may have about any work related issues.

As an experienced Communication Specialist, you are a valuable resource and asset to Corporate Operator Services.  I am confident that with some refocusing and adjustment, you can provide continued support to service our patients, families, and customers in a way that demonstrates service excellence.

PENN MED 000157

Penn Medicine

DOCUMENTATION OF PROGRESSIVE STEP
FOR PERFORMANCE IMPROVEMENT

| Name: | Brenda Kelly | Title : | Lead Communication Specialist |
|---|---|---|---|
| UPHS Entity: | Corporate | Department: | Contact Center |
| Immediate Manager | Sophia Douglas-Morris | Manager's Title: | Corporate Operator Services Manager |

Progressive Step: ☑ First Written Warning     ☐ Second Written Warning     ☐ Final Written Warning

Basis for Progressive Step: (specify performance deficiency or violation, dates, times, other individuals involved, etc., and attach relevant documentation):

Mrs. Brenda Kelly has failed to submit a completed physician's certification to the department of Disability Management by the required & extended grace period due date of 3/15/2014 and has advanced to the next level of discipline in Progressive Steps Policy. **(First Written Warning)**

Corrective Action Required, including applicable time frame(s):

This Level of discipline will remain active a minimum of twelve months from the date of the signed counseling. Please be aware that the next level of discipline and or performance deficiency will advance you to a **Second Written Warning.**

I acknowledge that this Progressive Step has been discussed with me by my manager. I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.
I further acknowledge that nothing in this Documentation of Progressive Step for Performance Improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee Signature   _Brenda Kelly_   Date   _4/29/2014_

I have attached additional comments I wish to make regarding this action.
Manager Signature   _Sophia Douglas-Morris_   Date   _4/29/2014_
Next Level Manager Signature   _[signature]_   Date   _4/30/14_

PENN MED 000152

**Penn Medicine
Contact Center
Corporate Operator Services**

**To:** Brenda Ford
Lead Communications Specialist

**Fr:** Sophia Douglas-Morris
Contact Center Manager

**Date: December 5, 2014**

**Re:   2nd Written Warning (Unprofessional Communication)**

Brenda, on Wednesday, December 3, 2014, Twanda processed a code and you assisted with the notification. Once the notification process was completed, Twanda asked you for the name of the first responded that you notified.  You responded that you "did not remember and that you always forget things". She asked you to call the nurse responder back and request the name so she can fill out the log sheet.

In a loud sarcastic manner, you replied that you will not call the nurse back. She requested several times for you to call the nurse and you refused to follow through. Also, you stated that you will not pick up a stat line in the future because you can't remember.

Brenda, as a Lead Operator, this conduct was very unprofessional. Your responsibility is to assist your team to the best of your ability and in a timely manner. It was not necessary for Twanda to repeatedly request the nurse back. Your overall leadership skills is a topic that we have addressed in the pass and you are not consistent in demonstrating that you are capable of providing effective leadership to the staff.

Brenda, in the future, please provide the following to the staff.

1. Deal with staff in a helpful, cooperative and support manner
2. Deal patiently with problems and complaints

Brenda, you are receiving a 2nd written warning under the Performance Improvement and Progressive policy #2-05-25.  This level of discipline will remain active for a minimum of 12 months.

If the above described behavior continues or any other infraction or performance deficiency occurs, you will advance to a Final Written Warning.

PENN MED 000146

Brenda, I am confident that you can make the necessary changes in order for you to excel in your role. Please discuss with me, any situations that may develop where you require help, advice, and assistance.

_Brenda hilf_
Employee

_12/8/2014_ (SD)
Date

_Sophia Dow_ (SD)
Contact Center Manager

_12/8/2014_ (SD)
Date

PENN MED 000147

JA160

 Penn Medicine

DOCUMENTATION OF PROGRESSIVE STEP
FOR PERFORMANCE IMPROVEMENT

| | Brenda Ford | Title : | Lead Communication Specialist |
|---|---|---|---|
| UPHS Entity: | Corporate | Department: | |
| Immediate Manager | Sophia Douglas | Manager's Title: | Corp. Operator Services Manager |

Progressive Step:  ☐ First Written Warning   ☐ Second Written Warning   ☑ Final Written Warning

**Basis for Progressive Step: (Failure to follow a directive regarding proper protocol for notifying the department of a call out.**

Brenda, on 2/1/15 you called out by texting Tenia Davis who was not the shift Lead. Because Cheryl was the shift Lead, all call out notification should have been addressed to her.  This is the second time you have not followed Call Center protocol.  On 01/27/15, you texted Ebony of your call out, but Ebony had a scheduled day off. Tammy inquired the reason why you are texting, and not calling the Lead Operator according to the call center protocol.  You stated that your cell phone only can text. Tammy told you that you must verbally call the call center and that you must call the shift Lead.

Despite the feedback you received from Tammy as to the proper protocol, you texted your call out again.

**Corrective Action Required, including applicable time frame(s):**

Brenda, as a Lead operator, you are aware of the proper procedure for calling out. In the future, please call the department and notified a shift Lead of your call out and do not text.

I acknowledge that this Progressive Step has been discussed with me by my manager. I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.
I further acknowledge that nothing in this Documentation of Progressive Step for Performance Improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee Signature    *Employee refused to sign*    Date  2/20/15

*witness* Jr BF    2/20/15

I have attached additional comments I wish to make regarding this action.
Manager Signature  *Sophia Douglas*    Date  2/20/15
Next Level Manager Signature    Date

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRENDA KELLY,

        Plaintiff,

  v.

UNIVERSITY OF PENNSYLVANIA
HEALTH SYSTEM, d/b/a PENN MEDICINE

Defendant.

        Civ. A. No. 2:16-cv-00618

June 23, 2016

### REPORT OF EXAMINATION

*Re: Forensic Document Analysis*
*"Brenda Kelly"*
*Our File No. 2016-040*

## I.  EXHIBITS EXAMINED

**(Q-1)**    Photocopy of a ***Penn Medicine Documentation of Progressive Step For Performance Improvement*** form, dated April 29, 2014, bearing one questioned "Brenda Kelly" signature.

**(Q-2)**    Photocopy of a ***Memo*** on Penn Medicine Contact Center Corporate Operator Services letterhead, dated December 5, 2014, bearing one questioned "Brenda Kelly" signature.

**(K-1)**    Photocopies of nine (9) documents bearing nine (9) known signatures of Brenda Kelly, ranging in date from April 16, 2005 through April 28, 2016.

        *Note:*    *Copies of the documents listed above have been attached for identification purposes.*

## II.   ASSIGNMENT

I have been asked by the Defendant in the above referenced case to determine, if possible, whether or not the author of the Brenda Kelly signatures appearing on the Exhibit K-1 documents, wrote either of the questioned "Brenda Kelly" signatures appearing on the Exhibit Q-1 and Q-2 documents.

## III. DISCUSSION

When an individual first learns how to write, he or she will develop both, hand-eye coordination, and form perception (which is how one sees formations and their ability to duplicate those formations).  In addition, the various nerves and muscles in the writer's fingers, wrist, elbow and shoulder are developed and trained.  It is through this developmental process that a person's highly individualized handwriting and signature can emerge.

One of the identifiable features of a signature or writing is the letter formation or the overall design of the letters.  Relatedly, while the design of the letters may be the eye catching feature; the execution (speed and fluidity) of a signature or writing can be just as important.  For example, if an individual would attempt to simulate, or imitate, another person's signature or writing, he or she may "draw" the letters so that the signature or writing is pictorially similar to the genuine signature(s) or writings of that particular individual.  In such cases, the questioned signature or writing would lack the speed and fluidity (execution) that is exhibited in the genuine signature(s) or writings.  Through careful examination, the lack of speed and/or skill in a signature or writing can be detected by a qualified forensic document examiner.

Conversely, if an individual would attempt to write with the same speed and fluidity (execution) as exhibited in the known signature(s) or writings; he or she will likely make mistakes in the individual letter formations or the overall design of the letters.

When examining a questioned signature or writing to determine its authenticity, the above mentioned types of comparisons are just some of the factors that a forensic document examiner must consider when conducting his or her analysis.

In this case, to determine the authenticity of the questioned "Brenda Kelly" signatures appearing on the Exhibit Q-1 and Q-2 documents;  I performed a series of visual and microscopic examinations following the procedures

III. DISCUSSION                                         (Continued)

prescribed by ASTM International; including a series of
side-by-side comparison examinations of each of the
submitted questioned and known signatures.  Each of the
examinations and comparisons I conducted in this matter were
non-destructive and conform to the *ASTM International
Standard Designation E2290-07a; Standard Guide for
Examination of Handwritten Items*.

IV.  **RESULTS OF EXAMINATION**

The author of the Brenda Kelly signatures appearing on
the Exhibit K-1 documents, **_wrote_**[1] the questioned "Brenda
Kelly" signatures appearing on the attached Exhibit Q-1 and
Q-2 documents.

Note:      *The conclusion rendered above has been expressed in
accordance with ASTM International Standard E 1658-08,
**Standard Terminology for Expressing Conclusions of
Forensic Document Examiners**.*

V.   **REMARKS**

One of the identifiable features of a signature or
writing is letter formation or the design of the letters.
Some of the elements that define letter formation are as
follows:

1.    *The general design of letters. (The uniqueness, position and
sequence of the strokes in the letter formation.)*

2.    *The relative size of letters with respect to other letters.*

3.    *The relative size of letter projections below the baseline.*

4.    *The relative size of letters projecting above the height of
other letters.*

5.    *Embellishments, ornamentations and flourishes.*

6.    *Habitual abbreviation(s) of letter formation due to speed.*

7.    *Inter-word or intra-word spacing and/or the overall balance
of the signature.*

While the design of the letters may be the eye catching
feature, the execution of a signature or writing can be just
as important.  Some of the elements that define the
execution of a signature or writing are as follows:

---

[1]      *"**Identification (definite conclusion of identity)** - this is the highest
degree of confidence expressed by document examiners in handwriting comparisons.  The
examiner has no reservations whatever, and although prohibited from using the word
"fact," the examiner is certain, based on evidence contained in the handwriting, that
the writer of the known material actually wrote the writing in question." - ASTM
International;* **Standard E 1658-08.**

**V.   REMARKS**                                            **(Continued)**

1.   *Intra-word connections, or the lack of a continuous writing movement.*

2.   *Pen emphasis, or pressure, applied to particular strokes; often times referred to as "shading".*

3.   *The direction and/or sequence of strokes in the letter formation.*

4.   *The speed of execution as evident by line quality.*

5.   *Smoothly rounded, sharply curving, elliptical or angular connecting strokes between letters.*

6.   *Starting of the initial writing movement before, or after, the writing instrument makes contacts the paper or substrate.*

7.   *Finishing the terminal writing movement before, or after, the writing instrument leaves the paper or substrate.*

8.   *Habitual retouching or the lack thereof.*

If a questioned signature is in agreement with the known signatures in both letter formation (i.e. writing similarity) and execution, then the signatures can be identified as having been written by a common author.  In this case, the questioned "Brenda Kelly" signatures appearing on the Exhibit Q-1 and Q-2 documents, and the known signatures of Brenda Kelly appearing on the Exhibit K-1 documents, are in complete agreement in both letter formation (i.e. writing similarity) and execution; and lack the presence of any unexplainable *significant differences*[2].

> **"The conclusion that a writing is not genuine is only properly reached when it contains divergences in the amount and quality beyond the range of variation in the standard writing that cannot reasonably be accounted for by changed conditions in the writer or surrounding the writer."**
> *(Questioned Documents, Second Edition, Osborn 1929, p. 205)*

> **"In identifying a person, for example, scars, deformities, fingerprints, or a series of accurate measurements, must be depended upon and finally, if the conclusion of identity is reached, either in a person or a handwriting, there must not remain significant differences that cannot reasonably be explained."**
> *(Questioned Documents, Second Edition, Osborn 1929, p. 245)*

---

[2]     *"**Significant Difference** - an individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and cannot be reasonably explained." - ASTM International;* **Standard E2290-07a.**

V.   REMARKS                                          (Continued)

> *"It also needs to be emphasized that two writings are identified as being by the same writer by the absence of fundamental divergences as well as by a combination of sufficient number of similarities.  The process is always a double operation, positive and negative, and if error is to be avoided neither part of the process should be overlooked.  In order to reach the conclusion of identity of two sets of writings there must not be present significant and unexplained divergences.  These divergences must, however, be something more than mere trivial variations that can be found in almost any handwriting."*
> *(Questioned Documents, Second Edition, Osborn 1929, p. 262)*

The conclusion rendered in this report is based upon a collective examination of all submitted evidence; as well as the understanding that the copies submitted for examination and comparison purposes are true and accurate reproductions of the original exhibits, and the questioned "Brenda Kelly" signatures having been naturally written.  I reserve the right to supplement this report upon the examination and inspection of the original Exhibit Q-1 and/or Q-2 documents, and/or the receipt of any additional contemporaneous known signatures of Brenda Kelly.

The Comparison Chart Illustrations necessary to graphically support and demonstrate the findings listed in this report have not yet been completed.  Should it become necessary to render testimony in this matter, the appropriate Comparison Chart Illustrations must be produced in advance of any such testimony.

My compensation in this matter is $400.00 per hour.  My compensation does not depend on the outcome of this matter, nor does it depend on the opinions offered in this matter.

Also attached, as Exhibits 1 and 2 respectively, are copies of our current Curriculum Vitae's.

RHODY R. DETWILER
Forensic Document Examiner

*PEER REVIEWED AND VERIFIED BY:*

GUS R. LESNEVICH
Forensic Document Examiner



# EXHIBIT Q-1

🔰 Penn Medicine

## DOCUMENTATION OF PROGRESSIVE STEP
### FOR PERFORMANCE IMPROVEMENT

| Name: | Brenda Kelly | Title : | Lead Communication Specialist |
|---|---|---|---|
| UPHS Entity: | Corporate | Department: | Contact Center |
| Immediate Manager | Sophia Douglas-Morris | Manager's Title: | Corporate Operator Services Manager |

Progressive Step:  ☑ First Written Warning     ☐ Second Written Warning     ☐ Final Written Warning

Basis for Progressive Step: (specify performance deficiency or violation, dates, times, other individuals involved, etc., and attach relevant documentation):

Mrs. Brenda Kelly has failed to submit a completed physician's certification to the department of Disability Management by the required & extended grace period due date of 3/15/2014 and has advanced to the next level of discipline in Progressive Steps Policy. (First Written Warning)

Corrective Action Required, including applicable time frame(s):

This Level of discipline will remain active a minimum of twelve months from the date of the signed counseling. Please be aware that the next level of discipline and or performance deficiency will advance you to a Second Written Warning.

I acknowledge that this Progressive Step has been discussed with me by my manager. I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.
I further acknowledge that nothing in this Documentation of Progressive Step for Performance Improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee Signature     _Brenda Kelly_     Date _4/29/2014_

I have attached additional comments I wish to make regarding this action.
Manager Signature     _Sophia Douglas-Morris_     Date _4/29/2014_
Next Level Manager Signature     _____     Date _4/30/14_

PENN MED 000152



EXHIBIT Q-2

JA169

**Penn Medicine**
**Contact Center**
**Corporate Operator Services**

To: Brenda Ford
    Lead Communications Specialist

Fr: Sophia Douglas-Morris
    Contact Center Manager

Date: December 5, 2014

Re: 2nd[t] Written Warning (Unprofessional Communication)

Brenda, on Wednesday, December 3, 2014, Twanda processed a code and you assisted with the notification. Once the notification process was completed, Twanda asked you for the name of the first responder that you notified. You responded that you "did not remember and that you always forget things". She asked you to call the nurse responder back and request the name so she can fill out the log sheet.

In a loud sarcastic manner, you replied that you will not call the nurse back. She requested several times for you to call the nurse and you refused to follow through. Also, you stated that you will not pick up a stat line in the future because you can't remember.

Brenda, as a Lead Operator, this conduct was very unprofessional. Your responsibility is to assist your team to the best of your ability and in a timely manner. It was not necessary for Twanda to repeatedly request the nurse back. Your overall leadership skills is a topic that we have addressed in the pass and you are not consistent in demonstrating that you are capable of providing effective leadership to the staff.

Brenda, in the future, please provide the following to the staff.

1. Deal with staff in a helpful, cooperative and support manner
2. Deal patiently with problems and complaints

Brenda, you are receiving a 2nd[t] written warning under the Performance Improvement and Progressive policy #2-05-25. This level of discipline will remain active for a minimum of 12 months.

If the above described behavior continues or any other infraction or performance deficiency occurs, you will advance to a Final Written Warning.

PENN MED 000146

Brenda, I am confident that you can make the necessary changes in order for you to excel in your role. Please discuss with me, any situations that may develop where you require help, advice, and assistance.

_____
Employee

_____
Contact Center Manager

12/8/2014 (sp)
Date

12/8/2014 (sp)
Date

PENN MED 000147



EXHIBIT K-1

CONFIDENTIAL

UNIVERSITY OF PENNSYLVANIA MEDICAL CENTER
**PLAN FOR IMPROVEMENT FORM**

Employee: Brenda Ford-Kelly     Department: Contact Center

Job Title: Communication Specialist     Date of Hire: 7/21/00

Class of Discipline:
☐ AA     ☐ A     ☐ B     ☒ C     Date of incident: 2/12/05

Infraction: Processed Code Call, incorrectly on 02/12/05 at 3:30pm

Specifics of incident (as needed): On 2/12/05 at approximately 3:30pm you assisted Terria Cunningham with a code Call. You made your public address announcement, but you failed to alert the Code pagers. (see attachment)

Discipline level:
☒ official written warning     ☐ suspension _____ days     ☐ termination

Change needed in employee behavior: Brenda must follow the Code procedures and make a public address announcement and alert code pagers for all code calls

Result of no change: Suspension / Termination

Date: 4/16/05     Supervisor: Deborah Sherman
Date: 2/23/05     Department Head: A. Jacobs

**Employee Section:**

Comments _____

I understand that signing indicates only receipt of the Plan for Improvement not agreement with the document or waiver of any rights as a University of Pennsylvania Medical Center employee including but not limited to the right to have this incident reviewed.

Employee signature Brenda Kelly     Date 4-16-05

If the employee refuses to sign the form, the witness present at time of issuance is to sign and complete the following:

"On (date) _____, I personally observed (supervisor's name) _____ serve and read a copy of this Plan For Improvement Form to (employee's name) _____ and that he/she refused to sign for and acknowledge the same."

Witness signature _____     Date _____

ORIGINAL (Personnel)     YELLOW (Department)     PINK (Employee)     AEL 5/2001

PENN MED 000085

*5004217*

**UNIVERSITY OF PENNSYLVANIA MEDICAL CENTER**
**PLAN FOR IMPROVEMENT FORM**

Employee: Brenda Ford                    Department: Contact Center

Job Title: Communications Specialist         Date of Hire: _____

**Class of Discipline:**
☐ AA    ☐ A    ☐ B    ☑ C

Date of incident: August 16, 2007

Infraction: Inappropriate behavior

Specifics of incident (as needed): on aug. 16, 2007, Brenda made a comment to a fellow employee, that "us sisters have to stick together against the white girls."

**Discipline level:**
☑ official written warning    ☐ suspension _____ days    ☐ termination

Change needed in employee behavior: While in the Contact Center, you are expected to conduct yourself in a professional manner at all times.

Result of no change: Suspension/Termination

Date: 9/6/07                          Supervisor: _____

Date: 9/7/07                          Department Head: _____

**Employee Section:**

Comments. _____

_____    ⋮ ⋯⋮ 1 9 2007

I understand that signing indicates only receipt of the Plan for Improvement not agreement with the document or waiver of any rights as a University of Pennsylvania Medical Center employee including but not limited to the right to have this incident reviewed.

Employee signature: Brenda hill          Date  9/6/2007

If the employee refuses to sign the form, the witness present at time of issuance is to sign and complete the following:

"On (date) _____, I personally observed (supervisor's name) _____ serve and read a copy of this Plan For Improvement Form to (employee's name) _____ and that he/she refused to sign for and acknowledge the same."

Witness signature _____          Date _____

011529        ORIGINAL (Personnel)    YELLOW (Department)    PINK (Employee)        AEL 9/2001

PENN MED 000038

JA174

| University of Pennsylvania Health System | Number: 2-05-25 |
| **Policy Manual** | |
| | Page 10 of 10 |
| Subject:    Performance Improvement and Progressive Steps | Effective: 1/01/08 |

Attachment B

DOCUMENTATION OF PROGRESSIVE STEP
FOR PERFORMANCE IMPROVEMENT

Employee Name _Brenda Kelly_ Title _Lead Communications Specialist_

UPHS Entity _Corporate_ Department _Contact Center_

Immediate Manager _Stephen Douglas_ Manager's Title _____

Progressive Step: First Written Warning _✓_ Second Written Warning ____ Final Warning ____

Basis for Progressive Step: (specify performance deficiency or violation, dates, times, other individuals involved, etc., and attach relevant documentation):

_Failure to follow Contact center protocol regarding a work schedule switch._

Corrective Action Required, including applicable time frame(s):

_This level of discipline will remain active for a minimum of 12 months. Please advise that the next level of discipline for a performance deficiency will advance you to a final written warning._

I acknowledge that this Progressive Step has been discussed with me by my manager. I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.

I further acknowledge that nothing in this Documentation of Progressive Step for Performance Improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee's Signature _Brenda Kelly_ Date _7-14-2011_

I have attached additional comments I wish to make regarding this action.

Manager's Signature _____ Date _7/20/11_

Next Level Manager's Signature _____ Date _7/20/11_

PENN MED 000355

500427

| University of Pennsylvania Health System **Policy Manual** | Number: 2-05-25 |
| --- | --- |
| Subject: Performance Improvement and Progressive Steps | Page 10 of 10 |
| | Effective: 1/01/08 |

Attachment B

### DOCUMENTATION OF PROGRESSIVE STEP
### FOR PERFORMANCE IMPROVEMENT

Employee Name _Brenda Kelly_ Title _Communication Specialist_

UPHS Entity _CORP_ Department _Contact Center_

Immediate Manager _Sophia Douglas_ Manager's Title _____

Progressive Step: First Written Warning ____ Second Written Warning ✓ Final Warning ____

Basis for Progressive Step: (specify performance deficiency or violation, dates, times, other individuals involved, etc., and attach relevant documentation):
_Brenda received a First Written Warning on 2/14/11, for Failure to "" Contact Center protocol. Since she has advanced to the next level for absence from the work-place on 11/2/11 & 11/1/11. (See attached memo for list of absences)_

Corrective Action Required, including applicable time frame(s):
_This level of discipline will remain active a minimum of 12 months. Please be aware that the next level of discipline &/or performance deficiency will advance you to a Final Warning._

I acknowledge that this Progressive Step has been discussed with me by my manager. I further acknowledge that if I fail to demonstrate immediate and sustained improvement I may be subject to additional disciplinary action up to and including termination of employment.

I further acknowledge that nothing in this Documentation of Progressive Step for Performance Improvement alters the at-will employment relationship between UPHS and me, and that either UPHS or I may terminate the employment relationship at any time without cause and without notice.

Employee's Signature _Brenda Kelly_ Date _11/8/2011_

_____

I have attached additional comments I wish to make regarding this action.

Manager's Signature _Sophia Douglas_ Date _11/8/11_

Next Level Manager's Signature _A. Gutos_ Date NOV _11/9/11_

PENN MED 000156

JA176



**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**

OCA Official Form No.: 960

[This form has been approved by the New York State Department of Health]

| Patient Name Brenda Kelly | Date of Birth 3/5/1965 | Social Security Number |
|---|---|---|

| Patient Address   2121 South Alden Street, Philadelphia, PA 19143 |
|---|

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

| 7. Name and address of health provider or entity to release this information:   University of Pennsylvania Family Medicine, 3737 Market Street, Philadelphia, PA 19104 |
|---|

| 8. Name and address of person(s) or category of person to whom this information will be sent:   Morgan Lewis & Bockius, LLP, 1701 Market Street, Philadelphia, PA 19103 |
|---|

9(a). Specific information to be released:

☐ Medical Record from (insert date) _____ to (insert date) _____

☒ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.

☐ Other: _____

Include: *(Indicate by Initialing)*

_____ **Alcohol/Drug Treatment**

_____ **Mental Health Information**

_____ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here *B K* I authorize _____
         Initials                                                              Name of individual health care provider

to discuss my health information with my attorney, or a governmental agency, listed here:

_____

(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information:   ☒ At request of individual   ☐ Other: | 11. Date or event on which this authorization will expire:   05/2018 |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

*Brenda Kelly*                                          Date: 4/27/2016

Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**

[This form has been approved by the New York State Department of Health]

| Patient Name  Brenda Kelly | Date of Birth  3/5/1965 | Social Security Number |
|---|---|---|

| Patient Address  2121 South Alden Street, Philadelphia, PA 19143 |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

7. Name and address of health provider or entity to release this information:
University of Pennsylvania Orthopedics Department, 3737 Market Street, Philadelphia, PA 19104

8. Name and address of person(s) or category of person to whom this information will be sent:
Morgan Lewis & Bockius, LLP, 1701 Market Street, Philadelphia, PA 19103

9(a). Specific information to be released:
☐ Medical Record from (insert date) _____ to (insert date) _____
☒ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.

☐ Other: _____     Include: (*Indicate by Initialing*)

_____ Alcohol/Drug Treatment
_____ Mental Health Information
_____ HIV-Related Information

**Authorization to Discuss Health Information**

(b) ☐ By initialing here ___ B. K. ___ I authorize _____
         Initials                                    Name of individual health care provider
to discuss my health information with my attorney, or a governmental agency, listed here:

_____
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information:  ☑ At request of individual  ☐ Other: | 11. Date or event on which this authorization will expire:  05/2018 |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_____          Date: ___4/27/2016___
Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.



OCA Official Form No.: 960

**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**
[This form has been approved by the New York State Department of Health]

| Patient Name    Brenda Kelly | Date of Birth 3/5/1965 | Social Security Number |
|---|---|---|

| Patient Address    2121 South Alden Street, Philadelphia, PA 19143 |
|---|

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

| 7. Name and address of health provider or entity to release this information: |
|---|
| Dr. David Finnie, Penn Presbyterian Medical Center, 51 N. 39th Street, Philadelphia, PA 19104 |

| 8. Name and address of person(s) or category of person to whom this information will be sent: |
|---|
| Morgan Lewis & Bockius, LLP, 1701 Market Street, Philadelphia, PA 19103 |

9(a). Specific information to be released:

☐ Medical Record from (insert date) _____ to (insert date) _____

☒ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.

☐ Other: _____

_____

Include: (indicate by initialing)

_____ **Alcohol/Drug Treatment**

_____ **Mental Health Information**

_____ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here ___*B.K.*___ I authorize _____
     Initials                                          Name of individual health care provider

to discuss my health information with my attorney, or a governmental agency, listed here:

_____
(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information: | 11. Date or event on which this authorization will expire: |
|---|---|
| ☒ At request of individual | 05/2018 |
| ☐ Other: | |

| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |
|---|---|

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_____          Date: __4/27/2016__
Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.



**AUTHORIZATION FOR RELEASE OF HEALTH INFORMATION PURSUANT TO HIPAA**

OCA Official Form No.: 960

[This form has been approved by the New York State Department of Health]

| Patient Name | | Date of Birth | Social Security Number |
|---|---|---|---|
| Brenda Kelly | | 3/5/1965 | |

| Patient Address |
|---|
| 2121 South Alden Street, Philadelphia, PA 19143 |

I, or my authorized representative, request that health information regarding my care and treatment be released as set forth on this form:

In accordance with New York State Law and the Privacy Rule of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), I understand that:

1. This authorization may include disclosure of information relating to **ALCOHOL and DRUG ABUSE, MENTAL HEALTH TREATMENT**, except psychotherapy notes, and **CONFIDENTIAL HIV\* RELATED INFORMATION** only if I place my initials on the appropriate line in Item 9(a). In the event the health information described below includes any of these types of information, and I initial the line on the box in Item 9(a), I specifically authorize release of such information to the person(s) indicated in Item 8.

2. If I am authorizing the release of HIV-related, alcohol or drug treatment, or mental health treatment information, the recipient is prohibited from redisclosing such information without my authorization unless permitted to do so under federal or state law. I understand that I have the right to request a list of people who may receive or use my HIV-related information without authorization. If I experience discrimination because of the release or disclosure of HIV-related information, I may contact the New York State Division of Human Rights at (212) 480-2493 or the New York City Commission of Human Rights at (212) 306-7450. These agencies are responsible for protecting my rights.

3. I have the right to revoke this authorization at any time by writing to the health care provider listed below. I understand that I may revoke this authorization except to the extent that action has already been taken based on this authorization.

4. I understand that signing this authorization is voluntary. My treatment, payment, enrollment in a health plan, or eligibility for benefits will not be conditioned upon my authorization of this disclosure.

5. Information disclosed under this authorization might be redisclosed by the recipient (except as noted above in Item 2), and this redisclosure may no longer be protected by federal or state law.

6. **THIS AUTHORIZATION DOES NOT AUTHORIZE YOU TO DISCUSS MY HEALTH INFORMATION OR MEDICAL CARE WITH ANYONE OTHER THAN THE ATTORNEY OR GOVERNMENTAL AGENCY SPECIFIED IN ITEM 9 (b).**

| 7. Name and address of health provider or entity to release this information: |
|---|
| University of Pennsylvania Rheumatology Department, 3737 Market Street, Philadelphia, PA 19104 |

| 8. Name and address of person(s) or category of person to whom this information will be sent: |
|---|
| Morgan Lewis & Bockius, LLP, 1701 Market Street, Philadelphia, PA 19103 |

9(a). Specific information to be released:

☐ Medical Record from (insert date) _____ to (insert date) _____

☒ Entire Medical Record, including patient histories, office notes (except psychotherapy notes), test results, radiology studies, films, referrals, consults, billing records, insurance records, and records sent to you by other health care providers.

☐ Other: _____

Include: (*Indicate by Initialing*)

_____ **Alcohol/Drug Treatment**

_____ **Mental Health Information**

_____ **HIV-Related Information**

**Authorization to Discuss Health Information**

(b) ☐ By initialing here _B.K_ I authorize _____
   Initials
   Name of individual health care provider

to discuss my health information with my attorney, or a governmental agency, listed here:

_____

(Attorney/Firm Name or Governmental Agency Name)

| 10. Reason for release of information:<br>☑ At request of individual<br>☐ Other: | 11. Date or event on which this authorization will expire:<br>05/2018 |
|---|---|
| 12. If not the patient, name of person signing form: | 13. Authority to sign on behalf of patient: |

All items on this form have been completed and my questions about this form have been answered. In addition, I have been provided a copy of the form.

_Brenda Kelly_                     Date: _4/28/2016_

Signature of patient or representative authorized by law.

\* Human Immunodeficiency Virus that causes AIDS. The New York State Public Health Law protects information which reasonably could identify someone as having HIV symptoms or infection and information regarding a person's contacts.

## **VERIFICATION**

The undersigned states that the facts in the foregoing Response to Defendant's First Request for Production of Documents and First Set of Interrogatories are true and correct to the best of her knowledge, information and belief. The undersigned understands that any intentionally false statements herein are subject to criminal penalties relating to sworn and unsworn statements.

Brenda Kelly



# EXHIBIT 1

# Curriculum Vitae

OF

## Khody R. Detwiler
*Forensic Document Examiner*

## Lesnevich & Detwiler
310 Airport Drive
Martinsburg, Pennsylvania 16662
(814) 793-2377
(814) 793-3790 Fax
lesnevich@aol.com
WWW.LESNEVICH.COM

# KHODY R. DETWILER
*FORENSIC DOCUMENT EXAMINER*

## HIGHLIGHTS/MAJOR CASES

*PEOPLE V. DAVID STEVENSON (IND. #2013-067)*
- Retained by the Orange County District Attorney's Office in Goshen, New York to examine evidence in a highly publicized homicide trial involving the murder of a 35 year old mother of four; also testified as an expert witness during the jury trial on behalf of the District Attorney's Office.

*PEOPLE V. CORY BYRD (IND. #2011-749)*
- Retained by the Orange County District Attorney's Office in Goshen, New York to examine evidence in a highly publicized homicide trial involving the murder of a 4 year old child; also testified as an expert witness during the jury trial on behalf of the District Attorney's Office.

*PAUL D. CEGLIA V. MARK ELLIOT ZUCKERBERG AND FACEBOOK INC.*
- Retained by counsel representing Facebook and Mark Zuckerberg in a breach of contract action brought in Federal Court in Buffalo, New York; alleging a multi-billion dollar ownership interest in Facebook.

*CHEVRON V. DONZINGER, ET. AL., (S.D.N.Y.); AGUINDA V. CHEVRON (LAGO AGRIO, ECUADOR); CHEVRON V. REPUBLIC OF ECUADOR (THE HAGUE, NETHERLANDS)*
- Retained by counsel representing Chevron Corporation in a multi billion-dollar environmental lawsuit originating from Lago Agrio, Ecuador.

*ALGOSAIBI (AHAB) VS. MAAN AL SANEA (SAAD GROUP) (AL KHOBAR, SAUDI ARABIA)*
- Retained by counsel representing Maan Al Sanea in a matter involving multi billion-dollar fraud claims in multiple jurisdictions with connections to over 100 international banking institutions originating from Saudi Arabia.

*PEOPLE VS. ANTHONY D. MARSHALL AND FRANCIS X. MORRISSEY, JR. (BROOKE ASTOR)*
- Assisted Gus Lesnevich on a matter in which he was retained by the Manhattan District Attorney's Office in a highly publicized case involving the Estate of Brooke Astor.

*ESTATE OF BADRI "ARKADY" PATARKATSISHVILI (TBILISI, GEORGIA)*
- Assisted Gus Lesnevich on a matter in which he was retained by council representing the multi-billion dollar business estate of Badri "Arkady" Patarkatshvili originating from Tbilisi, Georgia.

-1-

## EDUCATION

**The Pennsylvania State University**　　　　　　　University Park, Pennsylvania
**Bachelor of Science, Criminal Justice**　　　　　　　　　　　　August 2009

- Deans List Honors

- From August through December of 2008, I completed a mandatory semester long internship with Gus Lesnevich for partial fulfillment of my bachelor's degree in the Criminal Justice program at Penn State University.

## TRAINING EXPERIENCE/EMPLOYMENT

**Lesnevich & Detwiler**　　　　　　　　　　　　Martinsburg, Pennsylvania
**Forensic Document Examiner / Partner**　　　　　　　December 2008 - Present

- After completion of the mandatory internship sponsored through Penn State University (August through December 2008); I began the formal training program in the field of Forensic Document Examination under the direct supervision and instruction of Gus Lesnevich.

- The training program consists of a 24 month, full-time, training period covering all aspects of the Forensic Document Examination field. My training was completed in accordance with ASTM International Standard E-2388-11 (*Standard Guide for Minimum Training Requirements for Forensic Document Examiners*).[1] Some of the specific areas of instruction included in the training program are as follows:

  | | |
  |---|---|
  | *-Evidence Handling Procedures* | *-Examination Procedures* |
  | *-Handwriting/Printing Examinations* | *-Printing Processes* |
  | *-Photography and Digital Imaging* | *-Photocopiers/Facsimiles* |
  | *-Alterations, Obliterations, and Erasures* | *-Mechanical Impressions* |
  | *-Expert Witness and Legal Proceedings* | *-Ink Examinations* |
  | *-Electronic Signature Analysis* | *-Indentation Analysis* |

- As part of my training, I was also responsible for conducting a wide variety of case-specific research and literature reviews correlating to each of the individual cases submitted to our laboratory for analysis. This task was primarily accomplished through extensive review and study of the leading authoritative texts and peer-reviewed journal articles published within the Forensic Document Examination field.

---

[1]　*ASTM International, originally known as the American Society for Testing and Materials (ASTM), was formed over a century ago and is one of the largest voluntary standards development organizations in the world - a trusted source for technical standards for materials, products, systems, and services. See also: SWGDOC Standard for Minimum Training Requirements for Forensic Document Examiners (http://www.swgdoc.org).*

## TECHNICAL TRAINING

**Technical training by Foster + Freeman USA Inc.**
*(Sterling, Virginia - September 2, 2009)*
- Non-Destructive Ink Analysis -Video Spectral Comparator (VSC)
  *-Models: VSC 6000, VSC 2000IIR, VSC 400*
- Non-Destructive Indentation Analysis - Electrostatic Detection Apparatus (ESDA)
  *-Models: ESDA2 and ESDA Lite*

**Technical training in photography and digital imaging software (Adobe products) by professional photographer Gerald T. Leidy**
*(Martinsburg, Pennsylvania)*
- Following graduation from the Brooks Institute of Photography in Santa Barbara, California, Mr. Leidy enlisted with the United States Navy - Atlantic Fleet Combat Camera Group stationed in Norfolk, Virginia. In 1974, after serving four years with the United States Navy, Mr. Leidy established, and currently maintains, a professional photography studio located in Martinsburg, Pennsylvania.

**Appleton Papers Security Paper School**
*(Roaring Spring, Pennsylvania - December 1, 2011)*
- Overview of the paper making and Dandy Roll Processes
- Watermarking and Securities Technology

**Successful Completion of the Fundamentals of Forensic Questioned Documents in the Continuing & Professional Education Certificate Program through West Virginia University** *(November 2012)*
- Instructed by Anthony Iten of West Virginia University

**Advanced Video Spectral Comparator (VSC) Workshop**
*(Indianapolis, Indiana - August 29, 2013)*
- Instructed by Foster + Freeman Application Engineers Michael Zontini & Owen Lang

**Rochester Institute of Technology - Printing Process Identification and Image Analysis for Forensic Document Examiners Seminar**
*(Rochester, New York - November 12-15, 2013)*
- Some of the topics of instruction included the following:
  *-Traditional and Digital Printing Process Identification and Discrimination*
  *- Image Analysis and Digital Image Processing*
  *-Security Inks and Security Papers*

**Advanced Video Spectral Comparator (VSC) Workshop**
*(Honolulu, Hawaii - August 15, 2014)*
- Instructed by Foster + Freeman Application Engineers Michael Zontini & F.L. Jim Lee

-3-

JA186

## CONTINUING EDUCATION

**American Academy of Forensic Sciences (AAFS) 64th Annual Scientific Meeting**
*(Atlanta, Georgia - February 20-25, 2012)*
- Workshop: Flawed Forensics: Recognizing and Challenging Misleading Forensic Evidence and Disingenuous Expert Testimony
  *(Panel Presentation)*

**American Academy of Forensic Sciences (AAFS) 65th Annual Scientific Meeting**
*(Washington, D.C. - February 18-23, 2013)*
- Workshop: Signature Examination of Healthy and Impaired Writers
  *(Instructed by Michael Caligiuri & Linton Mohammed)*
- Workshop: Hyperspectral Imaging - United States Library of Congress
  *(Instructed by Fanella G. France & Joseph C. Stevens)*

**American Academy of Forensic Sciences (AAFS) 67th Annual Scientific Meeting**
*(Orlando, Florida - February 16-21, 2015)*
- Workshop: Classification of Typewritten Documents
  *(Instructed by Karen J. Nobles & Peter V. Tytell)*
- Workshop: Automating Image Production for Forensic Document Examiners
  *(Instructed by Mark Goff)*

**American Society of Questioned Document Examiners (ASQDE) 69th Annual Meeting**
*(Philadelphia, Pennsylvania - August 20-25, 2011)*
- Workshop: Printing Process Identification for Forensic Document Examiners
  *(Instructed by Scott Walters & Jeffrey Payne)*
- Workshop: Using Adobe Photoshop in a Forensic Document Workflow
  *(Instructed by George Reis)*

**American Society of Questioned Document Examiners (ASQDE) 70th Annual Meeting**
*(Charleston, South Carolina - August 18-23, 2012)*
- Workshop: The Individuality of Inkjet Printing
  *(Instructed by Rolf Fauser)*
- Workshop: Electrostatic Detection Devices (EDD) - Theoretical and Operational Considerations
  *(Instructed by Dan C. Purdy, Grant Sperry & Robert Muehlberger)*

**American Society of Questioned Document Examiners (ASQDE) 71st Annual Meeting**
*(Indianapolis, Indiana - August 24-29, 2013)*
- Workshop: Conclusion Scales and Logical Inference
  *(Instructed by R. Brent Ostrum)*
- Workshop: Forensic Examination of Digital Signatures
  *(Instructed by William Flynn & Kathleen Annunziata Nicolaides)*
- Workshop: Challenging Signatures
  *(Instructed by A. Frank Hicks)*

JA187

## CONTINUING EDUCATION *(CONT.)*

**Joint Annual Meeting of the American Society of Questioned Document Examiners (ASQDE - 72ⁿᵈ) and the Australasian Society of Forensic Document Examiners (ASFDE)**
*(Honolulu, Hawaii - August 11-15, 2014)*
- Workshop: Skillful Freehand Signature Simulation
  *(Instructed by Lloyd Cunningham & Linton Mohammed)*
- Workshop: Adobe, Digital Media and Evidence
  *(Instructed by John Penn II of Adobe)*

**American Society of Questioned Document Examiners (ASQDE) 73ʳᵈ Annual Meeting**
*(Toronto, Ontario - August 9-13, 2015)*
- Workshop: Characteristics of Fountain Pen Writing and Aqueous Ink Analysis
  *(Instructed by Lloyd Cunningham, Valery Aginsky,*
  *Linton Mohammed & William Flynn)*
- Workshop: Principles of Forensic Examination of Arabic Signatures
  *(Instructed by Mohammed Aloyoni & Dr. Abdulaziz Alkahtani)*

**Document Security Alliance (DSA) Meeting**
*(Washington, D.C. - October 20, 2011)*
- Discussion Topic: Document security before and after September 11ᵗʰ 2001

**Measurement Science & Standards in Forensic Handwriting Analysis Conference**
*(Gaithersburg, Maryland - June 4-5, 2013)*
- National Institute of Standards and Technology Campus (*NIST*)
- In collaboration with the following organizations:
  *-American Academy of Forensic Sciences - QD Section (AAFS)*
  *-American Board of Forensic Document Examiners (ABFDE)*
  *-American Society of Questioned Document Examiners (ASQDE)*
  *-Federal Bureau of Investigation Laboratory (FBI)*
  *-National Institute of Justice (NIJ)*
  *-Scientific Working Group for Forensic Document Examination (SWGDOC)*

**Mid-Atlantic Association of Forensic Scientists (MAAFS) Annual Meeting**
*(State College, Pennsylvania - May 19-23, 2014)*
- Attended various presentations sponsored by the Questioned Documents Section. Some of the topics of discussion included the following:
  *-Thermal Ribbon Analysis Utilizing the Thermal Ribbon Analysis Platform*
  *(TRAP)*
  *-The Use of Photoshop Macros to Simplify the Creation of Working Charts*
  *-Spectral Analysis of Documents Subjected to Latent Print Examinations*
  *Utilizing the Video Spectral Comparator (VSC)*

**Mid-Atlantic Association of Forensic Scientists (MAAFS) Annual Meeting**
*(Cambridge, Maryland - May 18-22, 2015)*
- Workshop: Forensic Examination of Biometrically Captured e-Signatures
  *(Instructed by William Flynn & Kathleen Annunziata Nicolaides)*

## CONTINUING EDUCATION *(CONT.)*

**3rd International Workshop on Automated Forensic Handwriting Analysis (AFHA)**
*(Honolulu, Hawaii - August 9-10, 2014)*
- This particular workshop explored a variety of automated systems which may be used to assist in the examination of both "online" and "offline" signatures and writings. Some of the specific topics of discussion included the following:
  - *Overview of handwriting pattern recognition systems*
  - *Kinematic approaches to signature analysis*
  - *Mathematical approaches to signature complexity and stability*
- Endorsed by the following organizations:
  - *German Research Centre for Artificial Intelligence (DFKI)*
  - *Netherlands Forensic Institute - Ministry of Security and Justice (NFI)*
  - *American Society of Questioned Document Examiners (ASQDE)*

**Northeastern Association of Forensic Scientists (NEAFS) 40th Annual Meeting**
*(Hershey, Pennsylvania - November 3-6, 2014)*
- Workshop: Ethics in the Practice of Forensic Science
  *(Instructed by Robin Bowen of West Virginia University)*

**Midwestern Association of Forensic Scientists (MAFS) 44th Annual Meeting**
*(Mackinac Island, Michigan - September 20-25, 2015)*
- Workshop: Forensic Examination of Electronic Signatures
  *(Instructed by William Flynn & Kathleen Annunziata Nicolaides)*
- Workshop: Getting the Most Out of Your Visual Spectral Comparator
  *(Instructed by David Tobin & Michael Zontini of Foster + Freeman USA)*
- Workshop: The Examination of Documents Requiring a Multi-Faceted Approach
  *(Instructed by Brian Lindblom)*
- Workshop: Evaluating Signatures: What Matters?
  *(Instructed by A. Frank Hicks)*
- Workshop: The Application of Questioned Document Examinations to the Analysis of Valuable Signatures & Other Antiques
  *(Instructed by Peter Belcastro, Jr. & Gregg Mokrzycki)*

**Mid-Atlantic Association of Forensic Scientists (MAAFS) Questioned Documents Section Fall Workshop: "Valuable Signatures and Memorabilia"**
*(National Baseball Hall of Fame: Cooperstown, New York - November 12, 2015)*
- Instructed by the following individuals:
  - *Michael Posner - Manager of Major League Baseball's Authentication Program*
  - *FBI Special Agent, Brian Brusokas - Art Crime Team*
  - *FBI Special Agent, John Iannuzzi - Interstate Robbery Apprehension Team*
  - *Gregg Mokrzycki - Forensic Document Examiner (FBI)*
  - *Peter Belcastro, Jr. - Forensic Document Examiner (FBI)*
- National Baseball Hall of Fame and Museum Panel Discussion:
  - *Erik Strohl - VP of Exhibitions and Collections -National Baseball HOF*
  - *Jim Gates - Library Director -National Baseball HOF*
  - *Sue MacKay - Director of Collections -National Baseball HOF*

JA189

## CONTINUING EDUCATION *(CONT.)*

**Mid-Atlantic Association of Forensic Scientists (MAAFS) Annual Meeting**
*(Richmond, Virginia - May 17-20, 2016)*
- Workshop: The Application of QD Examinations of the Analysis of Fine Art and Other Antiques
  *(Instructed by Gregg Mokrzycki)*
- Workshop: Identification Science
  *(Instructed by Stephen McKasson)*

## INTERNATIONAL EXPERIENCE

Since beginning my career in the field of Forensic Document Examination, I have conducted a wide variety of forensic examinations on thousands of individual documents and signatures involved in various litigations throughout the United States and abroad. My international casework has required extensive travel to Europe, South America and the Middle East. In addition, I have also been retained on numerous international matters that have not required international travel.

## PROFESSIONAL AFFILIATIONS

*~ International Association for Identification (IAI) - Regular Member ~*

*~ American Academy of Forensic Sciences (AAFS) - Associate Member ~*

*~ Mid-Atlantic Association of Forensic Scientists (MAAFS) - Regular Member ~*

*~ Northeastern Association of Forensic Scientists (NEAFS) - Associate Member ~*

*~ Midwestern Association of Forensic Scientists, INC. (MAFS) - Regular Member ~*

*~ ASTM International: Committee E30 - Forensic Science (ASTM) - Voting Member ~*

*~ American Society of Questioned Document Examiners (ASQDE) - Affiliate Member ~*



EXHIBIT 2

# CURRICULUM VITAE

OF

## GUS R. LESNEVICH
### *FORENSIC DOCUMENT EXAMINER*

## LESNEVICH & DETWILER
310 Airport Drive
Martinsburg, Pennsylvania 16662
(814) 793-2377
(814) 793-3790 Fax
lesnevich@aol.com
WWW.LESNEVICH.COM

# QUALIFICATIONS
## OF
# GUS R. LESNEVICH

After four years as a CID Agent (Criminal Investigator), I began my training in the field of Questioned Document Examination at the United States Military Crime Laboratory, Fort Gordon, Georgia. Upon completion of my training (1968 to 1970), I was certified by the Department of Defense, U.S. Army, as Examiner of Questioned Documents. During my military service, I served as Examiner, both in the United States, and as Chief, Questioned Document Section, U.S. Military Crime Laboratory (Provisional) South Vietnam.

Upon leaving military service, I entered private practice in Atlanta, Georgia. During this time, I worked as a Forensic Document Examiner for some of the leading law firms in the South, as well as handling civil disputes for private corporations and individual claimants and plaintiffs.

In 1974, I was recruited by the United States Secret Service. In 1976, I was promoted to Senior Document Examiner, at the Secret Service Identification Branch, a division of Special Investigations. During my tenure with the Secret Service, I was responsible for the training of junior examiners, and assuming individual responsibility for the examination of U.S. Treasury Checks, Saving Bonds, Banking Documents, etc., as well as the examination of threatening correspondence directed at the President of the United States, and other persons under the protection of the Secret Service.

In August of 1981, I left the United States Secret Service and re-entered private practice. Although I continue to work for the U.S. Attorneys, Federal, and State Law Enforcement Agencies, Legal Aid and Public Defenders, the predominance of my work is in the private sector.

I have qualified and testified as an Expert Witness in all Courts of the United States Armed Forces, State Courts along the East Coast of the United States and Federal Courts throughout the United States.

*NOTE: For additional information please visit*
*2004 U.S. App.Lexis 12432*
*www.ca3.uscourts.gov/opinarch/033915p.pdf*

# CURRICULUM VITAE
# GUS R. LESNEVICH

**June 1962 to March 1965**

- *Military Policeman, United States Army, Korea and Brooklyn, New York*

**April 1965 to March 1968**

- *United States Army Certified Criminal Investigator, (CID Agent), Nuremberg, Bavaria, Germany*

**April 1968 to June 1970**

- *Resident Trainee (full-time student) in the field of Questioned Documents - United States Army Criminal Investigation Laboratory, Fort Gordon, Georgia*

**July 1970 to April 1972**

- *Examiner of Questioned Documents - United States Army Criminal Investigation Laboratory, Fort Gordon, Georgia, and United States Army Criminal Investigation Laboratory, (Provisional) South Vietnam*

**May 1972 to August 1974**

- *Private practice, Examiner of Questioned Documents - Atlanta, Georgia*

**August 1974 to July 1981**

- *Examiner of Questioned Documents, Senior Examiner of Questioned Document - Identification Laboratory, United States Secret Service, Washington, District of Columbia*

**August 1981 to August 2005**

- *Private practice, Forensic Document Examiner - outside of Philadelphia, Pennsylvania*

**September 2005**

- *Relocated to south central Pennsylvania (Private Practice)*

**ADDENDUM TO**
**CURRICULUM VITAE**
**GUS R. LESNEVICH**

**July 1970 to April 1972**

- *Instructor, Questioned Documents - United States Army Criminal Investigation School, Fort Gordon, Georgia*

**August 1970 to March 1971**

- *Specialized Training in Printing, Forgery and Counterfeiting - United States Mint, Treasury Department, Washington, District of Columbia and United States Military Printing Facilities, Japan*

**August 1974 to July 1981**

- *Instructor, Questioned Documents Course - United States Secret Service, Washington, District of Columbia*

**April 1977 to July 1998**

- *Training of Examiners undergoing Resident Training in the Field of Forensic Document Examination - United States Secret Service Identification Laboratory, Washington, District of Columbia*

**July 1981 to Present**

- *Since entering private practice, I have continued training individuals undergoing Resident Training in the field of Forensic Document Examination.*

**Certifications:**

- *Department of Defense, U.S. Army (1970)*

- *American Board of Forensic Document Examiners (1980)*
  - *Re-certified for 5 year periods (1985, 1990, 1995 and 2000)*
  - *September 2005 to Current - limited practice*

## Gus R. Lesnevich Has Been Retained
## as a Government Expert
## in the Following Highly Publicized Cases

**U.S. vs. Eddie Antar**
*(Crazy Eddie)*

**U.S. vs. Don King**
*(1985, 1995 and 1998)*

**U.S. vs. Giovanni Gambino**

**U.S. vs. Leona Helmsley**

**U.S. vs. Autumn Jackson**
*(Bill Cosby)*

**U.S. vs. Imelda Marcos**

**U.S. vs. Bess Myerson**

**U.S. vs. Darryl Strawberry**

**U.S. vs. Lawrence Cusack**
*(President Kennedy Papers)*

**U.S. vs. Rutland**
*(see attached 3rd Circuit Court Opinion)*

**U.S. vs. Osama Bin Laden**
*(U.S. Embassy Bombing in Africa)*

**U.S. vs. Mokhtar Haouari and
Abdelghani Meskini**
*(Y2K Millennium Bomb Plot of LAX)*

**U.S. vs. Wesley Snipes**

**Kenneth Starr, Independent Counsel**
*(Vincent Foster Suicide)*

**Lawrence E. Walsh, Independent Counsel**
*(Iran-Contra Affair)*

**U.S. vs. Thomas Clines**
**U.S. vs. Albert Hakim**
**U.S. vs. Lt. Col. Oliver North**
**U.S. vs. Admiral John Poindexter**
**U.S. vs. General Richard Secord**
**U.S. vs. Caspar Weinberger**

*Insider Trading*
**U.S. vs. Ivan Boesky**
**U.S. vs. GAF Corporation**
**U.S. vs. Boyd L. Jefferies**
**U.S. vs. Dennis B. Levine**
**U.S. vs. Michael Milken**

*Federal Prosecution*
**Medellin, Cali and Bogota Cartels**

**People vs. Edward Leary**
*(N.Y.C. Subway Firebombing)*

**People vs. Abraham Hirschfeld**

**People vs. Chuck Jones**
*(Marla Maples' Publicist)*
*(1994 and 1999)*

**People vs. Anthony D. Marshall and
Francis X. Morrissey, Jr.**
*(Brooke Astor)*

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-3915

UNITED STATES OF AMERICA

v.

CHRIS RUTLAND

Christopher H. Rutland,

Appellant

On Appeal from the
United States District Court
for the District of New Jersey
(D.C. No. 02-cr-00494-01)
District Judge:
Honorable Dickinson R. Debevoise

Argued: March 29, 2004

Before: ALITO, FISHER
and ALDISERT, Circuit Judges.

(Filed : June 23, 2004)

Kenneth W. Kayser (Argued)
P.O. Box 2087
Livingston, NJ 07039
    *Attorney for Appellant*

George S. Leone
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Glenn J. Moramarco (Argued)
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street, 4th Floor
P.O. Box 2098
Camden, NJ 08101
    *Attorneys for Appellee*

OPINION OF THE COURT

FISHER, Circuit Judge.

Defendant Christopher H. Rutland appeals from his judgment of sentence, arguing that it was unfairly prejudicial to allow the government's exceptionally-qualified handwriting expert to testify to the ultimate issue of authorship of key documents. The Advisory Committee Note to Rule 403 of the Federal Rules of Evidence states, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." It is not unfairly prejudicial to allow an expert to testify to the ultimate issue. Jurors may properly take an expert's impressive experience and credentials into account when determining the weight of the expert's testimony. Therefore, we will affirm the decision of the district court.

I. Background

Rutland was a financial advisor with Citicorp Financial Services when he met Helen Constans, an elderly widow, in

1990. Constans trusted Rutland to invest her money, and Rutland had access to Constans' financial information, including the numbers and locations of her bank accounts as well as her social security number. Rutland later prepared Constans' tax returns.

Constans was eventually hospitalized, and later placed in a long-term care facility in September of 1995. Her niece, Dorothy McCosh, attempted to locate and sort Constans' financial documents. McCosh found an annuity statement that listed Barbara Grams as the annuitant. McCosh did not know anyone by the name of Grams. Because McCosh knew that Rutland had been Constans' financial advisor, McCosh twice contacted Rutland. Although Rutland and Grams had been dating since 1987, Rutland claimed each time that he did not know Grams, and that the annuity statement that listed Grams as the annuitant must have been a clerical error.

Rutland and Grams defrauded Constans of more than $637,000. They bought luxury automobiles, built a home in Arizona, and took vacations in Europe, Las Vegas, Florida, and the Carribean with Constans' money. They perpetrated the fraud by forging Constans' signature on multiple financial forms, including: change of address forms changing Constans' address to Rutland's or Grams' address; change of ownership forms transferring ownership of Constans' financial accounts to Rutland or Grams; documents to open accounts naming Grams as a joint owner with Constans; and

forging checks drawn on Constans' account made payable to Rutland or Grams.

Rutland and Grams were each charged with one count of conspiring to obtain money and property through a fraudulent scheme, in violation of 18 U.S.C. § 371.

The district court held a *Daubert*[1] hearing to determine the qualifications of both the government's handwriting expert and the defendants' expert, a critic of the field of handwriting analysis. The district court found that both experts were sufficiently qualified to testify at trial as expert witnesses.

Prior to trial, Rutland filed a motion *in limine* to prevent the government's handwriting expert from opining regarding the authenticity of Constans' signature on the documents completed by Rutland and Grams. The district court denied the motion.

At trial, the government's handwriting expert testified regarding his extensive qualifications and impressive past experience.[2] Then, he explained

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[2] The government's handwriting expert, Gus Lesnevich, testified that he had been employed as a forensic document examiner, or a handwriting expert, for approximately 34 years. He began working in this field while serving in the

2

background information and techniques used in handwriting analysis to provide the

_____

United States Army, and worked under the direct supervision of senior document examiners. He completed a two-year Department of Defense program, and was certified as an examiner of questioned documents.

After leaving the Army and briefly working in private practice, Lesnevich was recruited by the Secret Service. He became the senior document examiner for the Secret Service. He eventually left the Secret Service, and has been employed in the private sector since 1981. He had testified as an expert for approximately 32 years in approximately 500 criminal and civil cases.

Lesnevich is a member of several professional associations and is certified by the Department of Defense and the American Board of Forensic Document Examiners. Lesnevich has analyzed documents for the governments of the United States, South Korea, South Vietnam, Australia, New Zealand, Great Britain, and France. During Rutland's trial, Lesnevich testified about some of the prominent parties involved in cases he worked on as a handwriting expert: the Iran-Contra Affair, Oliver North, Richard Secord, Caspar Weinberger, Michael Milken, Leona Helmsley, Imelda Marcos, the office of Kenneth Starr, and organized crime cases.

Lesnevich has testified in both civil and criminal cases, for prosecutors as well as defense attorneys.

jury with tools to reach their own conclusions about the authenticity of the contested signatures. Ultimately, the expert applied his knowledge and opined that the signatures were forgeries.

The defense expert attacked the general reliability of handwriting analysis.

The jury convicted Rutland and Grams. The district court sentenced Rutland to 51 months imprisonment and ordered him to make restitution of $553,867. This timely appeal followed.

## II. Discussion

The issue before this court is narrow – whether expert opinion testimony should reach the ultimate issue when the expert has exceptionally impressive credentials. Rutland argues that in light of the expert's credentials and experience in high-profile cases, "the probative value of his opinion on authorship was substantially outweighed by the danger that the jury would accept his opinion based on his extraordinary experience rather than on his underlying analysis...." Rutland contends that when the district court permitted the expert to opine that the contested signatures were not signed by Constans, the probative value of the testimony was substantially outweighed by prejudice to the defendant.

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction of this timely appeal pursuant to 28 U.S.C. § 1291. Our applicable standard of review for evidentiary rulings is abuse of discretion.

3

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999); *United States v. Velasquez*, 64 F.3d 844, 847-48 (3d Cir. 1995).

A witness may testify as an expert if (1) the proffered witness is actually an expert; (2) the expert testifies to scientific, technical, or specialized knowledge; and (3) the expert's testimony assists the trier of fact. Fed. R. Evid. 702; *Velasquez*, 64 F.3d at 849. Additionally, testimony "in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). In *Velasquez*, we determined that handwriting analysis qualifies as scientific, technical, or specialized knowledge. *Velasquez*, 64 F.3d at 850-51. A handwriting expert may testify to the ultimate issue in a case. Fed. R. Evid. 704(a).

*Daubert* states that many factors must be considered when admitting expert testimony:

> [A] judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules. ... Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury... ."... "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because

> of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."

*Daubert*, 509 U.S. at 595 (citations omitted).

The probative value of expert testimony substantially outweighing the danger of unfair prejudice, confusion of issues, or misleading the jury has been discussed in the context of the substance of testimony. *See generally*, *In re Paoli R.R. Yard PCB Litigation*, 113 F.3d 444 (3d Cir. 1997); *Soldo v. Sandoz Pharmaceuticals Corp.*, 244 F. Supp. 2d 434 (W.D. Pa. 2003); *United States v. Nguyen*, 793 F. Supp. 497 (D.N.J. 1992). The probative value of expert testimony substantially outweighing the danger of unfair prejudice has not been addressed in the context of the qualifications and credentials of the expert, and Rule 403 has not been applied to limit an expert's testimony based solely upon the expert's highly impressive credentials.

Rutland suggests that juries accept expert opinions based upon the strength of the experts' experience rather than on the quality of analysis. He contends that the probative value of the exceptionally well-qualified expert's testimony is outweighed by unfair prejudice caused solely by his stellar qualifications. We reject Rutland's novel argument.

The term unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not

4

necessarily, an emotional one." *United States v. Cross*, 308 F.3d 308, 324 n.23 (3d Cir. 2002), *quoting* Advisory Committee Note to Rule 403. An expert's experience and credentials are properly taken into account by jurors when determining how much weight to give the expert's testimony. *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996). The past experience of expert witnesses properly influences the weight the testimony should receive. *Velasquez*, 64 F.3d at 848.

Rutland's suggestion of limiting an expert from testifying to the ultimate issue if the expert has stellar qualifications leads to an absurd result. Parties would be forced to determine if their proposed experts were overly qualified, and find less qualified experts. Expert opinions, valuable to the trier of fact because they are the opinions of highly skilled and qualified experts, would be provided by less qualified experts.

This Court will not limit an expert's testimony based merely upon the expert's qualifications.

### III. Conclusion

Unfair prejudice suggests a decision on an improper basis. It is not improper for jurors to consider an expert's experience and credentials when determining the weight of the expert's testimony.

Accordingly, the judgment of the district court will be AFFIRMED.

5

| University of Pennsylvania Health System POLICY MANUAL | Number: 2-02-10 |
|---|---|
| | Page. 1 of 3 |
| SUBJECT:   **SICK LEAVE POLICY** | Effective: 7-01-2014 |

**POLICY**

The University of Pennsylvania Health System (UPHS) makes available paid sick time for eligible employees to provide continuity of income to the employee in the event of health related issues that prevents the employee from working his/her regularly scheduled hours.

**PURPOSE**

The purpose of this policy is to define how eligible employees will be compensated for time lost from work due to illness.

For information about sick leave as it relates to extended absences due to medical reasons, please see Leave of Absence policies.

**SCOPE**

This policy applies to all eligible employees of the Hospital of the University of Pennsylvania (HUP), those parts of the Clinical Practices of the University of Pennsylvania (CPUP) which practice at or in conjunction with HUP operating under its license, and UPHS Corporate departments. This policy also applies to those practices and sites that are off campus facilities or departments of HUP and operating under its license, including e.g. HUP's inpatient rehabilitation facility. For purposes of this policy, the above facilities, practices and sites are collectively referred to as "entity."

**IMPLEMENTATION**

Implementation of and compliance with this policy are the responsibility of Human Resources, Entity Senior Leadership, Department Directors/Business Administrators, and Supervisors.

**PROCEDURE**

Sick time accrual will be proportionate to the number of regular paid hours each pay period. Sick time is accrued at 3.7 hours per 80-hour pay period accruable up to a maximum of 960 hours. Regular part-time employees accrue sick time on a prorated basis determined by the number of hours worked each pay period, excluding overtime, as compared to full-time status.

All regular employees will accrue sick time on a pay period basis from their first day of hire for every hour of paid working time, excluding overtime. Non-paid time accrues no sick time entitlement. Sick time is not accrued during unpaid leaves of absence.

Temporary employees do not accrue sick time. If they transfer to regular status, they receive no retroactive benefit for the period of temporary status.

Non-exempt employees who are in their introductory period, accrue, but may not use, paid sick time during the first 90 days of employment. At the end of this period, the employee is eligible for the accrued paid sick time. Exempt employees may use sick time as it is accrued.

PENN MED 000518

| **University of Pennsylvania Health System** POLICY MANUAL | Number: 2-02-10 |
|---|---|
| | Page: 2 of 3 |
| SUBJECT:  **SICK LEAVE POLICY** | Effective: 7-01-2014 |

Employees who are scheduled to work on shift differential shifts will receive their regular rates of pay, inclusive of differential, for absences resulting from illnesses, injury, or disease.

Employees must report absences to their supervisors or department manager on a daily basis before their regular starting time as specified by department guidelines.  In the absence of such specific guidelines, employees must notify their supervisor or department manager at least one hour prior to their regular starting time.   Only in cases of hospitalization or extended illness, beyond three days, may the daily notification requirement be waived by supervisors.

Employees who are absent three or more days due to serious illness must complete the required documentation for Family Medical Leave including the Provider of Care Certificate documenting the nature of the illness/injury and their ability to return to work.  Managers may require employees to provide a physician's certificate in instances of absence for injury/illness up to three days if the manager deems it appropriate. Unscheduled absences are considered incidents of absence per Performance Improvement and Progressive Steps policy.

UPHS reserves the right to have an employee examined by a physician(s) of its choice for an Independent Medical Examination to investigate chronic absenteeism, patterns of abuse, use of sick time to extend vacation, etc., and to take corrective action when it deems necessary.
If there is a pattern of absence (i.e., Friday or Monday absences), the supervisor may request a physician statement even if the length of the illness is less than three days.  If a physician note is not received, the employee will not be paid sick leave for that absence.

When an employee reports to work complaining of illness or becomes ill during regular working hours, such illness is to be reported to the supervisor. The decision to retain the employee at work or send the employee home will be made by the supervisor. When an employee leaves work due to illness, the time spent away from the job is chargeable to sick time, if available, and will be counted as an occurrence of an absence as defined in the Performance Improvement and Progressive Steps Policy:

> "An absence...will be deemed to be an attendance violation if it is not scheduled and approved by the employee's manager in advance of the occurrence.  An occurrence of an absence is defined as time off from work separated by time worked."

When an employee has a routine scheduled medical appointment (for example, physician, dental, eye) this time is chargeable to personal time. The employee should give proper notification to the supervisor as to the time of the appointment and the approximate time that will be spent away from the job.

Sick time may be used for Pre-Admission Testing.

For absences covered by Workers' Compensation, see policy on Workers' Compensation.

All sick time must be recorded on time records by the supervisor, either as paid or unpaid sick time, in accordance with this policy. Sick time should be recorded in hours and quarter hours for non-exempt employees.

| University of Pennsylvania Health System<br>POLICY MANUAL | Number: 2-02-10 |
|---|---|
| | Page: 3 of 3 |
| SUBJECT: **SICK LEAVE POLICY** | Effective: 7-01-2014 |

Vacation or personal time may not be used when an employee is absent due to illness, injury or disease and has sick time available. Vacation or personal time may be used to provide continued income for an employee when sick time is exhausted. This option is voluntary and not mandatory.

Employees who are ill while on scheduled vacation, personal holiday, bereavement leave, military or reserve training time are not eligible for sick time pay during that period.

Employees who give notice of resignation or who are notified by their manager of their position being terminated cannot use their sick time for any absences after notification is made. They can be compensated for absences by using personal holiday time or vacation time.

Legal Holidays which occur or are scheduled during the period when an employee is on paid sick time are charged to holiday time and not sick time.

Employees transferring to another entity within UPHS may transfer their accrued regular sick time up to 960 hours, if they meet UPHS's sick time eligibility requirements.

Employees who terminate are not entitled to compensation for their accrued sick time. If rehired within six months after termination, the previous accrued and unused sick time will be credited to their accounts after the successful completion of the Introductory Period.

Employees who are retiring from active employment directly to pension status after ten or more years of service and who have the maximum amount of 960 hours will receive a retirement payment at the time of retirement, as follows:

| LENGTH OF SERVICE | AMOUNT OF TIME TO BE PAID |
|---|---|
| 10 years | 240 hours |
| 12 years | 320 hours |
| 14 years | 400 hours |
| 16 years | 480 hours |
| 18 years | 560 hours |
| 20 years | 720 hours |
| 25 years | 960 hours |

| SUPERSEDES:<br>01/01/1988, 01/01/2001 | ISSUED BY: |
|---|---|
| | *Patricia J. Wren*<br>Patricia J. Wren, Vice President<br>Human Resources |
| | *Garry Scheib*<br>Garry Scheib, Executive Director<br>Hospital of the University of Pennsylvania |

PENN MED 000520

JA204

**Douglas, Sophie**

| | |
|---|---|
| From: | Douglas, Sophie |
| Sent: | Tuesday, February 10, 2015 5:40 PM |
| To: | Ford, Brenda |
| Cc: | Zylstra, Amy; Douglas, Sophie |
| Subject: | Counseling |

Good Afternoon Brenda,

Unfortunately, you will be receiving a counseling for not following the proper call out protocol.. On 2/1/15, you text texted Tenia who was not the Lead of your call out.

If you have any questions or concerns, please feel free to notify me.

Thank you,

Sophie

*Sophia Douglas, BA*
*Corporate Operator Services Manager*
*University of Pennsylvania Health System*
*Philadelpha, PA 19104*
*Ph 215-615-2312*
*(If you want to see a change in the world, then be the change)*

1

PENN MED 000392

**Douglas, Sophie**

| | |
|---|---|
| From: | Douglas, Sophie |
| Sent: | Friday, March 06, 2015 4:43 PM |
| To: | Crowley, Joann |
| Cc: | Douglas, Sophie |
| Subject: | RE: Brenda Kelly Counseling |

Hello Joann,

On March 3,Carliece received a counseling which we discussed. On 3/4/15,  Brenda who sits with the Presby group came over to the HUP group and stated the following.  " I hate the HUP operators and that is what she(implying Carliece ) get for messing with my girlfriend(Adriane).". The counseling that Carliece received pertained to Carliece uttering an abrupt statement to Adriane(Lead). So, apparently Brenda is defending Adriane by making this statement.

Brenda, has been counseled for making unprofessional statements in the past which is not acceptable.  Ebony an Acting Lead heard the statement. I asked Brenda yesterday if she made such a statement and she replied that she did not make such a comment. When Brenda made this statement, another operator replied "not all operators.   I would like to counsel Brenda because it appears that she is trying to taunt Carliece who was sitting in another aisle. Ebony was also sitting in another aisle and heard this statement.

This type of behavior is not what our leadership represents and she does not exhibit professional conduct while in her leadership role(pattern). I just don't understand why individuals can't come to the workplace and handle themselves in a professional manner.

Brenda currently is at a Final WW.

Regards,

Sophie

From: Douglas, Sophie
Sent: Wednesday, February 11, 2015 1:38 PM
To: Crowley, Joann
Subject: RE: Brenda Kelly Counseling

Thanks Joann. She did it again on the 2/10/5. She called a regular operator(not a text) of a call out when a Lead was present.  To be honest, texting can cause a major issue for our department.  There are occasions where coverage will be needed and the person may miss the text for hours. We have not had a problem thus far. Brenda, just like doing what she wants to do.

Thanks a bunch.

1

PENN MED 000400

**Douglas, Sophie**

| | |
|---|---|
| **From:** | Douglas, Sophie |
| **Sent:** | Monday, March 16, 2015 1:02 PM |
| **To:** | Crowley, Joann |
| **Cc:** | Douglas, Sophie |
| **Subject:** | Brenda Kelly |

Hello Joann,

I hope you had a great weekend.  Below are more issues relating to Brenda.

Sophie

---

**From:** Stewart, Tammy
**Sent:** Monday, March 16, 2015 9:18 AM
**To:** Douglas, Sophie
**Cc:** Zylstra, Amy
**Subject:** Brenda

Morning,

1. On Saturday, 3/14/15, Brenda called in and spoke to Dawn, stating that she was calling out LOA. (She is still not following the protocol procedure when calling out, Lyn was the lead.)

I was then contacted at 5:43am. (I'm constantly being contacted for Brenda calling out, and then she comes in)

She then called back while Lyn was trying to find coverage, asking if they needed her.

Lyn still had not found coverage, so she told her if she wanted to come in, it was fine since they hadn't covered her shift yet.

My problem with this is, if you're calling out LOA, then you must be **ill** and unable to come to work. So she should not call back asking to come in.

2. Today she allowed Jeanmarie to combine her breaks at approximately 8:40am, when PMC was already short of staff. She asked Miles to come over and cover until Jeanmarie came back. Which

was not feasible since HUP is also working short. We have one person in for OT, but **need 2**.

Please assist,
Tammy

*Tammy Stewart*
*Corporate Services Information Coordinator*
*Office: 215-615-2313*
*Fax: 215-349-5555*
*Tammy.Stewart@uphs.upenn.edu*

1

PENN MED 000404



# Penn Medicine

## Personnel Action Form (PA52)          Rev. 2/5/13

Please complete all fields in the applicable section, obtain Authorized Signatures, and forward completed form to your Compensation Consultant.

For additional assistance, please use the **PA52 Key** located at http://uphsxnet.uphs.upenn.edu/hr/policies/pdf/PA-52-Key.pdf

| Employee Name: | Brenda Kelly | Employee #: | 500427 |
|---|---|---|---|

**Job, Department, & Rate Changes and Retro Corrections:**      ○ Primary Job      ○ Alternate Job

| Effective Date of Change(s): | 04/01/2015  3/29/15 | Reason Code: | JSDEMOTION - Demotion |
|---|---|---|---|

| Type of Change | Entity | *Department # | Job Code | Hourly Rate | Status Code | FTE | Daily Hours | Shift |
|---|---|---|---|---|---|---|---|---|
| Current | Corp | R1002 | M1444 | $22.20 | FA | 1.0 | | |
| New | Corp | R1002 | M1428 | $22.20 | FA | 1.0 | | |

* If salary expense is split, enter Accounting Units & % to be expensed in the Comments section.
* If applicable, enter the Activity # in the Comments Section.

| If changing Dept. or Job Code, please enter name of new E-Star manager: | Tammy Stewart |
|---|---|

Comments:

**Additional Pay (e.g., bonus, interim pay) for work performed during this time period:**

| Start Date | Stop Date | Amount | Bonus Code |
|---|---|---|---|
| | | | |

○ Charge to Home Accounting Unit      ○ Charge to Accounting Unit:

Comments:

**Authorized Signatures:** Please obtain appropriate signatures for this Employee Action:

| **Requestor Signature: | Print Name & Title:** Sophia Douglas, Manager, Corp. Operator Service | Date: Apr 1, 2015 | Phone: 215-615-2312 |
|---|---|---|---|
| **Other Required Signature:** | Print Name & Title: Amy Zylstra, Assc. Exec. Director, Call Center | Date: Apr 1, 2015 | Phone: 215.615.2308 |
| **Human Resources Signature:** | Print Name & Title: Lean Potorken | Date: 4/2/2015 | Phone: 614-1524 |
| **Compensation Signature: | Print Name & Title:** | Date: 4/2/15 | Phone: |

** Required Signatures

entered 4/2/15 MC

PENN MED 000173

Case 2:16-cv-00618-MAK   Document 20-5   Filed 06/24/16   Page 30 of 42



PENN MED 000457

JA209

179A

M1428 = Communications Specialist

M1444 = Lead Communications Specialist

| Level | Effective | Stop Date | Assignment Date | Position | Job Code | PL | Dept | Pay Rate | FTE |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 03/29/2015 | 06/19/2015 | | R10021428 | M1428 | CORP | R1002 | 22.2000 | 1.000000 |
| 1 | 06/22/2014 | 03/28/2015 | | R10021428 | M1428 | CORP | R1002 | 22.2000 | 1.000000 |
| 1 | 09/01/2013 | 06/21/2014 | | R14521444 | M1444 | CORP | R1452 | 21.5000 | 1.000000 |
| 1 | 06/24/2012 | 08/31/2013 | | R14521444 | M1444 | CORP | R1452 | 21.1300 | 1.000000 |
| 1 | 06/26/2011 | 06/23/2012 | | R14521444 | M1444 | CORP | R1452 | 20.7200 | 1.000000 |
| 1 | 06/27/2010 | 06/25/2011 | | R14521444 | M1444 | CORP | R1452 | 20.1700 | 1.000000 |
| 1 | 06/28/2009 | 06/26/2010 | | R14521444 | M1444 | CORP | R1452 | 19.5840 | 1.000000 |
| 1 | 06/29/2008 | 06/27/2009 | | R14521444 | M1444 | CORP | R1452 | 19.2000 | 1.000000 |
| 1 | 05/01/2008 | 06/28/2008 | | R14521444 | M1444 | CORP | R1452 | 18.6400 | 1.000000 |
| 1 | 07/01/2007 | 04/30/2008 | | R14521444 | M1444 | CORP | R1452 | 18.6400 | 1.000000 |
| 1 | 07/02/2006 | 06/30/2007 | | R14521444 | M1444 | CORP | R1452 | 18.1000 | 1.000000 |
| 1 | 02/26/2006 | 07/01/2006 | | R14521444 | M1444 | CORP | R1452 | 17.5700 | 1.000000 |
| 1 | 09/13/2005 | 02/25/2006 | | R14521428 | M1428 | CORP | R1452 | 16.0700 | 1.000000 |
| 1 | 07/03/2005 | 09/12/2005 | | R14521428 | M1428 | CORP | R1452 | 16.0700 | 1.000000 |
| 1 | 05/03/2005 | 07/02/2005 | | R14521428 | M1428 | CORP | R1452 | 15.6000 | 1.000000 |
| 1 | 07/04/2004 | 05/02/2005 | | | M1428 | CORP | R1452 | 15.6000 | 1.000000 |
| 1 | 07/01/2004 | 07/03/2004 | | | M1428 | CORP | R1452 | 15.1500 | 1.000000 |
| 1 | 09/01/2003 | 06/30/2004 | | | M1428 | CORP | R1452 | 15.1500 | 1.000000 |
| 1 | 07/06/2003 | 08/31/2003 | | | M1428 | CORP | R1452 | 15.1500 | 1.000000 |
| 1 | 08/18/2002 | 07/05/2003 | | | M1428 | CORP | R1452 | 14.7100 | 1.000000 |
| 1 | 06/23/2002 | 08/17/2002 | | | M1428 | CORP | R1452 | 14.2100 | 1.000000 |
| 1 | 06/25/2001 | 06/22/2002 | | | M1428 | CORP | 9888 | 14.2100 | 1.000000 |
| 1 | 02/04/2001 | 06/23/2001 | | | M1428 | CORP | 9888 | 13.8000 | 1.000000 |
| 1 | 07/21/2000 | 02/03/2001 | | | M1428 | CORP | 9888 | 13.5300 | 1.000000 |



# Penn Medicine

Contact Center

June 19, 2015

Ms. Brenda Kelly
2121 Alden Street
Philadelphia PA 19143

Dear Brenda:

This is to notify you that your employment with the University of Pennsylvania Health System is being terminated effective June 19, 2015, in accordance with UPHS Performance Improvement and Progressive Steps Policy. As we discussed, this action is being taken as a result of your failure to correctly perform a Presbyterian Rapid Response announcement on June 15, 2015.

The announcement was made at University of Pennsylvania Hospital instead of Presbyterian Hospital. Several callers from HUP alerted the Call Center of the error, in which I immediately approached your work station. You were engaged in a personal call. As you aware the operator person line must be cleared in order to perform an overhead from the operator console. Because you were on your personal line, you manually performed the overhead by entering a back- up code that is utilized to perform overheads when unable to perform overheads via console (used the incorrect code).

I tested the overhead function on the computer console, and the overhead opened up because the personal line was cleared. I also had the opportunity to listen the call that you were on while activating the Rapid Response to affirm that you were in fact on your workstation personal line. Brenda clinical emergencies are mission critical and the call center responsibility is to activate all clinical emergencies in a timely manner because lives are at stake.

Below, I dedicated the process that you utilized.

### Presby Procedure to Process an Overhead

1. Overhead via computer console- push CLRT F7- the overhead opens up on the personal line and the operator is able to announce the overhead to Presby.
2. Back up from phone (only utilized when console function is down) – For Presby, dial 107+2 on the physical phone and announce the overhead. (You utilized HUP backup method which is 137+2(incorrect)

3930 Chestnut Street, 6th Floor | Philadelphia, PA 19104-3111 | 215.615.2300 | Fax: 215.615.2325

PENN MED 000148

Also, below outline the previous counselings that were issued which progressed you to the termination level.

4/29/14 – 1st Written Warning for failure to submit in a timely manner a completed physician's certification to Disability Management to support your request for a Leave of Absence

12/8/14 – 2nd Written Warning for unprofessional behavior towards a coworker

2/20/15 - Final Written Warning for failure to follow the department's call-out procedure

Your final check for hours worked will be paid in accordance with the UPHS bi-weekly payroll schedule and process. Any unused accrued vacation and personal hours will be paid in the following pay period after your last day worked.

If applicable, your health benefits will remain active through the end of this month. Thereafter, you may elect continuation of your health benefits (COBRA) through the Health System's employee group health care plans by purchasing the benefits. You will receive information about COBRA and the cost to continue our benefits directly from ADP, our COBRA Administrator.

In the event that you have vested years of service in the UPHS defined benefit pension plan, you may contact the Retirement Department at 215-615-2675.

If you have any questions regarding this termination action, please contact Joann Crowley, Human Resources Manager within 5 days of receipt of this letter at 215-615-2662.

NOTE: Your employer name and address is: University of Pennsylvania Health System, Corporate Services, 3001 Market Street, Suite 320, Philadelphia PA 19104.

Sincerely,

Sophia Douglas
Manager, Contact Center
(215) 615-2312

Cc: HR Generalist (noted in letter)
     Employee Records Department

Encl: Managerial Decision Review Policy

PENN MED 000149

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| BRENDA KELLY | : | |
| 2121 Alden Street | : | |
| Philadelphia, PA 19143 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | CASE NO.: 16-0618 |
| : | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF PENNSYLVANIA | : | **JURY TRIAL DEMANDED** |
| HEALTH SYSTEM, d/b/a PENN | : | |
| MEDICINE | : | |
| 1500 Market Street, 8th Floor West Tower | : | |
| Philadelphia, PA 19102 | : | |
| | : | |
| Defendant. | : | |
| | : | |

## FIRST AMENDED CIVIL ACTION COMPLAINT

Plaintiff Brenda Kelly (hereinafter referred to as "Plaintiff" unless indicated otherwise) hereby complains as follows against Defendant and aver as follows:

### INTRODUCTION

1.    Plaintiff initiates the instant action to redress violations by Defendant of the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et. seq.*), the Americans with Disabilities Act ("ADA" - 42 USC §§ 12101 *et. seq.*) and the Pennsylvania Human Relations Act (PHRA). Plaintiff asserts herein that she was subjected to hostility, unlawful dissuasion, interference and retaliation in connection to her disability and need for reasonable accommodations and for attempting to and actually exercising her rights under the FMLA and that she suffered damages sought herein.

**JURISDICTION AND VENUE**

2.      This Court, in accordance with 28 U.S.C. 1331, has jurisdiction over Plaintiff's claims because this civil action arises under a law of the United States.

3.      This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.      Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing and dual-filing her Charge with the EEOC and PHRC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

5.      Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

**PARTIES**

5.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.      Plaintiff is an adult individual, with an address as set forth in the caption.

7.      Defendant University of Pennsylvania Health System (hereinafter "Defendant") is an entity overseeing and operating multiple hospitals/medical facilities in the greater

2

Philadelphia area, including but not limited to Penn Medicine.  Defendant was at all times Plaintiff's employer.

8.     At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

9.     Defendant is an "employer" within the meaning of the Family and Medical Leave Act because Defendant employed at least fifty (50) or more full-time employees within the present or preceding calendar year for at least twenty (20) calendar weeks and engages in a business that affects interstate commerce.

## FACTUAL BACKGROUND

10.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.     Plaintiff is a 50-year-old female.

12.     Plaintiff was employed with Defendant from on or about February 4, 1991 through on or about June 19, 2015, a period of approximately 24.5 years.

13.     Plaintiff worked in multiple capacities for Defendant, including as a Communication Specialist a/k/a operator or call center representative, as a Lead, and as a Supervisor of Communication Specialists.

14.     Plaintiff worked within Defendant's call center, which takes, accepts, directs, transfers, and re-routes incoming calls for many of Defendant's health facilities throughout Philadelphia and Eastern Pennsylvania.  The call center also serves at times to notify various medical personnel to appear at particular medical facilities of Defendant in emergency or code circumstances.

3

JA215

15. Sophie Douglas, a Corporate Operator Service Manager, oversaw Plaintiff, leads and Communication Specialists.

16. Toward the end of Plaintiff's employment with Defendant, she suffered from numerous health problems, including but not limited to Osteoarthritis. This has and continues to cause Plaintiff pain, stiffness, and swelling at times limiting her ability to work, walk or perform other manual tasks.

17. In spite of Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendant; however, at times, she would need reasonable accommodations, including but not limited to time off from work to care for and treat for her health conditions, reasonable breaks at times to walk and stretch, and certain reasonable and minor modifications in her work equipment.

18. For years leading up to Plaintiff's termination from employment, she had sought and been approved for FMLA leave on an intermittent basis. However, managers of Defendant became very frustrated with employees taking or seeking FMLA, and supervisory employees including but not limited to Douglas and Tammy Stewart (supervisory coordinator) were making very derogatory comments about people abusing FMLA, using too much FMLA, and implying that Plaintiff was taking FMLA unnecessarily.

19. In addition to making discriminatory statements about employees using FMLA, management of Defendant also engaged in a pattern of making FMLA usage more difficult for employees such as Plaintiff by: (a) requesting additional documentation of people on FMLA; (b) at times denying attempts to use FMLA; (c) attributing usage of full days of FMLA use to expedite exhaustion of FMLA time despite that employees were only using partial days of

4

FMLA; (d) by questioning employee need for FMLA days, including of Plaintiff; and (e) admonishing employees for using FMLA in general at times.

20.     Because Plaintiff's medical conditions were significantly exacerbated in late 2014, and through early 2015, Plaintiff used extensive FMLA coverage through late 2014 and again in the Spring of 2015.

21.     Plaintiff also required reasonable accommodations during that same timeframe in the form of time off from work, breaks to stretch as needed and certain minor modifications in her work equipment.

22.     Plaintiff was given a barrage of discipline, including on one occasion being written up for her request for time off, and was demoted during her last approximate 6 months of employment with Defendant, despite having a stellar work record and having been promoted on multiple occasions, having been a model employee, despite receiving prior good evaluations, and contrary to her prior 24 years of work history with Defendant.

23.     Plaintiff was then pretextually terminated in or about June of 2015 for an alleged accumulation of progressive discipline despite that she disputed that incidents resulting in her termination were valid, occurred or that they warranted termination as others were not disciplined or terminated for the same or similar alleged offenses (and such discipline was retaliatory and pretextual).

24.     During her approximate twenty four and a half (24.5) years of employment with Defendant Entity, and she was terminated by Defendant: (a) while being given pretexual discipline; (b) shortly after using FMLA leave; (c) at a time when she was confiding in her management about her serious health problems; (d) while requesting accommodations from her management; and (e) for reasons selectively enforced against her.

**Count I**
**Violation of the Family and Medical Leave Act ("FMLA")**
**(Interference & Retaliation)**

25.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

26.     Plaintiff was an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. § 2611(2)(a)(i)(ii).

27.     Plaintiff requested leave from Defendant, her employer, with whom she had been employed for at least twelve (12) months pursuant to the requirements of 29 U.S.C.A. § 2611(2)(i).

28.     Plaintiff had at least 1,250 hours of service with Defendant during the prior twelve (12) months.

29.     Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A. § 2611(4)(A)(i).

30.     Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A. § 2612 (a)(1) for a total of twelve (12) work weeks of leave because she suffered from qualifying physical health problems.

31.     Defendants unlawfully interfered with Plaintiff's rights and retaliated against her by: (1) engaging in numerous acts motivated by animosity towards Plaintiff's FMLA requests or needs to dissuade Plaintiff from further using FMLA (explained *supra*); (2) demoting her instead of reinstating her the same or similar position she held pre-medical leave(s) and pre-use of FMLA; (3) disciplining her for FMLA-qualifying absenteeism and/or for using such leave; (4) preventing Plaintiff from using FMLA leave at times; (5) and engaging in adverse actions

6

JA218

towards Plaintiff for exercising her FMLA rights such as creating a hostile work environment, demoting her, and terminating her.

32. These actions as aforesaid constitute both interference and retaliation violations of the FMLA.

### Count II
### Violations of the Americans with Disabilities Act, as Amended ("ADAAA")
([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3]
Failure to Accommodate; [4] Hostile Work Environment)

33. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

34. Plaintiff suffered from qualifying health conditions under the ADA (as amended) which affected her ability (at times) to perform some daily life activities, as described *supra*.

35. Plaintiff requested reasonable accommodations from Defendant, as described *surpa*.

36. Defendant refused to accommodate Plaintiff and expressed significant hostility towards Plaintiff's health conditions and need for reasonable accommodations.

37. Plaintiff believes and therefore avers that Defendant discriminated against Plaintiff by subjecting her to a hostile work environment, issuing her pretextual discipline and ultimately terminating her employment because: (1) of her known and/or perceived health problems; (2) her record of impairment; (3) her requested accommodations; (4) Defendant failed to accommodate her disabilities; and (5) creating a hostile work environment by engaging in adverse actions and hostility towards Plaintiff for her medical conditions and need for reasonable accommodations, including but not limited to expressing extreme hostility towards Plaintiff's health conditions and needs for reasonable accommodations, issuing Plaintiff pretextual discipline, demoting Plaintiff and terminating Plaintiff.

JA219

**COUNT III**
**Violations of the Pennsylvania Human Relations Act ("PHRA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3]**
**Failure to Accommodate; [4] Hostile Work Environment)**

38. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

38. Plaintiff re-asserts and re-alleges every allegation of Count II as they also constitute identical violations of the PHRA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

i.    Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld (if determined that there are such benefits) from the date she first suffered discrimination, interference or retaliation at the hands of Defendant until the date of verdict;

ii.   Plaintiff is to be awarded liquidated damages (in accordance with the Statutes she is suing under), as permitted by applicable law, to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

iii.  Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

JA220

iv.     Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law;

v.     Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law. Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF &CERUTTI, P.C.**

By:     *Julia W. Clark*_____
Julia W. Clark, Esq.
Attorney for Plaintiff
3331 Street Road
Two Greenwood Square
Suite 128
Bensalem, PA 19020

Dated: June 6, 2016

9

JA221